## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |  |
|---|---|---|
| | § | |
| STRIKE 3 HOLDINGS, LLC, | § | Civil Action |
| | § | No. <u>8:20-cv-00676-MSS-CPT</u> |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| JOHN DOE infringer identified as | § | |
| using IP address 47.197.99.186, | § | |
| Defendant. | § | |
| | § | |

## <u>DECLARATION OF EXPERT DR ERIC FRUITS IN SUPPORT OF JOHN DOE'S OPPOSITION TO STRIKE 3's MOTION FOR SUMMARY JUDGMENT</u>

I, Dr. Eric Fruits, declare as follows:

1.      I have read Strike 3's motion for summary judgment, I have been designated as an expert witness in this case. My expertise is that I am an economist. I have testified in numerous Federal and State Court proceedings as well as an international criminal tribunal on matters involving statistical analysis. My training involved significant doctoral-level training in statistics and statistical analysis. I use and rely on my knowledge of statistics regularly as part of my analysis of a wide range of problems and issues. My understand is that John Doe's counsel has timely served my expert report. I am unaware of Strike 3 filing a rebuttal report on my expert report. A redacted version of my expert report is attached as Exhibit A.

2.      Strike 3 appears to argue on page 16 of their brief (ECF 114, page 24 of 43) that a program used for child pornography criminal investigations "Child Protection System" or "CPS" is operationally similar to "VXN" which is used for civil pornography investigations. Strike 3 references the case of *United States v. Cullen,* 796 F.App'x 976,981 (11th Cir 2019). I understand Strike 3 has not provided any evidence to evaluate the extent to which CPS and VXN software and the use of the software are similar. Thus, Strike 3's argument is lacking in evidentiary support and is likely irrelevant.

3.      I have reviewed a letter dated February 1, 2019, from Human Rights Watch ("HRW") to the U.S. Department of Justice regarding CPS software. https://www.hrw.org/sites/default/files/supporting_resources/hrw_ltr_to_doj.pdf. The letter is attached as Exhibit B. Several of the issues raised by HRW regarding CPS and its use mirrors issues regarding VXN and its use including (a) it is unclear what information is available regarding the system's potential for error, and (b) the likelihood and extent of potential human error in identifying files as illicit or copyrighted.

4.      I have reviewed the article published by ProPublica regarding the Human Rights Watch investigation of the CPS software. See also Jack Gillum, *Prosecutors Dropping Child Porn Charges After Software Tools Are Questioned*, PROPUBLICA (Apr. 3, 2019), https://www.propublica.org/article/prosecutors-

dropping-child-porn-charges-after-software-tools-are-questioned. Attached is the article as Exhibit C.

5. The U.S. Bureau of Justice Statistics published research by the Urban Institute on the federal prosecution of alleged child sexual exploitation. William Adams & Abigail Flynn, *Federal Prosecution of Commercial Sexual Exploitation of Children Cases, 2004-2013*, SPEC. REP. NCJ 250746 (Oct. 2017, Rev. Nov. 21, 2017), https://bjs.ojp.gov/content/pub/pdf/fpcsecc0413.pdf. Over the years 2004 through 2013, for the alleged possession, receipt, or distribution of child pornography, the publication reports 26,568 suspects, of which 9,875 were declined for prosecution (37%); of these, prosecution was declined for "weak or inadmissible evidence" for approximately 2,490 suspects. To summarize, according to this information, approximately 9.3% of total suspects were not prosecuted because of weak or inadmissible evidence. See Exhibit D.

6. As noted in my expert report submitted in this matter, Strike 3 has informed a court that approximately one-third of the cases it resolved were dismissed for insufficient evidence. My report also notes that it is not known from the information provided by Strike 3 is how many cases it settled despite there being insufficient evidence and that there may be a non-trivial number of cases that are settled, despite insufficient evidence of infringement (e.g., because the defendant's cost of litigation is greater than the cost of settlement).

7.     My understanding is that Dr. Kal Toth is addressing the software aspect of software reliability. My understanding is that Dr. Kal Toth is addressing the issue of whether the machine or the computer system is inherently or measurably reliable. Much like one measures the reliability of a gas chromatograph or a radar gun.

8.     But even if, hypothetically, the VXN software is reliable, there are numerous other opportunities for error to be introduced. For example, Susan B. Stalzer indicates in her deposition that she makes a subjective determination whether the work in question is a work for which Strike 3 is alleging copyright infringement. Stalzer deposition at 14:6-28:8 (Exhibit D).

9.     This is a common issue in statistical analysis. Even if the software is reliable (e.g., it accurately calculates statistics from the underlying data and the calculations can be verified by performing the same calculations using different software), the underlying data may be unreliable and/or the analyst's interpretations of the statistical results may be unreliable. But unlike statistical software in which numerous software packages can be used to evaluate the reliability the results (e.g., Stata, SAS, R, EViews, SPSS), I am not aware of any third-party independent testing of the VXN software.

10.    From an economics standpoint, a federal or state prosecutor has no direct incentive to pursue a child pornography conviction based on a "false positive" (i.e., pursuing a conviction against a person who is likely innocent). The cost of

investigating a case, working it up, and carrying it through trial can be substantial. My understanding is that prosecutors are not given a "bonus" or other remuneration for the number of convictions they obtain. They may get promoted or achieve elected office, but by and large there are no direct monetary benefits to the state to act on a false positive. Moreover, by pursuing a false positive, the prosecutor faces a higher likelihood of losing at trial, thereby diminishing his or her opportunities for advancement. For a defendant facing a charge of possession of child pornography, the median prison sentence is 60 months, if convicted, according to the Urban League report. Thus, economically speaking, a truly innocent defendant would be more likely to continue defending the allegations rather than settling.

11.     This is in sharp contrast to Strike 3 pursuit of civil damages. Since the model for Strike 3 is a cost of defense settlement (my report indicates $14,600 to $19,500 per case settled, according to information provided by Jessica Fernandez), it is more likely that an individual will agree to a settlement whether or not they infringed. Therefore, there is little economic incentive for Strike 3 to build reliable software. For Strike 3, the revenues from settling a false positive are the same as settling against an actual infringer. For an alleged infringer, the costs of settling are roughly the same or less than the costs of defending the allegations in court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 25, 2022, in Portland, Oregon

Eric Fruits, Ph.D.

Exhibit A – Expert Report

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |  |
|---|---|---|
|  | § |  |
| STRIKE 3 HOLDINGS, LLC, | § | Civil Action |
|  | § | No. 8:20-cv-00676-MSS-CPT |
| Plaintiff, | § |  |
| v. | § |  |
|  | § |  |
| JOHN DOE infringer identified as using IP | § |  |
| address 47.197.99.186, | § |  |
| Defendant. | § |  |
|  | § |  |

## JOHN DOE'S EXPERT REPORT BY ERIC FRUITS, PhD

EXPERT REPORT OF ERIC FRUITS, PH.D.
IN THE MATTER OF

# STRIKE 3 HOLDINGS, LLC

### v.

# JOHN DOE INFRINGER
# IDENTIFIED AS USING IP ADDRESS 47.197.99.186

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
CIVIL ACTION NO. 8:20-CV-00676-MSS-CPT

**Economics International Corp.**

503-928-6635

www.econinternational.com

info@econinternational.com

April 1, 2022

# Contents

Summary of conclusions ........................................................................... 2

1  Qualifications ......................................................................................... 5

2  Assignment ............................................................................................ 6

3  The Strike 3-Malibu nexus ................................................................... 7

4  Litigation is not the only effective way to reduce infringement ... 10

5  DMCA's public policy purpose to reduce copyright litigation ..... 13

6  Actual and statutory damages ........................................................... 17

7  Nuisance lawsuits and sue-then-settle strategies ........................... 19

8  Quantifying Strike 3's sue-then-settle strategy ............................... 26

9  One-third of Strike 3 matters are dismissed for insufficient evidence ................................................................................................. 31

10 Strike 3's revenues from settling litigation or threatened litigation ............................................................................................... 32

**Exhibits**

1    Curriculum vitae

2    Materials and other information relied upon

## Summary of conclusions

1.      Plaintiff's amended complaint alleges that, using BitTorrent, in the second half of 2019, Defendant copied and distributed 36 works in which Strike 3 Holdings, LLC ("Strike 3") is the owner of the copyrights-in-suit and thereby willfully infringed on Plaintiff's copyrights.[1] Plaintiff is seeking, inter alia, statutory damages.

2.      I have been retained by counsel for Defendant in this matter to provide an economic opinion regarding damages in this matter and the economics of copyright enforcement. The following are my conclusions. The remainder of the report provides the bases for my conclusions.

3.      Strike 3's business model, operations, and litigation/settlement activities are similar to those of Malibu Media, LLC ("Malibu Media"). Information provided in Malibu Media matters can reliably inform analysis of Strike 3's business model, operations, and litigation/settlement activities.

4.      Litigation is not the only way for Plaintiff to stop infringement. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it seems obvious that the filing of lawsuits is not "effective" in deterring infringement.

5.      The DMCA's public policy purposes are to reduce copyright litigation and to discourage infringement. At the time of the downloading activity alleged by Strike 3, Defendant's Internet service

---

[1] Throughout my report, "Strike 3" refers to Plaintiff and/or Plaintiff's parent company, General Media Systems, LLC.

provider indicates it had policies to comply with the DMCA, including, "[r]epeated copyright infringements are grounds for termination of service." Strike 3's failure to provide DMCA information to Defendant's Internet service provider prior to litigation should be weighed in evaluating whether Plaintiff is engaging in copyright misuse to profit from its litigation/settlement practices.

6.     Plaintiff's actions in this suit, and others, are consistent with a theory that plaintiff is pursuing nuisance value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-of-prevailing claims. Strike 3's strategy in BitTorrent litigation appears to satisfy a three-part test for nuisance value litigation. These actions should be weighed in evaluating whether Plaintiff's strategies and actions are consistent with the public policy purposes of copyright protection or constitute copyright misuse.

7.     Plaintiff's revenues from settling copyright litigation claims are ███ million to ███ million a year.

8.     Plaintiff's revenues from paid subscriptions likely are insufficient to cover the costs of producing its works. Consequently, it is more likely than not that Plaintiff's business would fail without the substantial revenues it generates from settling copyright infringement claims.

9.     Strike 3 has not provided any verifiable financial information in this matter regarding its operations. Strike 3 has not provided any information—such as financial statements or tax returns—supporting its claims regarding revenues, costs, and subscriber numbers. A finder of fact should question the reliability of Strike 3's claims regarding its business and financial claims.

PORTIONS CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
EXPERT REPORT OF ERIC FRUITS, PH.D.                                         **4**

10.    If I obtain new or additional information from Plaintiff, its experts, or other sources, I reserve the right to revise my analysis and conclusions. ∎

## STRIKE 3 HOLDINGS v. JOHN DOE

ERIC FRUITS, PH.D.

# 1   Qualifications

11.     I am president and chief economist at Economics International Corp., a consulting firm that specializes in providing economics services to private and public sector clients. I am senior competition scholar at the International Center for Law & Economics, a nonpartisan nonprofit focusing on antitrust and competition policy. I am also an adjunct professor at Portland State University, where I teach courses in industrial organization and the economics of regulation and antitrust. I have a masters' and a doctorate degree in economics and a bachelors' degree in business economics and public policy. Exhibit 1 is a current curriculum vitae including testimony and publications.

12.     My graduate-level training included the study of statistics and econometrics (the application of statistical methods to economics issues). I have taught graduate-level courses in economics, econometrics, finance, and the economics of regulation and antitrust. I have published several peer-reviewed papers, each of which have included statistical and econometric analysis.

13.     I have been engaged in many projects involving financial analysis and business valuation. I have testified in federal and state courts on business and technology valuation and financial markets. As an economic damages expert for both plaintiffs and defendants in different matters, I have provided expert testimony regarding business valuation, lost profits, and foregone income. I have provided expert opinions involving statistics, economics, and finance to United States of America federal and state courts and to an international criminal tribunal.

14.     I am familiar with BitTorrent litigation. I served as an economics expert in the case of *Malibu Media, LLC v. Doe subscriber assigned IP address 76.126.99.126* in the Northern District of California. I served as an economics expert in the case of *Clear Skies v. Hancock* in the Northern District of Illinois. I served as an economics expert in the case of *Strike 3 Holdings, LLC, v. John Doe, Subscriber Assigned IP Address 73.225.38.130* and *QOTD v. Wilson* in the Western District of Washington.

15.     Economics International Corp. is compensated at a flat rate of $4,000 to produce this report. The firm is compensated at an hourly rate of $325 an hour for any additional work, including testimony. No part of the compensation is dependent on the outcome of the matter.

## 2   Assignment

16.     I have been retained by counsel for Defendant in this matter to provide an economic opinion regarding damages in this matter and the economics of copyright enforcement.

17.     Plaintiff's amended complaint alleges that, using BitTorrent, in the second half of 2019, Defendant copied and distributed 36 works

in which Plaintiff is the owner of the copyrights-in-suit and thereby willfully infringed on Plaintiff's copyrights. Plaintiff is seeking, inter alia, statutory damages.

18.    In preparing this report, I have relied on my general expertise and knowledge regarding economics, finance, and statistics as well as publicly available information and information provided by counsel for Defendant.

19.    I have no opinions regarding liability in this matter.

20.    I am not offering any analysis, conclusions, or expert opinions regarding the law or accounting. Any citations in this report to legal codes, court rulings, or accounting concepts reflect my understanding as an economist.

21.    The information that I relied upon in forming my conclusions in this report is cited throughout this report and provided in Exhibit 2. Any of the information referred to in this report and its exhibits, as well as summaries or exhibits based on this information, may be used at trial.

22.    I reserve the right to supplement or modify my report and opinions as new or additional information is presented or obtained or analyses are completed, including analyses provided by Plaintiff or its experts.

## 3    The Strike 3-Malibu nexus

23.    David Williamson, who serves as Chief Technology Officer for Strike 3, made a declaration under a penalty of perjury at Docket 11-1, where he claims "full knowledge of its Information Technology Systems." (¶ 12) Williamson also serves as Vice President of

Technology for General Media Systems, LLC, Strike 3's parent company (¶ 13) and makes several claims regarding Strike 3's business and its response to alleged copyright infringement. I understand that none of these claims have been supported by verifiable information provided by Strike 3, including:

    a.  Strike 3 receives "nearly all" of its revenue from subscriptions, DVD sales, and licensing. (Williamson, ¶ 37)

    b.  Strike 3 has 15 million visitors to each websites each month. (Williamson, ¶ 14)

    c.  Strike 3 provides jobs for nearly 100 people worldwide. (Williamson, ¶ 18)

    d.  Strike 3 has a subscriber base that is "one of the largest of any adult site in the world." (Williamson, ¶ 20)

    e.  Strike 3 is "the number one seller of adult DVDs in the United States." (Williamson, ¶ 21)

    f.  Strike 3 works "are typically among the most pirated television shows and movies on major torrent websites." (¶ 30)

    g.  Strike 3 sends an average of 50,000 Digital Millennium Copyright Act ("DMCA") notices a month. (Williamson, ¶ 31)

24.    Several of Williamson's claims echo claims made by Collette Field in *Malibu Media, LLC v. Doe subscriber assigned IP address 98.116.160.61* (EDNY, Case No. 2:15-cv-03504-JFB-SIL, Doc. 6, Jul. 13, 2015). At the time, Field was co-owner of Malibu Media, LLC d/b/a X-Art.com.

25.     Both Strike 3 and Malibu Media claim most of their revenue derives from sources other than settlements in litigation.

    a. **Strike 3**: "We are a respected entertainment company that makes nearly all of its revenue from sales of subscriptions, DVDs, and licenses." (Williamson, ¶ 37)

    b. **Malibu**: "[R]evenues from subscriptions to X-Art.com are by far and away the dominant driver of Malibu Media's business." (Field, ¶ 13)

26.     Both Strike 3 and Malibu Media claim large numbers of "subscribers."

    a. **Strike 3**: "[W]e have a subscriber base that is one of the largest of any adult site in the world." (Williamson, ¶ 20)

    b. **Malibu**: "Currently we have tens of thousands of members …" (Field, ¶ 15)

27.     Both Strike 3 and Malibu Media claim large-scale copyright infringement of their works.

    a. **Strike 3**: "Our movies are typically among the most pirated television shows and movies on major torrent websites." (Williamson, ¶ 30)

    b. **Malibu**: "Each month, approximately 80,000 U.S. residents use BitTorrent to steal our movies." (Field, ¶ 16)

28.     Both Strike 3 and Malibu Media claim alleged copyright infringement is harming their businesses.

    a. **Strike 3**: "Unfortunately, piracy is a major threat to our company. We can compete in the industry, but we cannot compete when our content is stolen." (Williamson, ¶ 26)

    b. **Malibu**: "[W]e are finding it hard to grow and maintain the memberships as so many people are finding our films for free." (Field, ¶ 15) "Now, that our videos are so highly desirable, more people steal our videos than pay for a subscription." (Field, ¶ 18) "We are even getting many complaints from our members (asking why they should pay when they are available for free on the torrents)." (Field, ¶ 19)

29.    Both Strike 3 and Malibu Media claim they send "thousands" of DMCA notices each month.

    a. **Strike 3**: "We send on average 50,000 Digital Millennium Copyright Act notices a month but it does virtually nothing to stop the rampant copyright infringement." (Williamson, ¶ 31)

    b. **Malibu**: Despite sending thousands of DMCA notices per week, the infringement continues. (Field, ¶ 28)

30.    As discussed in Sections 7 through 9, both Strike 3 and Malibu Media engage in the same sue-and-then-settle strategy to profit from suing alleged copyright infringers in court. Both companies have engaged the services of attorney Emilie Kennedy in these matters.

## 4   Litigation is not the only effective way to reduce infringement

31.    The Williamson Declaration claims filing lawsuits against individual alleged downloaders is the "most, if not the only, effective way to stop" infringing downloading of its copyrighted material (¶ 32).

32.    Information from PACER indicates that Strike 3 has filed 6,129 complaints in federal courts between September 25, 2017 and December 15, 2021—and average of about 1,450 a year. Filing fees alone amount to approximately $580,000 a year.

33.    Since the date of the Williamson Declaration, Strike 3 has filed more than 2,500 complaints in federal court alleging copyright infringement. If the volume of complaints filed by Strike 3 are an indication of actual infringement, it would be reasonable to conclude that the filing of such lawsuits is not "effective" in deterring infringement.

34.    I understand that Strike 3 has filed approximately 50 complaints for full bill of discovery on approximately 4,000 IP addresses between January 2020 and August 2021.

35.    In an earlier Strike 3 matter, Greg Lansky, the founder and Chief Creative Officer of Strike 3's brands, indicated Strike 3 was formed in 2015.[2] (Lansky, ¶ 3) In his declaration, Williamsons indicate he has been with Strike 3 "since its inception." (Williamson, ¶ 12)

36.    Prior to the formation of Strike 3, Malibu Media filed nearly 3,300 complaints alleging copyright infringement similar to the claims Strike 3 is making in this case. The Lansky Declaration claimed he was involved in the industry for approximately nine years before forming Strike 3. (Lansky, ¶¶ 3-4) His declaration indicates that he was sufficiently familiar with the industry to conclude, "the

---

[2] *Strike 3 Holdings, LLC vs. John Doe subscriber assigned IP address 73.225.38.130,* Declaration of Greg Lansky, United States District Court for the Western District of Washington at Seattle, Case No. 2:17-cv-01731-MJP, (n.d.).

industry and I were not offering the best quality and experience possible." (Lansky, ¶ 7)

37.     As someone with nearly a decade of experience in the industry before founding Strike 3, it would be reasonable to conclude that Lansky was aware of the highly publicized Malibu Media cases and understood the pervasiveness of alleged copyright infringement of pornographic works. As someone who had been with Strike 3 since inception, it would be reasonable to conclude that Williamson had a similar awareness.

38.     Strike 3's general counsel, Emilie Kennedy was an attorney at Lipscomb, Eisenberg & Baker, PL and Pilar Law Group, two firms that were involved in many of Malibu Media's copyright infringement lawsuits. It would be reasonable to conclude that Kennedy understood the pervasiveness of alleged copyright infringement of pornographic works. According to her LinkedIn profile, Kennedy joined Strike 3 in June 2017.[3] Soon thereafter, Strike 3 began filing thousands of copyright infringement lawsuits against John Doe defendants.

39.     It defies economic reasoning and common sense that Lansky would form his business and—as he says in his declaration—"risk everything" without a strategy to mitigate the costs of anticipated efforts to infringe on Strike 3's works. Similarly, it does not make economic sense that Williamson—as Chief Technology Officer and Vice President of Technology—would not invest in a technology strategy to mitigate the risks of copyright infringement.

---

[3] Emilie Kennedy, LinkedIn (n.d.), https://www.linkedin.com/in/emiliekennedy, retrieved Mar. 31, 2022.

40.     In addition to filing thousands of lawsuits, like this one, the Williamson Declaration identifies only two measures undertaken by Strike 3 to mitigate alleged copyright violations:

   a. "We do regularly scan our records for people who appear to be abusing our service, and take action to prevent further abuse." (¶ 27)

   b. "We send on average 50,000 Digital Millennium Copyright Act notices a month but it does virtually nothing to stop the rampant copyright infringement." (¶ 31)

# 5   DMCA's public policy purpose to reduce copyright litigation

41.     The Williamson Declaration states Strike 3 sends an average of 50,000 DMCA notices a month, but that the notices do "virtually nothing" to stop infringement of its copyrights. I understand Strike 3 has not provided any information supporting this claim.

42.     I understand that Plaintiff has not provided any information demonstrating that Strike 3 notified Defendant's Internet service provider ("ISP"), Frontier Communications, of Defendant's alleged activity outside of the present litigation.

43.     The court in *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 698 (9th Cir. 2015) identifies the public policy purposes of copyright protection are to (a) stimulate artistic creativity for the general public good, and (b) secure a fair return for producer's creative labor. The court concludes rewards to the copyright owner are a "secondary consideration."

The constitutional policy underlying copyright protection is to "promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. "The immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). "'The sole interest of the United States and the primary object in conferring the monopoly,' [the Supreme] Court has said, 'lie in the general benefits derived by the public from the labors of authors.'" *Id.* (quoting *Fox Film Corp. v. Doyal,* 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010 (1932) ). To motivate the creative activity of authors and inventors for the sake of the public's benefit, copyrights are limited in time and scope. *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). "Implicit in this rationale is the assumption that in the absence of such public benefit, the grant of a copyright monopoly to individuals would be unjustified." 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.03[A] (2014) (footnote omitted). "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration." *United States v. Paramount Pictures,* 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

44.     Citing *In re Charter Commc'ns, Subpoena Enforcement Matter*, 393 F.3d at 773 (8th Cir. 2005), the court in *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.* (E.D. Va., 2016) notes:

Congress enacted the Digital Millennium Copyright Act ("DMCA"), which sought to strike a balance "between the

> interests of ISPs in avoiding liability for infringing use of their services and the interest of copyright owners in protecting their intellectual property and minimizing online piracy." In return for a certain amount of cooperation, ISPs would enjoy the protection of four liability-limiting safe harbors. To be eligible, an ISP must, for example, "adopt[] and reasonably implement[], and inform[] subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." [footnotes and citations omitted]

45.     From an economics approach, the idea to "strike a balance" recognizes that the public policy purpose of copyright enforcement under the DMCA is to discourage infringement while reducing the costs associated with litigation.

46.     At the time of the downloading activity alleged by Plaintiff, Defendant's Internet service provider, Frontier Communications, indicates it had policies to comply with the DMCA: "Prohibited activity includes but is not limited to … transmitting or receiving copyright infringing or obscene material. Repeated copyright infringements are grounds for termination of service."[4]

---

[4] Frontier Communications (2020), "Residential Internet acceptable use policy." November 15. https://web.archive.org/web/20180308153627/https://frontier.com/~/media/corporate/policies/aup-residential.ashx, captured March 8, 2018; https://web.archive.org/web/20200219042114/https://frontier.com/~/media/corporate/policies/aup-residential.ashx, captured February 19, 2020.

47.     In 2021, a U.S. District Court judge upheld the $1 billion verdict against Cox Communications that found the cable and internet service provider liable for piracy infringement of over 10,000 musical works on its network with damages amounting to an average of $99,830 per work.[5]

48.     Monitoring companies like Rightscorp, Inc. send DMCA notices on behalf of other media companies to the IP address of alleged infringers. In these notices, requests are made to pay for the works allegedly infringed. In some cases, the infringers have paid for the works allegedly infringed. In other cases, the notices have been associated with a cessation of the alleged infringing activity. In either case, if the objective of Strike 3 is to reduce alleged infringement, this approach would be more beneficial to Strike 3 than filing lawsuits. The notice requesting payment would provide an infringer the incentive to convert to a subscriber. A notice to subscriber who is not the infringer could result in proactive actions to prevent infringement, such as changing a wi-fi password. Because the cost of sending a DMCA notice is de minimis, and because a DMCA notice can be sent in a more timely manner than filing a lawsuit, this approach is less costly and more effective than pursuing lawsuits against, what the Williamson Declaration describes as "extreme" infringers. (¶ 34)

---

[5] Chris Eggertson (2021), "Judge upholds $1b major label verdict against Cox Communications," *Hollywood Reporter*. January 13. https://www.hollywoodreporter.com/business/digital/judge-upholds-1-billion-major-label-verdict-against-cox-communications-4115809/.

# 6   Actual and statutory damages

49.     17 U.S.C. 504 identifies two remedies for copyright infringement.

>   a. **Actual damages and profits**: a quantifiable monetary loss the plaintiff has suffered, or the profit the infringer has gained, from infringing the copyrights. I understand Plaintiff has not made a claim that Defendant gained a profit from the alleged copyright infringement. A quantifiable monetary loss to Plaintiff can be calculated by identifying what Plaintiff would have received had it sold or licensed the works.

>   b. **Statutory damages**: an amount in the range of $750 to $30,000 per infringed work. In some circumstances, including those in which the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court may reduce the award of statutory damages to $200.

50.     In deposition, Susan Stalzer, who claims to "work for" Strike 3, testified, she was "not aware of any specific dollar amounts" of damages from alleged copyright infringement, and that she "would imagine" the amount to be "sizable."[6]

51.     Strike 3 sells and licenses its works to customers by charging a flat fee that allows customers to access all its works—a common practice that is known colloquially as "all-you-can-eat" pricing. At the time of the alleged infringement, Strike 3 had a pricing plan of

---

[6] Stalzer deposition, 23:20-24.

$29.95 per month for each of its sites.[7] The period of the alleged infringement spanned a little less than five months. If Defendant had purchased access to each of the four sites over the five-month period, Strike 3 would have received $599, less payment processing fees ($29.95 per month x 4 sites x 5 months). Under this measure of actual lost profits, Strike 3's total actual damages would be no higher than $599.

52.    I understand that Plaintiff's Amended Complaint seeks statutory damages for 36 works, but does not specify the range of statutory damages sought.

53.    For the range of statutory damages specified by 17 U.S.C. 504, and assuming Defendant is liable for infringing on all 36 works, damages would be in the range of $7,200 to $1,080,000.

54.    In a similar BitTorrent case, the court concludes statutory damages are not intended to serve as a windfall to plaintiffs:[8]

> Plaintiff argues that a significantly higher award is necessary to force people like Defendants to appear and participate in these BitTorrent cases. Plaintiff apparently wants the Court to raise the statutory damage award to an amount that is at or above the anticipated costs of defending this action. A defendant may, however, decide that conceding liability through default is the best course

---

[7] See, for example, Blacked.com (2019), "Join Blacked.com," Internet Archive (Oct. 7), https://web.archive.org/web/20191007114048/https://members.blacked.com/joinnow.

[8] *CELL Film Holdings, LLC v. Roger Hawkins*, Order Granting in Part Cell Film Holdings' Motions for Default Judgment, Case 2:16-cv-01091-RSL (W.D. Wash, March 14, 2019).

of action given the nature of the claims and the available defenses. The "punishment" for that choice is the entry of default judgment and an award of damages under the governing standards. As discussed above, those standards lead to the conclusion that the minimum statutory penalty should apply in this case. Plaintiff offers no support for the proposition that participation in federal litigation should be compelled by imposing draconian penalties that are out of proportion to the harm caused by Defendants' actions or any benefits derived therefrom. Statutory damages are not intended to serve as a windfall to plaintiffs and will not be used to provide such a windfall here.

55.    I reserve the right to supplement or modify my report if Plaintiff or its experts provide a quantifiable claim for damages.

# 7   Nuisance lawsuits and sue-then-settle strategies

56.    Plaintiff's actions in this suit, and others, are consistent with a theory that plaintiff is pursuing nuisance-value settlements, using the prospect of statutory damages and litigation expenses to extract quick settlements of low-probability-of-prevailing claims.

57.    One of the earliest models of a sue-then-settle strategy finds that with low costs of filing a suit, plaintiffs can gather valuable information about the strength of their claim from a defendant's response:[9]

---

[9] P'ng, I. P. L. (1983), "Behavior in suit, settlement, and trial," *Bell Journal of Economics*, 14(2): 539–550.

> A strategy such as [file suit, then go to trial if the defendant offers to settle, otherwise drop the action] may not at first seem to make much sense. Why does the plaintiff not grab the settlement when it is offered? Further reflection reveals that such a strategy may be quite appropriate where the defendant has information not available to the plaintiff. For instance, it might be that the defendant has chosen [to offer to settle if violator, otherwise do not offer to settle]. For the plaintiff then, the defendant's offer to settle is an indication that the defendant did in fact violate the law, so that the plaintiff may prefer to increase his winnings by going to trial. On the other hand, the defendant's refusal to offer to settle may be an indication that he did not violate the law, in which case the plaintiff would want to cut his losses. …

> Put differently, the plaintiff's first strategy, (do not sue), is dominated by his fifth strategy, [file suit, then go to trial if the defendant offers to settle, otherwise drop the action]. We conclude that the plaintiff will always bring an action.

> This surprising result is implied by the assumption that the plaintiff incurs no legal costs by filing an action and then dropping it. Given the assumption, the conclusion is quite intuitive: the plaintiff loses nothing from filing suit.

58.     Another early model of "nuisance suits" concludes that although a defendant knows that the plaintiff will drop the case if the defendant responds, the defendant will still be willing to pay a

settlement amount of up to the cost of responding solely in order to avoid having to make such a response.[10]

59.     P'ng (1983) applies his sue-then-settle model to what he calls "frivolous suits:"

> To some extent, this result accords with the folklore: a plaintiff brings a frivolous action in the hope of extorting a settlement that is less than the value of the defendant's legal costs. The analysis also points to another possibility: the defendant may be able to deter plaintiffs who have filed actions from bringing these to trial by adopting a strategy of refusing to settle, whatever his true type.

60.     The economic rationale for damages is to make the plaintiff "whole" and/or to deny the liable party of the profits of from the wrongful act. Concepts of the efficient allocation of resources conclude that laws, institutions, or arrangements that provide a windfall profit to plaintiffs would result in a misallocation of resources. Legal scholars have implicitly incorporated the economic approach in their attempts to define a copyright "troll:"[11]

> A copyright troll is a plaintiff who seeks damages for infringement upon a copyright it owns, not to be made whole, but rather as a primary or supplemental revenue stream.

---

[10] Rosenberg, D. and S. Shavell (1985), "A model in which suits are brought for their nuisance value," *International Review of Law and Economics*. 5(1): 3–13.

[11] DeBriyn, J. (2012), "Shedding light on copyright trolls: An analysis of mass copyright litigation in the age of statutory damages," *UCLA Entertainment Law Review*, 19(1): 79–112.

61.    The following attempt to define "trolling" recognizes the process of searching or prowling for potential revenues from litigation or the threat of litigation:[12]

> The essence of trolling is that the plaintiff is more focused on the business of litigation than on selling a product or service or licensing their IP to third parties to sell a product or a service. The paradigmatic troll plays a numbers game in which it targets hundreds or thousands of defendants, seeking quick settlements priced just low enough that it is less expensive for the defendant to pay the troll rather than defend the claim.

62.    Greenberg (2015) identifies the role statutory damages may play in the misallocation of resources for a copyright owner who "uses the prospect of statutory damages and litigation expenses to extract quick settlements of often weak claims."[13]

63.    Commenting on the doctrine of copyright misuse, Judge Posner noted the following: "hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively, is an abuse of process."[14]

64.    Consistent with Posner's observation regarding opponents with a "lack of resources," AIPLA (2011) reports the median cost of litigating copyright infringement through the end of discovery in the

---

[12] Sag, M. (2015), "Copyright trolling: An empirical study," *Iowa Law Review*, 100(3): 1105–1147.

[13] Greenberg, B. A. (2015), "Copyright trolls and common law," *Iowa Law Review Bulletin*, vol. 100:77–86.

[14] *Assessment Techs. of WI, LLC v. Wire Data, Inc.*, 350 F.3d 640 (2003).

West is $150,000.[15] In *Malibu Media, LLC v. Mullins*, No. 18-cv-06447 (N.D. Ill. Jan. 13, 2021), in which the plaintiff voluntarily dismissed its claim with prejudice, defendant's attorney submitted a proposed fee and cost calculation of $64,172.

65.    Sudarshan (2008) proposes a three-part test to identify nuisance value patent litigation, which could be applied to copyright suits (citations omitted):[16]

> This Article relies on nuisance-value patent litigation having three specific and necessary definitional conditions.
>
>> First, the patent holder offers a settlement (or license) figure which is significantly less than the cost of defending the suit through the discovery phase of a trial.
>>
>> Second, this settlement amount does not correspond to traditional measures of patent damages, i.e., reasonable royalty or lost profits.
>>
>> Third, the plaintiff seeks to avoid litigation because of a sufficiently high probability that the asserted claims are a) invalid, or b) not infringed by the defendant's products.
>
> This definition recognizes that a suit is not necessarily a nuisance suit just because the offered settlement amount

---

[15] American Intellectual Property Law Association (2011), *Report of the Economic Survey.*

[16] Sudarshan, R. (2008), "Nuisance-value patent suits: An economic model and proposal," *Santa Clara High Technology Law Journal*, 25(1):159-189.

is less than the cost of defense. For example, the second prong of the definition excludes situations where a defendant's infringement may have been so minor that a license would have been worth less than the cost of asserting the patent in litigation. Similarly, the third prong of the definition leaves out scenarios where a plaintiff's validity and infringement contentions are meritorious, but a steep discount may have been given to the defendant for any number of reasons.

66.    Based on information available at the time of this report, Strike 3's strategy in BitTorrent litigation appears to satisfy Sudarshan's (2008) three-part test for nuisance value litigation.

67.    Sag (2015) suggests that sue-then-settle actions are consistent with a theory that plaintiffs are pursuing nuisance value settlements:[17]

> After obtaining the names and addresses of account holders suspected of participating in a BitTorrent swarm, the plaintiff can get to work negotiating settlements. An account holder accused of infringement is almost invariably threatened with statutory damages and the prospect of paying the plaintiff's attorney's fees if he is unable to establish his innocence. Reports indicate that settlements are usually in the range of $2000 to $4000. That is a lot to pay for a movie, but only a fraction of the potential statutory damages for willful copyright infringement, which can be as high as $150,000 per work infringed. The $4000 figure is also evidently "a sum

---

[17] Sag, M. (2015), "Copyright trolling: An empirical study," *Iowa Law Review,* 100(3): 1105–1147.

calculated to be just below the cost of a bare-bones
defense." This does not prove that the plaintiffs are
simply pursuing nuisance-value settlements, but it is
consistent with that theory.

68.     Consistent with Sag's (2015) observations, I understand Strike 3
has accepted offers of judgment of $3,250, inclusive of damages,
costs, and attorney fees.

    a. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address
76.172.87.57* (S.D.Cal.) 3:17-cv-02317-JAH-BLM.

    b. *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address
76.247.176.87* (N.D.Cal.) 5:17-cv-07058-EJD.

69.     In a similar Strike 3 matter, the court concluded, "Strike 3 is a
copyright troll," and invoked much of the economic logic discussed
above (citations omitted):[18]

    Little wonder so many defendants settle. Indeed, the
copyright troll's success rate comes not from the
Copyright Act, but from the law of large numbers.
According to PACER, over the past thirteen months,
Strike 3 has filed 1849 cases just like this one in courts
across the country—forty in this district alone—closely
following the copyright trolls who together consumed
58% of the federal copyright docket in 2015. These serial
litigants drop cases at the first sign of resistance, preying
on low-hanging fruit and staying one step ahead of any
coordinated defense. They don't seem to care about

---

    [18] *Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.180.154.14*.
Memorandum Opinion. Civil Action #1:18-cv-01425-RCL (D.D.C). November 16,
2018.

whether defendant actually did the infringing, or about developing the law. If a Billy Goat Gruff moves to confront a copyright troll in court, the troll cuts and runs back under its bridge. Perhaps the trolls fear a court disrupting their rinse-wash-and-repeat approach: file a deluge of complaints; ask the court to compel disclosure of the account holders; settle as many claims as possible; abandon the rest.

## 8   Quantifying Strike 3's sue-then-settle strategy

70.    Survival analysis is generally defined as a set of methods for analyzing data where the outcome variable is the time until the occurrence of an event of interest. The event can be death, occurrence of a disease, or the termination of a lawsuit. The time to event or survival time can be measured in days, weeks, years, or other increments. For example, if the event of interest is termination of a lawsuit, then the survival time can be the number of days from the date in which a lawsuit is filed to the date in which the lawsuit is terminated.

71.    Many common methods of analyzing data, such as *t*-test and ordinary linear regression, cannot effectively handle the censoring of observations. Observations are *censored* when the information about their survival time is incomplete—the most commonly encountered form is what is known as right censoring (as opposed to left censoring). Right censoring occurs when, at the time of the analysis, the event in question (e.g., termination of a lawsuit) has not yet occurred.

72.    Information submitted to the court in *Malibu Media, LLC v. John Doe subscriber assigned IP address 24.148.79.226*, Civil Action No. 1:14-cv-00693 (N.D. Ill. Apr. 6, 2014) identifies 268 cases filed by Malibu

Media with a total of 886 defendants among the cases. The first cases were filed on June 14, 2012 and the last cases filed February 18, 2014. On the date the information was submitted to the court, April 6, 2014, matters involving 788 defendants had been terminated. In other words, the data spans 662 days (June 14, 2012 to April 6, 2014), over which period, matters involving 788 defendants had been terminated and matters involving 98 defendants had yet to be resolved (i.e., right censored). The survival time for this matter is considered to be at least as long as the duration between the date the case was filed and the last date in the data.[19] Censoring is an important issue in survival analysis, representing a particular type of missing data.

73.     Survival methods of statistical analysis incorporate information from both censored and uncensored observations in estimating important model parameters. The *dependent* variable in survival analysis is composed of two parts. One part is the time to event (e.g., days between the filing and terminating of a case). The other part is the event status, which records if the event of interest occurred or not (e.g., termination of case). One can then estimate two functions that are dependent on time: the survival and hazard functions. The survival and hazard functions are key concepts in survival analysis for describing the distribution of event times.[20]

---

[19] Another example of right censoring is when a subject drops out of the study before the end of the study observation time and did not experience the event in question. This person's survival time is said to be censored, since we know that the event of interest did not happen while this person was under observation.

[20] The *survival* function gives, for each discrete time unit, the probability of surviving (or not experiencing the event) up to that time. The *hazard* function gives the potential that the event will occur, per time unit, given that an individual has survived up to the specified time.

74.    With information from the survival and hazard functions, other quantities of interest (e.g., median survival) may be estimated.

75.    The Kaplan-Meier method is a nonparametric estimator of the survival function.[21] The method is widely used to estimate and graph survival probabilities as a function of time and has been used to evaluate the duration of legal disputes.[22] It can be used to obtain descriptive statistics for survival data—including the median survival time—and compare the survival experience for two or more groups of subjects. To test for overall differences between estimated survival curves of two or more groups of subjects, such as males versus females, or treated versus untreated (control) groups, or Strike 3 versus non-Strike 3 matters, several tests are available. One widely used test is the *log-rank test*.

76.    The analysis in this report relies on three datasets of copyright and other intellectual property lawsuits:

   a.  A set of intellectual property disputes filed between 1994 and 2015 in all U.S. district courts, compiled by Matthew Sag, Professor of Law at Loyola University Chicago School of Law, the Associate Director for Intellectual Property at the Institute for Consumer Antitrust Studies, hereafter "Sag Data." The Sag Data can be placed into three categories, "control" (i.e., not pornography), "porn" (pornography, excluding Malibu Media), and "Malibu." The Sag Data does

---

[21] *Parametric* methods assume that the underlying distribution of the survival times follows certain known probability distributions, such as the exponential, Weibull, and lognormal distributions. *Nonparametric* methods make no assumptions regarding the underlying distribution.

[22] See, for example, Kessler, D. (1996), "Institutional causes of delay in the settlement of legal disputes," *Journal of Law, Economics, & Organization*, 12(2): 432–460.

not include information regarding the circumstances underlying the termination of the matters.

b. Information submitted to the court in *Malibu Media, LLC v. John Doe subscriber assigned IP address 24.148.79.226*, Plaintiff's Status and Informational Report for Its Cases in the Northern District Of Illinois, Civil Action No. 1:14-cv-00693 (N.D. Ill. Apr. 6, 2014), hereafter "Illinois Data." The submission provides information regarding 268 cases filed by Malibu Media with a total of 886 defendants among them. Of the 886 defendants, 643 were within joined suits and 243 defendants were from cases against a single defendant. This information is supplemented with the date the suit was terminated as reported in the Sag Data.

c. Information from PACER regarding that Strike 3 copyright disputes has filed in federal courts between September 25, 2017 and December 15, 2021.

77.     Kaplan-Meier analysis was performed with R, an open source and widely used statistical language, using Shinyapps.io, produced by RStudio, Inc., a project affiliated with the Foundation for Open Access Statistics. Figure 1 summarizes the results, specifically the median time to dismissal for each of the categories of cases:

a. Non-porn: 215 days,

b. Porn (excluding Strike 3 and Malibu): 177 days,

c. Malibu: 140 days, and

d. Strike 3: 113 days.

## Figure 1: Kaplan-Meier results, copyright cases



Source: IP Litigation in US District Courts 2015 Update; PACER

78.    The series are significantly different from each other under the log-rank test: porn matters are dismissed more quickly than non-porn, Malibu Media matters are dismissed more quickly than other porn matters, and Strike 3 matters are dismissed more quickly than any other.

79.    These results do not prove that Strike 3 is pursuing nuisance-value settlements, but it is consistent with that theory. It is consistent with the analysis of P'ng (1983), finding that matters in which a Plaintiff faces a negative expected value of going to trial are likely to be dropped if a settlement cannot be obtained. The results are also consistent with the cut-and-run strategy observed by the court in a previous Strike 3 matter.

# 9    One-third of Strike 3 matters are dismissed for insufficient evidence

80.    Information provided by the court in *Strike 3 Holdings, LLC against John Doe*, Memorandum and Order, 18-CV-0449 (ENV) (JO), 18-CV-1155 (KAM) (JO), 18-CV-1159 (KAM) (JO), 18-CV-1184 (JBW) (JO), 18-CV-1196 (JBW) (JO), 18-CV-2073 (ILG) (JO), 18-CV-2132 (AMD) (JO), 18-CV-3216 (KAM) (JO), 18-CV-3778 (ENV) (JO), 18-CV-3785 (WFK) (JO), 18-CV-6988 (NGG) (JO), 19-CV-0725 (NGG) (JO), 19-CV-0729 (AMD) (JO) (E.D.N.Y. Mar. 21, 2019) provides information regarding the status of 276 cases filed by Strike 3 with the court.

81.    Information described in ¶ 72 provides information regarding the status of 886 cases filed by Malibu Media

82.    The following is the status of the Strike 3 and Malibu Media suits at the time of the submissions to the courts:

|  | Malibu | Strike 3 |
|---|---|---|
| Dismissed — Hardship | 49 | 28 |
| Dismissed — Insufficient Evidence | 259 | 50 |
| Dismissed — No Discovery | 304 | |
| Dismissed — Settled | 174 | 49 |
| Dismissed — Other | | 16 |
| Judgment Entered | 2 | |
| Litigation | 8 | |
| Pending | 90 | 133 |
| Total defendants | 886 | 276 |

83.    Both Strike 3 and Malibu Media reported that approximately one-third of cases were dismissed for insufficient evidence. This observation is consistent with Sudarshan's (2018) third part of his three-part test to identify nuisance value litigation, specifically that

the plaintiff seeks to avoid litigation because of a sufficiently high probability that the asserted claims are either invalid or not infringed by the defendant.

84.    What is not known from the information provided by Strike 3 is how many cases are settled despite there being insufficient evidence. The information provided in Section 8 suggests there may be a non-trivial number of cases that are settled, despite insufficient evidence of infringement, because the defendant's cost of litigation is greater than the cost of settlement.

## 10  Strike 3's revenues from settling litigation or threatened litigation

85.    Several courts have questioned what motivates Malibu Media's penchant for litigation, which is a question that should be raised regarding Strike 3's similar penchant for litigation: Is it an interest in protecting its copyrights or an interest in using litigation as a profit center? See, for example:

   a.  *Malibu Media, LLC v. Duncan*, 2020 WL 567105, at *3 (S.D. Tex. Feb. 4, 2020) (expressing concern over Malibu's so-called "litigation-as-a-business strategy" and noting that others have labeled the company a "copyright troll");

   b.  *Malibu Media, LLC v. Mantilla*, 2020 WL 6866678, at *5 (D. Conn. Nov. 20, 2020) ("[I]t appears from the sheer number of lawsuits filed by Malibu Media in this Court and across the nation that there is good reason to doubt the extent to which Malibu Media's business model is premised on sales of copyrighted material as distinct from litigation income.");

    c. *Malibu Media, LLC v. John Does 1 through 10*, 2012 WL
       5382304, at *4 (C.D. Cal. June 27, 2012) ("The federal courts
       are not cogs in [Malibu's] copyright-enforcement business
       model.");

    d. *Malibu Media, LLC v. Doe*, 2020 WL 6043946, at *2 (N.D.N.Y.
       Oct. 13, 2020) ("Malibu Media's action in this case appears
       consistent with many of the accusations levied against it by
       other courts, especially as it relates to strong-arming
       nuisance settlements under the threat of embarrassing
       litigation.").

86.    Strike 3 has not provided any verifiable financial information in
this matter regarding its operations. In her deposition as the
corporate representative for Strike 3 in this matter, Jessica Fernandez
testified to the following:

    a. Strike 3 receives between ████████ and ████████ a month in
       settlement revenues, of which "the net" of costs is ████████ a
       month to Strike 3.[23] This amounts to ████████ to
       ████████ a year in settlement revenues, with a midpoint
       of ████████ a year.

    b. ████████████████████████████████████████████

---

[23] Fernandez deposition, 144:1-145:20.
[24] Fernandez deposition, 28:14-19, 117:10-16.

PORTIONS CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
EXPERT REPORT OF ERIC FRUITS, PH.D.                                    **34**



87.     Table 1 provides as summary of Strike 3's estimated revenues and expenses based on the scant information provided by Strike 3.

## Table 1:  Revenues and expenses claimed by Strike 3



---

[25] Fernandez deposition, 31:20-23.
[26] Fernandez deposition, 121:7-122:4.
[27] Fernandez deposition, 144:7-10.

88.     To be blunt, the information provided by Fernandez is not believable. Strike 3 has not provided any information supporting these claims, such as financial statements or tax returns. The following paragraphs identify some of the reasons why a finder of fact should question the reliability of Strike 3's claims regarding its business and financial claims.

89.     Strike 3 files an average of about 1,450 copyright complaints a year in federal court. (¶ 32) Based on the information provided by Fernandez, this amounts to approximately $14,600 to $19,500 in settlement revenues per case settled and $5,000 to $6,600 per case filed.

90.     Assuming the range of settlement revenues and production costs provided by Fernandez follow a normal (i.e., "bell curve") distribution, then a straightforward statistical test known as the "Z-test" indicates there is a 97% chance that Strike 3's annual settlement revenues *exceed* its annual production costs.

91.     It is likely that the per-work production costs provided by Fernandez are inflated by the allocation of fixed costs such as full-time staffers and location costs. The expert report of David Dickson in this matter concludes that Strike 3's production costs are in the range of $3,660 to $8,070 per work. Because of the wide gap between the costs claimed by Fernandez and calculated by Dickson, it would be reasonable for a finder of fact to question the reliability of Strike 3's claims.

92.     Pornographic DVD sales have been declining since 2006.[28] In 2007, industry wide, DVD sales accounted for 44% of revenues.[29] If sales subsequently declined by 80% since, then DVD sales would comprise less than 10% of industry revenues.[30] It would be reasonable to conclude that that Strike 3's DVD sales revenue (less production and distribution costs) are a relatively small share of Plaintiff's total revenue. For example, if one assumed Strike 3's received net revenues of $10 per DVD sold, or $1.9 million a year, that would amount to about 3% of Strike 3's total revenues.

93.     Information provided in *Malibu Media, LLC v. William Mullins and Collette Pelissier*, Case No. 1:18-cv-06447 (N.D. Ill., Doc. 125, Sep. 28, 2021) indicates Malibu Media received approximately $4,800 a week in net revenues from subscribers, amounting to less than $250,000 a year. Despite Field/Pelissier's claim that Malibu Media had "tens of thousands of members," subscriber revenues suggest that the company had fewer than 2,000 paying subscribers at the time. Based on this information it would be reasonable for a finder of fact to question the reliability of Fernandez's claim that Strike 3 has 200,000 paying subscribers.

---

[28] Chaffin, J. (2007) "Porn industry suffers slump in DVD sales," *Financial Times*, Mar. 8., https://www.ft.com/content/2ca67f30-cdcd-11db-839d-000b5df10621 ("In 2006, after a decade of steady, double-digit growth, spending on top-shelf DVDs and home video fell by more than 15 per cent …"). Raustiala, K. and C. J. Sprigman (2019) "The Second Digital Disruption: Streaming and the Dawn of Data-Driven Creativity," *New York University Law Review*, 94:1555-1622 ("In the intervening decade, this decline has only accelerated. Today, adult DVD sales are a tiny fraction of what they once were. And revenues for the traditional producers of recorded content have fallen, by some estimates (likely overblown) by up to eighty percent." [footnotes omitted])

[29] Chaffin (2007).

[30] Raustiala and Sprigman (2019).

94.     Fernandez testified that Strike 3 has 200,000 paying subscribers. Assuming annual per-subscriber revenues of $235, that amounts to $47 million in annual revenues from paying subscribers. It would be reasonable for a finder of fact to question the reliability of Strike 3's paying subscriber claims.

   a.  The U.S. Copyright Office indicates that Strike 3 has approximately 1,250 works registered. Fernandez testified that this is a "good ballpark figure" of how many works Strike 3 has produced.[31] This implies that each work produced by Strike 3 is associated with an average of $37,600 *a year* in revenues from paying subscribers.

   b.  Strike 3 claims "We provide jobs for nearly 100 people worldwide." (Williamson, ¶ 18) This implies that each employee would be associated with an average of $470,000 a year in revenues from paying subscribers.

95.     Table 2 shows that if it is assumed that Strike 3 has only 2,000 paying subscribers, then settlement revenues would account for more than 75% of Strike 3's revenues and the firm would be unprofitable.

---

[31] Fernandez deposition, 118:6-12.

**Table 2:  Revenues and expenses claimed by Strike 3 with 2,000 subscribers**



96.     Based on these calculations it would be reasonable for a finder of fact to question the veracity of Strike 3's claims regarding subscriber numbers and that it receives "nearly all" of its revenue from subscriptions, DVD sales, and licensing. In contrast, it would be reasonable to conclude that Strike 3 derives most of its income from settling copyright infringement lawsuits against John Doe defendants and there is a likelihood Strike 3 would fail as a business without its income from settling lawsuits. ∎

PORTIONS CONFIDENTIAL AND SUBJECT TO PROTECTIVE ORDER
EXPERT REPORT OF ERIC FRUITS, PH.D.                                    **39**

Respectfully submitted by

Dated: April 1, 2022

Eric Fruits, Ph.D.

# Eric Fruits, Ph.D.

Tel: 503-928-6635
www.econinternational.com
fruits@econinternational.com



**Dr. Eric Fruits** is an economics expert, finance expert, and statistics expert. He has produced numerous research studies involving economic analysis, financial modeling, and statistical analysis.  As an expert witness, he has provided expert testimony in state courts, federal courts, and an international court.

As an economic damages expert, Dr. Fruits has provided expert testimony regarding business valuation, lost profits, and foregone income.  He has been a testifying expert in cases involving real estate valuation, health care services, and transportation and shipping services.  His research on the formation of cartels was published in the top-tier *Journal of Law & Economics*.  His study of the impact of natural gas pipeline on residential property values has been published in the *Journal of Real Estate Research*, one of the premier academic journals in the field.  He has provided expert testimony to state courts and federal courts.

Dr. Fruits is an antitrust expert who has written articles on price fixing and cartels for the top-tier *Journal of Law and Economics*.  He has assisted in the review of several mergers including Sysco-US Foods, Exxon-Mobil, BP-Arco, and Nestlé-Ralston.  He has worked on many antitrust lawsuits, including *Ross-Simmons v. Weyerhaeuser*, a predatory bidding case that was ultimately decided by the United States Supreme Court.

As a finance expert, Dr. Fruits has been a testifying expert and provided expert consulting services in cases alleging insider trading and market manipulation.  He is a securities expert who has conducted numerous research studies on financial issues, including initial public offerings and municipal bonds.

As a statistical expert, Dr. Fruits has provided expert testimony regarding real estate transactions, profit projections, agricultural commodities, and war crimes allegations.  His expert testimony has been submitted to state courts, federal courts, and an international court.

He has written peer-reviewed articles on real estate markets, initial public offerings (IPOs), the municipal bond market, and the formation and operation of cartels.

Dr. Fruits has been affiliated with Portland State University, Pacific Northwest College of Art, University of Southern California, Indiana University, and the Claremont Colleges.  He has been an economic consultant with Nathan Associates, LECG, ECONorthwest, and Econ One Research.

## Present Positions & Affiliations

Economics International Corp.                                        2006–present
    President and Chief Economist

Cascade Policy Institute                                        2019–present
    Vice President of Research

International Center for Law & Economics                        2017–present
    Senior Competition Scholar

Portland State University                                        2002–present
    Adjunct Professor in Economics, Business Administration, and Urban Studies & Planning

## Previous Professional Experience

Portland State University                                                           2010–2019
    Oregon Association of Realtors Faculty Fellow
    *Center for Real Estate Quarterly Report*, Editor

Nathan Associates Inc.                                                              2012–2018
    Principal Consultant

Info Tech, Inc.                                                                     2015–2018
    Expert Consultant

Pacific Northwest College of Art                                                    2009–2010
    Adjunct Professor

ECONorthwest                                                                        2002–2008
    Senior Economist

LECG, LLC                                                                           1999–2002
    Senior Economist

Claremont Graduate University                                                       1996–2002
    Adjunct Professor of Economics and Visiting Scholar

Econ One Research, Inc.                                                             1998–1999
    Economist

University of Southern California, Marshall School of Business                      1997–1998
    Visiting Assistant Professor of Finance & Business Economics

Indiana University, Kelley School of Business                                       1997
    Visiting Assistant Professor of Business Economics & Public Policy

Scripps College                                                                     1996
    Adjunct Professor of Economics

Pomona College                                                                      1994
    Lecturer in Economics

Andersen Consulting                                                                 1990–1991
    Staff Consultant

## Education

Ph.D., Economics, Claremont Graduate University                                     1997

M.A., Economics, Claremont Graduate University                                      1993

B.S. with Distinction, Business Economics & Public Policy, Indiana University       1990

## Publications

The fatal economic flaws of the contemporary campaign against vertical integration. *Kansas Law Review*, with G. A. Manne and K. Stout. 68:923–973. 2020.

*Static and Dynamic Effects of Mergers: A Review of the Empirical Evidence in the Wireless Telecommunications Industry*. OECD Directorate for Financial and Enterprise Affairs Competition Committee, Global Forum on Competition. DAF/COMP/GF(2019)13, with J. Hurwitz, G. A. Manne, J. Morris, and A. Stapp. January 31, 2020.

Perceived environmental risk, media, and residential sales prices. *Journal of Real Estate Research*, with J. Freybote. 37(2):217–243. 2015.

Compact development and greenhouse gas emissions: A review of recent research. *Center for Real Estate Quarterly Journal*, 5(1):2–7. Winter 2011.

Test bank for W. B. Brueggeman and J. D. Fisher. *Real Estate Finance and Investments*, 14th ed. McGraw-Hill/Irwin. 2010.

A comprehensive evaluation of the comparative cost of negotiated and competitive methods of municipal bond issuance. *Municipal Finance Journal*, with R. J. Pozdena, J. Booth, and R. Smith. 28(4):15–41. Winter 2008.

Market power and cartel formation: Theory and an empirical test. *Journal of Law and Economics*, with D. Filson, E. Keen, and T. Borcherding. 44:465–480. 2001.

*The Determinants of Managerial Ownership: Theory and Evidence From Initial Public Offerings*. Claremont Graduate University. 1997.

Managerial ownership, compensation, and initial public offerings. In Marr, M. and Hirschey, M., editors, *Advances in Financial Economics*, volume 2. JAI Press. 1996.

## Testimony in Legal Proceedings

*Gabriel Bryce Owens vs. Mt. Hood Ski Bowl, LLC, H. Ski Corp, Mt. Hood Ski Company, LLC.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 18CV22336. Trial testimony March 18, 2022.

*Renee Booth and Bradley Converse v. United States of America.* United States District Court for the Eastern District of California. Case No. 2:19-at-00754. Deposition testimony December 14, 2021.

*Paul Mathew Kirby v. Oregon Health & Science University School of Nursing.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 18CV22336. Trial testimony November 17, 2021.

*In Re: Packaged Seafoods Antitrust Litigation.* United States District Court for the Southern District of California. Case No. 3:15-MD-02670-JLS-MDD. Deposition testimony October 28, 2021.

*Beatbox Music, Pty, Ltd. v. Labrador Entertainment, Inc., et al.* United States District Court for the Central District of California, Western Division. Case No. 2:17-CV-6108-MWF (JPRX). Deposition testimony August 11, 2021.

*Kimberly Taylor Blair and Kelly Blair v. United States of America.* United States District Court for the Western District of Washington Case No. 3:20-cv-05172. Deposition testimony May 26, 2021.

*Bean v. Bean.* Circuit Court for the State of Oregon for the County of Coos. Case No. 20DR11385. Trial testimony April 15, 2021.

*Faun Patzer vs. Adventist Health Medical Group, Portland Adventist Medical Center.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 17CV04441. Trial testimony June 18, 2019.

*Julie Veysey v. Israel Cervante Meraz and Henry Nicholas Veysey.* Circuit Court for the State of Oregon for the County of Marion. Case No. 17CV52030. Trial testimony October 3, 2018.

*Katrina L. Pinkerton v. Wells Fargo Bank, N.A.* United States Bankruptcy Court for the District of Oregon. Case No. 17-33794-tmb13. Adv. Proc. No. 18-03016-tmb. Prove-up hearing testimony June 20, 2018.

*Estate of Jamey Charlotte Haines v. State of Oregon Department of Transportation.* Circuit Court for the State of Oregon for the County of Washington. Case No. 17CV17952. Trial testimony February 6, 2018.

*Rosebank Road Medical Services Ltd. dba Rosebank Road Medical Centre, and Geeta Murali Ganesh v. Ramji Govindarajan and John Does 2–20.* Superior Court of California, County of San Francisco, Unlimited Civil. Case No. CGC-16-549755. Deposition testimony September 27, 2017. Trial testimony December 13–14, 2017.

*United States of America ex rel. Duke Tran v. Wells Fargo Bank, N.A.* United States District Court for the District of Oregon, Portland Division. Case No. 3:15-cv-979. Deposition testimony October 3, 2017.

*Nubia Rodriguez v. The State of Oregon, Department of Human Services and Antoinette Hughes.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 16CV09393. Trial testimony September 13, 2017.

*Madison-Rae Jordan v. United States of America.* United States District Court for the Southern District of California. Case No. 3:15-cv-01199-BEN-NLS. Deposition testimony January 25, 2017.

*Marie M. Pearson v. Waste Management of Oregon, Inc. and James Walker.* Circuit Court for the State of Oregon for the County of Multnomah. Case No. 15CV18258. Trial testimony August 23, 2016.

*Investors Asset Acquisition, et al. v. Angelo S. Scardina, et al.* Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. Case No. 502014CA004618XXXXMB AD. Deposition testimony August 5, 2016.

*James Busey vs. Richland School District, Richard Jansons, Heather Cleary, Mary Guay, Rick Donahoe, and Phyllis Strickler.* United States District Court for the Eastern District of Washington. Case No. CV-12-5022-EFS. Deposition testimony February 25, 2016.

*Kivin Varghese v. Amazon.com, Inc. and Amazon Technologies, Inc.* Superior Court for the State of Washington in and for the County of King. No. 12-2-39303-6 SEA. Deposition testimony September 22, 2014.

*LMG Concerts, LLC v. Salem Communications Corporation, Salem Media of Oregon, Inc., Caron Broadcasting, Inc., Does 1 through 5.* U.S. District Court for the District of Oregon. Case No. 3:12-CV-1117. Deposition testimony September 18, 2013.

*Claude Hadley v. Extreme Technologies, Inc.* Circuit Court for the State of Oregon for Lane County. Case No. 16-11-03225. Trial testimony March 14, 2012.

*David Hill Development, LLC, v. City of Forest Grove, Steve A. Wood, and Robert A. Foster.* U.S. District Court for the District of Oregon. Civ. No. 08-266-AC. Deposition testimony December 10, 2010. Trial testimony September 20, 2011.

*Gordon Ogawa v. Malheur Home Telephone Company dba Malheur Bell and Qwest Corporation.* U.S. District Court for the District of Oregon. No. CV 08-694-MO. Trial testimony September 9, 2010.

*Dave Molony and Gold Leaf Investments, Inc. v. Crook County.* U.S. District Court for the District of Oregon. No. 3:05-CV-1467-MO. Trial testimony May 27, 2009.

*Starr-Wood Cardiac Group of Portland, P.C., Dr. H. Storm Floten, and Dr. Anthony Furnary v. Dr. Jeffrey S. Swanson, Dr. Hugh L. Gately, and Cardiothoracic Surgeons LLC.* Circuit Court for the State of Oregon for the County of Multnomah, No. 0706-06308. Trial testimony September 5, 2008.

*Milutinovic et al.* International Criminal Tribunal for the former Yugoslavia, No. IT-05-87 PT. Trial testimony April 23–24, 2008.

*In re: The Marriage of Virginia Salvadori and Gabriel Salvadori.* State of Washington Clark County Superior Court, No. 06-3-00692-2. Trial testimony April 14, 2008.

*Pamela L. Bond, Individually and as Personal Representative of the Estate of Craig R. Bond, Deceased v. United State of America.* U.S. District Court for the District of Oregon. No. 06-1652-JO. Trial testimony February 6, 2008.

*Erik E. Tolleshaug v. Shaver Transportation Co.* Circuit Court for the State of Oregon for the County of Multnomah, No. 060809122. Trial testimony December 14, 2007.

*In re: The Marriage of Denise M. Kunze and Gust F. Kunze.* State of Washington Clark County Superior Court, No. 05-3-00801-3. Trial testimony October 29, 2007.

*Securities and Exchange Commission v. Philip Evans and Paul Evans.* U.S. District Court for the District of Oregon. No. CV 05-1162-PK. Deposition testimony February 27, 2007. Trial testimony March 8, 2007.

*Randall D. Lam v. Kaiser Foundation Hospitals; Northwest Permanente, P.C.; Kaiser Foundation Health Plan of the Northwest; Robert James Shneidman, M.D.; and David Lee Brown, Jr., P.A.* Circuit Court for the State of Oregon for the County of Multnomah. No. 020706633. Trial testimony November 9, 2006.

*Vitascan Partners I and Vitascan Partners II v. G.E. Healthcare Financial Services and GE/Imatron.* Superior Court for the State of California. No. 01129909. Trial testimony July 24, 2006.

*Squaxin Island Tribe, Island Enterprises, Inc., Swinomish Indian Tribal Community, and Swinomish Development Authority v. Fred Stephens, Director, Washington State Department of Licensing.* U.S. District Court for Western District of Washington. No. C033951Z. Deposition testimony June 15, 2005.

Eric Fruits, Ph.D.      6

*Androutsakos v. M/V PSARA, PSARA Shipping Corporation, and Chevron U.S.A., Inc.* United States District Court for the District of Oregon. No. 02CV1173KI. Trial testimony May 21, 2004.

*In re: Consolidated PERS Litigation.* Supreme Court for the State of Oregon. Nos. S50593, S50532, S50656, S50657, S50645, S50685, S50687, and S50686. Trial testimony February 27, 2004.

*CollegeNET, Inc., v. ApplyYourself, Inc.* United States District Court for the District of Oregon. Nos. 02CV484HU and 02CV1359HU. Daubert hearing May 9, 2003.

## Committee and Other Service

Peer reviewer and academic adviser for textbooks and academic journals:

A. O'Sullivan. *Urban Economics*, 9th ed. McGraw-Hill/Irwin. 2018.

*Taking Sides: Clashing Views in Urban Studies.* M. A. Levine, editor. McGraw Hill. 2012.

W. B. Brueggeman and J. D. Fisher. *Real Estate Finance and Investments*, 14th ed. McGraw-Hill/Irwin. 2011.

*Municipal Finance Journal*

*Land Economics*

Taxpayer Association of Oregon. Board Member, 2014–present.

City Club of Portland. Research Board Member, 2015–2017.

State of Oregon. Explanatory Statement Committee member. Ballot Title 86: Amends Constitution: Requires creation of fund for Oregonians pursuing post-secondary education, authorizes state indebtedness to finance fund. 2014.

Laurelhurst Neighborhood Association. City of Portland, Oregon. Past President and Board Member, 2014–2015. President, 2009–2014.

City of Portland. Mayor's Economic Cabinet. 2008–2012.

State of Oregon Department of Environmental Quality. Fiscal Advisory Committee for the Proposed Adoption of Air Quality Improvements at the PGE Boardman Power Plant. 2008.

State of Oregon Department of Environmental Quality. Fiscal Advisory Committee for the Proposed Adoption of the Utility Mercury Rule and Other Federal Air Quality Regulations. 2006.

City of Portland. Mayor's Ad Hoc Work Group on Regulatory Reform. 2002.

## Grants and Awards

| | |
|---|---|
| City of Portland Spirit of Portland Award, nominee | 2010 |
| City of Portland Livability Volunteer Award | 2010 |
| Institute for Humane Studies Research Grant | 1996 |
| John Randolph Haynes and Dora Haynes Foundation Grant | 1995 |

Eric Fruits, Ph.D.                                                                                                        7

| Lynde and Harry Bradley Foundation Grant | 1992–1995 |
|---|---|
| Lionel Edie Award | 1990 |

## Courses Taught

Microeconomics

Industrial Organization

Economics of Regulation and Antitrust

Urban Economics

Managerial Economics

Econometrics

Real Estate Finance and Investment

State and Local Public Finance

Economics and the Creative Industries

War Crimes

March 28, 2022

**Exhibit 2: Materials and other information relied upon**

First Amended Complaint (n.d.).

Defendant's Answer, Affirmative Defenses, and Counterclaims (Nov. 12, 2020).

Dickson, David, Expert Report (Apr. 4, 2022).

Fernandez, Jessica, Deposition (Mar. 16, 2022).

Stalzer, Susan, Deposition (Mar. 9, 2022).

Williamson, David, Declaration (May 28, 2020).


American Intellectual Property Law Association (2011), *Report of the Economic Survey*.

*Assessment Techs. of WI, LLC v. Wire Data, Inc.*, 350 F.3d 640 (2003).

Blacked.com (2019), "Join Blacked.com," Internet Archive (Oct. 7),
https://web.archive.org/web/20191007114048/https://members.blacked.com/joinnow.

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.* (E.D. Va., 2016).

*CELL Film Holdings, LLC v. Roger Hawkins*, Order Granting in Part Cell Film Holdings'
Motions for Default Judgment, Case 2:16-cv-01091-RSL (W.D. Wash, March 14, 2019).

Chaffin, J. (2007) "Porn industry suffers slump in DVD sales," *Financial Times*, Mar. 8.,
https://www.ft.com/content/2ca67f30-cdcd-11db-839d-000b5df10621.

DeBriyn, J. (2012), "Shedding light on copyright trolls: An analysis of mass copyright
litigation in the age of statutory damages," *UCLA Entertainment Law Review*, 19(1): 79–
112.

Eggertson, Chris (2021), "Judge upholds $1b major label verdict against Cox
Communications," *Hollywood Reporter*. January 13.
https://www.hollywoodreporter.com/business/digital/judge-upholds-1-billion-major-
label-verdict-against-cox-communications-4115809/.

Field, Collette, *Malibu Media, LLC v. Doe subscriber assigned IP address 98.116.160.61*
(EDNY, Case No. 2:15-cv-03504-JFB-SIL, Doc. 6, Jul. 13, 2015).

Frontier Communications (2020), "Residential Internet acceptable use policy."
November 15.
https://web.archive.org/web/20180308153627/https://frontier.com/~/media/corporate/pol
icies/aup-residential.ashx, captured March 8, 2018;

1

https://web.archive.org/web/20200219042114/https://frontier.com/~/media/corporate/policies/aup-residential.ashx, captured February 19, 2020.

Greenberg, B. A. (2015), "Copyright trolls and common law," *Iowa Law Review Bulletin*, vol. 100:77–86.

Kennedy, Emilie, LinkedIn (n.d.), https://www.linkedin.com/in/emiliekennedy, retrieved Mar. 31, 2022.

Kessler, D. (1996), "Institutional causes of delay in the settlement of legal disputes," *Journal of Law, Economics, & Organization*, 12(2): 432–460.

Lansky, Greg, *Strike 3 Holdings, LLC vs. John Doe subscriber assigned IP address 73.225.38.130*, Declaration, United States District Court for the Western District of Washington at Seattle, Case No. 2:17-cv-01731-MJP, (n.d.).

*Malibu Media, LLC v. Doe*, 2020 WL 6043946, at *2 (N.D.N.Y. Oct. 13, 2020).

*Malibu Media, LLC v. Duncan*, 2020 WL 567105, at *3 (S.D. Tex. Feb. 4, 2020).

*Malibu Media, LLC v. John Doe subscriber assigned IP address 24.148.79.226*, Civil Action No. 1:14-cv-00693 (N.D. Ill. Apr. 6, 2014).

*Malibu Media, LLC v. John Does 1 through 10*, 2012 WL 5382304, at *4 (C.D. Cal. June 27, 2012).

*Malibu Media, LLC v. Mantilla*, 2020 WL 6866678, at *5 (D. Conn. Nov. 20, 2020).

*Malibu Media, LLC v. Mullins*, No. 18-cv-06447 (N.D. Ill. Jan. 13, 2021).

*Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 698 (9th Cir. 2015).

P'ng, I. P. L. (1983), "Behavior in suit, settlement, and trial," *Bell Journal of Economics*, 14(2): 539–550.

Raustiala, K. and C. J. Sprigman (2019) "The Second Digital Disruption: Streaming and the Dawn of Data-Driven Creativity," *New York University Law Review*, 94:1555-1622.

Rosenberg, D. and S. Shavell (1985), "A model in which suits are brought for their nuisance value," *International Review of Law and Economics*. 5(1): 3–13.

Sag, M. (2015), "Copyright trolling: An empirical study," *Iowa Law Review*, 100(3): 1105–1147.

*Strike 3 Holdings, LLC against John Doe*, Memorandum and Order, 18-CV-0449 (ENV) (JO), 18-CV-1155 (KAM) (JO), 18-CV-1159 (KAM) (JO), 18-CV-1184 (JBW) (JO), 18-CV-1196 (JBW) (JO), 18-CV-2073 (ILG) (JO), 18-CV-2132 (AMD) (JO), 18-CV-3216 (KAM) (JO), 18-CV-3778 (ENV) (JO), 18-CV-3785 (WFK) (JO), 18-CV-6988 (NGG) (JO), 19-CV-0725 (NGG) (JO), 19-CV-0729 (AMD) (JO) (E.D.N.Y. Mar. 21, 2019).

*Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 76.172.87.57* (S.D.Cal.) 3:17-cv-02317-JAH-BLM.

*Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 76.247.176.87* (N.D.Cal.) 5:17-cv-07058-EJD.

*Strike 3 Holdings, LLC v. John Doe subscriber assigned IP address 73.180.154.14*. Memorandum Opinion. Civil Action #1:18-cv-01425-RCL (D.D.C). November 16, 2018.

Sudarshan, R. (2008), "Nuisance-value patent suits: An economic model and proposal," *Santa Clara High Technology Law Journal*, 25(1):159-189.

U.S. Copyright Office, Public Catalog (n.d.)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2022, I electronically served the foregoing document on:

**MAMONE VILLALON**
*Counsel for Plaintiff Strike 3*
*Holdings, LLC*
By: /s/ *Tyler A. Mamone*
Tyler A. Mamone, Esq.
Florida Bar No.: 111632
100 SE 2nd St., Suite 2000
Miami, Florida, 33131
Tel: (786) 209-2379
Tyler@mvlawpllc.com
*Counsel for Plaintiff*


By email as per agreement of the parties.


/J. Curtis Edmondson/

Declarant

Exhibit B – Human Rights Watch Letter

350 Fifth Avenue, 34th Floor
New York, NY 10118-3299
Tel:      212-290-4700
Fax:     212-736-1300; 917-591-3452

**HUMAN RIGHTS WATCH**

HRW.org

**US PROGRAM**

Nicole Austin-Hillery, *Executive Director*
Sara Darehshori, *Senior Counsel*
Dreisen Heath, *Senior Coordinator*
Elizabeth Kennedy, *Researcher*
Rachel Kent, *Press Officer*
Clara Long, *Senior Researcher*
Megan McLemore, *Senior Researcher*
Grace Meng, *Senior Researcher*
Alison Leal Parker, *Managing-Director*
Laura Pitter, *Senior National Security Counsel*
Thomas Rachko, *Associate*
John Raphling, *Senior Researcher*
Brian Root, *Quantitative Analyst*
Sarah St. Vincent, *Researcher*
Jasmine L. Tyler, *Advocacy Director*

**HUMAN RIGHTS WATCH**

Kenneth Roth, *Executive Director*
Michele Alexander, *Deputy Executive Director, Development and Global Initiatives*
Iain Levine, *Deputy Executive Director, Program*
Chuck Lustig, *Deputy Executive Director, Operations*
Bruno Stagno Ugarte, *Deputy Executive Director, Advocacy*

Emma Daly, *Communications Director*
Peggy Hicks, *Global Advocacy Director*
Babatunde Olugboji, *Deputy Program Director*
Dinah PoKempner, *General Counsel*
Tom Porteous, *Deputy Program Director*
James Ross, *Legal & Policy Director*
Joe Saunders, *Deputy Program Director*
Frances Sinha, *Human Resources Director*

**BOARD OF DIRECTORS**

Hassan Elmasry, *Co-Chair*
Joel Motley, *Co-Chair*
Wendy Keys, *Vice-Chair*
Susan Manilow, *Vice-Chair*
Jean-Louis Servan-Schreiber, *Vice-Chair*
Sid Sheinberg, *Vice-Chair*
John J. Studzinski, *Vice-Chair*
Michael G. Fisch, *Treasurer*
Bruce Rabb, *Secretary*
Karen Ackman
Jorge Castañeda
Tony Elliott
Michael E. Gellert
Hina Jilani
Betsy Karel
Robert Kissane
David Lakhdhir
Kimberly Marteau Emerson
Oki Matsumoto
Barry Meyer
Joan R. Platt
Amy Rao
Neil Rimer
Victoria Riskin
Graham Robeson
Shelley Rubin
Kevin P. Ryan
Ambassador Robin Sanders
Javier Solana
Siri Stolt-Nielsen
Darian W. Swig
Makoto Takano
John R. Taylor
Amy Towers
Peter Visser
Marie Warburg
Catherine Zennström

Matt Dummermuth
Principal Deputy Assistant Attorney General
US Department of Justice
810 Seventh St. NW
Washington, DC 20531

Cc: Caren Harp
Administrator, Office of Juvenile Justice and Delinquency Prevention
US Department of Justice

Michael Horowitz
Inspector General
US Department of Justice

Peter Winn
Acting Chief Privacy and Civil Liberties Officer
US Department of Justice

Re: Child Protection System software suite

February 1, 2019

Dear Mr. Dummermuth:

We write to ask questions and express concerns about Child Protection System (CPS), a software suite that federal and state law enforcement—including members of the Internet Crimes Against Children Task Force Program established by the Justice Department—use to investigate crimes related to the sharing of child sexual exploitation images.

Human Rights Watch has long promoted accountability for sexual abuse of children around the world, and recognizes that lawful and rights-protecting efforts to prosecute and punish those who commit such crimes are of utmost importance.[1] Our examination of CPS, however, raises several concerns that tie into broader problems in the US criminal justice system.

Specifically, we are concerned that:

---

[1] Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and pornography, UN Doc. A/RES/54/263 (March 16, 2001), art. 3(1)(c), https://www.ohchr.org/en/professionalinterest/pages/opsccrc.aspx (accessed October 29, 2018). Human Rights Watch has produced a substantial body of work investigating and advocating effective measures to curb sexual abuse of children. Some examples include Human Rights Watch, *Breaking the Silence: Child Sexual Abuse in India* (2013), https://www.hrw.org/report/2013/02/07/breaking-silence/child-sexual-abuse-india; Human Rights Watch, "End Child Marriage," https://www.hrw.org/EndChildMarriage; and Saroop Ijaz, "Protect Pakistan's Children from Sexual Abuse," commentary, Human Rights Dispatch, August 14, 2018, https://www.hrw.org/news/2018/08/14/protect-pakistans-children-sexual-abuse.

H U M A N
R I G H T S
W A T C H

HRW.org

- As has proven to be the case regarding other technical investigative methods US authorities have previously employed,[2] the CPS software may not have been subject to thorough independent testing of its accuracy and functioning. Since the system is designed to flag people as suspected of having committed crimes, both its error rates and its potential to exceed constitutional bounds have implications for rights. It is unclear what information the Justice Department has about CPS' potential for error (and on what basis), although prosecutors stated in one court filing that CPS mistakes are "practically nonexistent."[3]
- CPS is provided by a non-profit organization that has repeatedly stated it offers the system exclusively to law enforcement, while prosecutors have argued that they cannot provide the software to criminal defense experts for testing because it is proprietary and not in the government's possession. We fear that the government may be shielding its methods from scrutiny by relying on its arrangements with the non-profit—one whose close relationship with police may, in fact, make it a government agent.
- The CPS software may be facilitating undisclosed police access, without legal process, to personal data about internet subscribers held by a datamining program that private credit reporting agency TransUnion owns. There appears to be a close relationship between the non-profit organization that offers CPS and this private credit reporting agency. If this is indeed occurring, such a practice would give rise to constitutional, federal, and human rights law and policy concerns.
- Among the potential issues arising from any such secret law enforcement access to personal data is that defendants and trial courts may not learn about, or be able to challenge, the breadth of information police obtain—and the potential for that information to facilitate decision-making based on implicit bias or other improper factors.
- Law enforcement may be concealing any such secret use of personal data by deliberately creating a new and different paper trail—a practice known as "parallel construction," which our prior reporting suggests is a common and rights-harming problem in US prosecutions.[4]
- Potential errors by officers in identifying files as illicit—and registering them as such in a shared database—may harm legitimate free expression in a lasting manner. It is unclear whether any systematic review occurs to prevent this from happening.
- The available sources do not indicate what efforts the Justice Department or other law enforcement agencies make to ensure that any data incorrectly linking innocent people to the highly stigmatized offense of possessing child sexual abuse images is corrected or deleted.

This letter provides background and details regarding these concerns and seeks information from the Justice Department on or before February 18, 2019 about current policies and practices related to law enforcement uses of CPS.

---

[2] Recent examples include hair comparisons and bite-mark analysis. See, for example, President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring the Scientific Validity of Feature-Comparison Methods* (2016), pp. 8-9, 13-14, 83-87, 118-122, https://www.innocenceproject.org/wp-content/uploads/2017/03/PCAST-2017-update.pdf (accessed October 30, 2018) (hereinafter "PCAST Report").

[3] *Infra* n. 22 and accompanying text.

[4] Human Rights Watch, *Dark Side: Secret Origins of Evidence in US Criminal Cases*, January 2018, https://www.hrw.org/sites/default/files/report_pdf/us0118.pdf.

HUMAN

RIGHTS

WATCH

HRW.org

The discussion below is based on research we conducted between May 2016 and October 2018, including an examination of records from 20 federal prosecutions in which the government explicitly disclosed the use of CPS, as well as information appearing in a set of federal civil-rights lawsuits brought against local authorities in Mississippi in 2011 following the use of CPS there. (See Appendix for a list of these cases.) Although we do not address state cases here, media coverage and other sources suggest that prosecutions in state courts involving CPS use may be common.[5]

### The CPS Software Suite

CPS is a set of software tools and databases designed to help law enforcement identify individuals who allegedly share child exploitation images on peer-to-peer networks, which enable internet users to connect to one another and trade files such as pictures, music, and videos. A US-based non-profit organization, Child Rescue Coalition (CRC), reports that it provides the software suite to law enforcement—including the Internet Crimes Against Children Task Force run by the Justice Department.[6]

It is our understanding that a CPS component called Peer Spectre monitors file-sharing traffic on peer-to-peer networks. Anyone on a peer-to-peer network can search for files by keyword, and we understand that Peer Spectre carries out continuous, automated keyword searching for suspicious file titles and identifies Internet Protocol (IP) addresses that are allegedly sharing those files. The results of these searches are logged in servers law enforcement can access.

We understand that a second component of CPS, Shareaza LE, then enables law enforcement to single out a particular IP address and attempts to download all the files it is sharing, a technique known as a "sole source download." This gives police a means of investigating the tips CPS generates when it monitors the peer-to-peer network. Our information suggests that without Shareaza LE (which is not available to the public), peer-to-peer network users typically cannot carry out sole source downloads.

We understand that at these initial stages, suspected child exploitation images are identified using "hash values," or unique digital identifiers roughly analogous to fingerprints, that can be calculated for many files using certain algorithms.

What is now CPS was apparently developed as part of a collaborative effort by law enforcement authorities and then was acquired by a data broker known as TLO, LLC, in

---

[5] See, for example, Carey Codd, "Boca Raton-Based Child Rescue Coalition Works 'To Find Those That Victimize Kids," *CBS4 News*, November 18, 2015, https://miami.cbslocal.com/2015/11/18/boca-raton-based-child-rescue-coalition-works-to-find-those-that-victimize-kids/ (accessed December 12, 2018) ("The Broward State Attorney's Office said they've prosecuted close to 150 cases based on information supplied by the Child Rescue Coalition"); *People v. Worrell*, 59 Misc. 3d 594 (N.Y.), March 2, 2018; *State v. Baric*, 2018 WI App. 63 (Wis. Ct. App.), September 18, 2018; *Frazier v. State*, 180 So. 3d 1067 (Fla. Dist. Ct. App.), November 20, 2015.

[6] *United States v. McKinion*, no. 2:14-cr-00124 (C.D. Cal..), Declaration of William S. Wiltse (doc. 62-1), para. 2; Child Rescue Coalition Inc., Internal Revenue Service Form 990 (2017), p. 36; Department of Justice, "Office of Juvenile Justice and Delinquency Prevention's Internet Crimes Against Children Task Forces Arrest More Than 1,000 Child Predators in Operation Broken Heart," Press release, June 22, 2015, https://www.justice.gov/opa/pr/office-juvenile-justice-and-delinquency-prevention-s-internet-crimes-against-children-task (accessed October 30, 2018); Internet Crimes Against Children Task Force Program, https://www.icactaskforce.org/ (accessed October 30, 2018).

HUMAN
RIGHTS
WATCH

HRW.org

2009.[7] TLO was purchased by credit reporting agency TransUnion in 2013 after filing for bankruptcy and is now known as TLOxp.[8] CRC, the non-profit organization that now offers CPS, was established in the wake of TLO's bankruptcy and continues to share a physical address with TLOxp.[9]

**Reliability Testing Concerns: Accuracy and Reach**

1. Accuracy

Concern has grown in recent years about how US courts regard technical investigative methods and whether those methods have been adequately tested to ensure their accuracy and consistency.[10] Without rigorous testing, it is impossible to know objectively how often an investigative method produces false positives or false negatives, and what factors may affect those rates.[11]

However, to date we have not found any public information on CPS having been tested by qualified independent experts or results of such testing.

Knowing the accuracy of investigative methods is important for human rights and constitutional reasons. Except in an emergency or other exceptional circumstance, US police may force people to submit to intrusive searches of their homes or electronic devices only if the authorities first obtain a warrant from a court based on a demonstration that they have probable cause to believe they will find evidence of a crime. To show that such probable cause exists, they may rely wholly or partly on results from an investigative tool such as CPS. If the tool has accuracy problems, its results may not provide a sufficiently sound basis for a court to include in the justification for issuing a warrant—and a warrant issued without probable cause is unconstitutional under the Fourth Amendment. In turn, under the "fruit of the poisonous tree" rule, trial courts will normally prohibit prosecutors from introducing any evidence that derives from an initial illegal search, such as one based on a warrant that lacked probable cause.[12]

---

[7] See, for example, *United States v. Dang*, no. 6:16-cr-10027 (D. Kan.), Affidavit of William S. Wiltse (doc. 23-1), undated, filed September 26, 2016, para. 2; *United States v. Clements*, no. 1:15-cr-00275 (N.D. Ohio), Affidavit of William S. Wiltse (doc. 18-1), August 2, 2013, para. 2.

[8] Jeff Ostrowski, "After founder's death, Boca tech firm TLO files for Chapter 11," *Palm Beach Post*, May 9, 2013, https://www.mypalmbeachpost.com/business/after-founder-death-boca-tech-firm-tlo-files-for-chapter/34CcCzHza646WkCtWoWZuN/ (accessed October 30, 2018); TransUnion, "TransUnion Completes Acquisition of TLO," https://newsroom.transunion.com/transunion-completes-acquisition-of-tlo/ (accessed October 30, 2018); TransUnion and TLOxp, www.tloxp.com (accessed October 30, 2018).

[9] CRC's Form 990 tax filing for 2013 covers a period beginning December 11, 2013, suggesting that the organization was established on or around this date. Its address is listed on its 2017 Form 990; the same address is listed on TLOxp's "Contact Us" page, https://www.tlo.com/contact (accessed October 31, 2018).

[10] See, PCAST Report, *supra* n. 2, pp. 3-6; Rebecca Wexler, "Convicted by Code," *Slate*, October 6, 2015, https://slate.com/technology/2015/10/defendants-should-be-able-to-inspect-software-code-used-in-forensics.html (accessed October 31, 2018); Jonathan Jones, "Forensic Tools: What's Reliable and What's Not-So-Scientific," Frontline, April 17, 2012, https://www.pbs.org/wgbh/frontline/article/forensic-tools-whats-reliable-and-whats-not-so-scientific/ (accessed October 30, 2018); Innocence Project, "Misapplication of Forensic Science," undated, https://www.innocenceproject.org/causes/misapplication-forensic-science/ (accessed October 30, 2018).

[11] See generally PCAST Report, *supra* n. 2, pp. 5-6.

[12] *Wong Sun v. United States*, 371 U.S. 471 (1963).

H U M A N
R I G H T S
W A T C H

HRW.org

This means establishing a technique's error rates is critical both to protecting people from unconstitutional searches and to ensuring that in a criminal trial, the prosecution cannot unfairly benefit from illegal police activities.

Where software is concerned, the Justice Department's policy guidance states that such tools "used to support evidence discovery, extraction and examination, case examination and evaluation and method development shall be technically reviewed by qualified experts and validated prior to use."[13] Materials the US Commerce Department's National Institute of Standards and Technology (NIST) has published help demonstrate that it is possible to develop a methodology for objectively testing how, and how reliably, software operates. For example, as part of a project concerning computer forensic tools, NIST has set out a testing process that includes, inter alia:

- The development of test cases, which are then posted online, along with other information, for "peer review by members of the computer forensics community and for public comment by other interested parties";
- The incorporation of feedback from the peer-review and public-comment processes;
- NIST's acquisition of the tool for testing;
- An examination of the available documentation;
- The selection of appropriate test cases;
- The development of a test strategy;
- The execution of the test; and
- The production and online posting of a test report.[14]

As noted above, despite the existence of such scientific methodologies and the Justice Department's policy, we have been unable to locate any evidence that CPS has been subjected to complete, independent, peer-reviewed testing. If such tests have been carried out, we request that you make the studies publicly available.[15]

When defendants have made motions seeking to arrange for expert testing of the software, federal prosecutors have sometimes sought to avoid producing CPS' source code for testing on the grounds that it is protected from disclosure by law enforcement privilege,[16] that the code is proprietary and not in the government's possession[17]—or both.[18] We have identified only one case—*United States v. Ocasio*—in which prosecutors ultimately produced the CPS

---

[13] U.S. Department of Justice, "Scientific Research and Integrity Policy," undated, https://www.justice.gov/olp/forensic-science (accessed December 6, 2018), p. 6.

[14] National Institute of Standards and Technology, "Methodology Overview," February 22, 2018, https://www.nist.gov/itl/ssd/software-quality-group/computer-forensics-tool-testing-program-cftt/cftt-general-0 (accessed October 30, 2018).

[15] CRC's president William Wiltse testified during a 2013 hearing concerning a defense motion to suppress in *United States v. Thomas*, a Vermont federal case, that some aspects of the CPS suite were tested internally to a certain degree when CPS was first developed, but that the suite had not been tested more recently or subjected to thorough, independent testing using a standardized process. *United States v. Thomas*, no. 5:12-cr-00037 (D. Vt.), "Transcript: Motion to Suppress & Request for a *Franks* Hearing," (doc. 99), April 17, 2013, pp. 102-110.

[16] See, for example, *United States v. Dang*, *supra* n. 7, Response to Defendant's Motion to Compel Production (doc. 23), September 26, 2016, p. 12; *United States v. Hartman*, no. 8:15-cr-00063 (C.D. Cal.), Opposition to Defendant's Motion to Compel Discovery (doc. 37), September 24, 2015, p. 4.

[17] See, for example, *United States v. Neale*, no. 5:12-cr-00044 (D. Vt.), Response to Defendant's Motion to Compel Discovery (doc. 44), December 7, 2012, pp. 8-10; *United States v. Crowe*, no. 1:11-cr-01690 (D.N.M.), Response to Defendant's Motion to Compel and Motion to Inspect (doc. 58), June 1, 2012, pp. 11-15.

[18] *Ibid.*; *United States v. Dang*, *supra* n. 7, Response to Defendant's Motion to Compel Production (doc. 23), September 26, 2016, pp. 12, 23-24.

HUMAN
RIGHTS
WATCH

HRW.org

source code to a defendant, and a statement submitted in a later case suggests that *Ocasio* was resolved through a plea agreement before any expert testing took place.[19]

By contrast, in a 2015 decision in *United States v. Naylor*, a West Virginia federal court simply accepted an officer's assertion that in his personal experience, the tool had never erred and was (in the court's words) "100% reliable."[20] The court therefore concluded that "[t]he CPS software appears to be a reliable investigative tool for law enforcement in these types of cases" and rejected the defendant's motion to suppress evidence found through the software.[21] In at least one case, the government itself has asserted in a motion that "[e]rror is practically nonexistent in the Shareaza LE and CPS systems" without citing any sources for this claim.[22]

We fear this situation—in which prosecutors resist defense testing of CPS but are willing to make, or apparently allow witnesses to make, assertions about the software's accuracy—may interfere with the judiciary's ability to assess the tool's potential for malfunction, and thus jeopardize fair-trial rights.

Regarding assertions that CPS' source code is proprietary or otherwise not in the government's possession, we note that CRC has consistently described itself as heavily enmeshed with and dedicated to furthering the operations of law enforcement. In its tax filings, the organization has stated that it "offers space at its operational location to law enforcement agencies in order to easily access the tracking system."[23] Affidavits by the group's president, William Wiltse, have described access to CPS as "made available to specifically trained and licensed law enforcement officers and … *restricted to only those law enforcement officers in the performance of law enforcement activity*" (emphasis added).[24] Testimony by Wiltse in 2013 concerning CPS-enabled investigations (prior to the establishment of CRC) described a "restricted area" on TLO's property: "The only people allowed into this area are sworn law enforcement officers. Even our boss, our CEO, cannot get into this area without being escorted," Wiltse told the court.[25] Wiltse himself is a reserve deputy sheriff for Florida's Palm Beach County, according to his affidavits and CRC's website.[26]

---

[19] For the decision granting the defendant's motion to compel production of the CPS source code in *United States v. Ocasio*, no. 3:11-cr-02728 (W.D. Tex.), see 2013 U.S. Dist. Lexis 79313 (2013 WL 2458617), June 6, 2013. For a discussion concerning how *Ocasio* was resolved, see *United States v. Shia*, no. 3:15-cr-00257 (N.D. Cal.), Affidavit of Tami Loehrs Re Ocasio Case (doc. 27), November 19, 2015.

[20] *United States v. Naylor*, 99 F. Supp. 3d 638, 643 (S.D.W. Va., 2015).

[21] *Ibid.*

[22] *United States v. Piroska*, no. 5:12-cr-00327 (N.D. Ohio), Response in Opposition to Defendant's Motion to Compel (doc. 32), August 2, 2013, pp. 7-8. To the best of our knowledge, the case the government mentioned in the second part of the sentence involved a different software program.

[23] See, for example, Form 990 (2017), *supra* n. 9, p. 36.

[24] *United States v. Dunning*, no. 7:15-cr-00004 (E.D. Ky.), August 26, 2015, Affidavit of William S. Wiltse (doc. 30-1), September 14, 2015, para. 13; *United States v. Crowe*, *supra* n. 17, Affidavit of William S. Wiltse (doc. 58-1), June 1, 2012, para. 3; *United States v. Clements*, *supra* n. 7, Affidavit of William S. Wiltse (doc. 18-1), August 2, 2013, para. 3.

[25] *United States v. Thomas*, *supra* n. 15, Transcript, pp. 131-32.

[26] *United States v. Dunning*, *supra* n. 24, Affidavit of William S. Wiltse, para. 1; Child Rescue Coalition, "Our Team," https://childrescuecoalition.org/our-team/ (accessed October 31, 2018).

We therefore regard government arguments that prosecutors cannot produce the CPS source code for testing as both inappropriate and jeopardizing fair-trial rights, insofar as access to the source code is necessary for scientifically sound testing.[27]

### 2.   Reach

Accuracy is not the only aspect of CPS that is susceptible to testing and should be subject to scientifically sound validation prior to law enforcement use. The software suite's reach also has potential constitutional consequences.

Federal courts have found that police do not need a search warrant to monitor peer-to-peer network activities that take place in public,[28] and CRC's president has maintained that the CPS software only locates information that peer-to-peer network users have publicly shared. [29] If this description of CPS is correct, then under current US constitutional law, police may use or rely on the software without obtaining a warrant first.

However, defendants in several federal cases have offered evidence that files (or traces of files) officers have identified using CPS may have been stored in areas of their devices that were not publicly shared, raising Fourth Amendment concerns.[30] We acknowledge that the strength of this evidence is open to debate and that federal prosecutors have challenged the credibility of the forensic expert who produced the relevant reports. However, nowhere in the records we reviewed does the government actually set out evidence refuting the claims that CPS can reach beyond publicly shared folders, let alone persuasively show that the software cannot do so or is not being so used.[31]

This, too, is a matter that rigorous independent testing can and should resolve.

### Free Speech and Related Concerns

To function accurately, CPS depends not only on the correct identification of IP addresses and the hash values of shared files, but on police officers correctly designating files as containing illegal child exploitation images. The potential for mistakes in this respect prompts concerns about the resulting impact on legitimate free expression, particularly if the Justice Department does not ensure that these designations are regularly reviewed.

---

[27] See, also, Rebecca Wexler, "Life, Liberty, and Trade Secrets: Intellectual Property in the Criminal Justice System," *Stanford Law Review*, vol. 70 (May 2018), pp. 1364-65, 1429, https://review.law.stanford.edu/wp-content/uploads/sites/3/2018/06/70-Stan.-L.-Rev.-1343.pdf (accessed October 31, 2018) (specifically addressing the CPS case *Ocasio* and concluding that "extending the [trade secret] privilege wholesale from civil to criminal proceedings is both harmful and unnecessary").

[28] See, for example, *United States v. Thomas*, 2013 WL 6000484 (D. Vt. 2013), 47-51 (aff'd 2d Cir., 788 F. 3d 345, 351 (2015); *United States v. Baalerud*, 2015 WL 1349821 (W.D.N.C. 2015), pp. 23-26; *United States v. Dodson*, 960 F. Supp. 2d p. 689, pp. 695-696 (W.D. Tex. 2013).

[29] See, for example, *United States v. Clements*, *supra* n. 7, Affidavit of William S. Wiltse (doc. 18-1), August 2, 2013, para. 8; *United States v. Crowe*, *supra* n. 25, Affidavit of William S. Wiltse (doc. 58-1), May 31, 2012, para. 6.

[30] *United States v. Clements*, *supra* n. 7, Affidavit of Tami Loehrs (doc. 17-2), November 19, 2015, para. 10; *United States v. Crowe*, *supra* n. 25, Affidavit of Tami Loehrs (doc. 48-1), April 26, 2012, paras. 11, 14-16; *United States v. Dang*, *supra* n. 7, Affidavit of Tami Loehrs (doc. 19-1), August 9, 2016, para. 11; *United States v. Hartman*, *supra* n. 24, Affidavit of Tami Loehrs (doc. 50-1), October 8, 2015, paras. 14-16.

[31] See, for example, *United States v. Hartman*, *supra* n. 16, Order Re Pretrial Motions (doc. 87), November 24, 2015, pp. 22-23 (noting that "the Government has not refuted the defense expert's analysis that suggests the files at issue here were not designated as shareable," although it had "ample opportunity to do so").

HUMAN
RIGHTS
WATCH

HRW.org

An affidavit by Wiltse in an Ohio federal prosecution, *United States v. Clements*, and his 2013 testimony in *Thomas* indicate that officers using CPS may designate newly discovered files as "Child Notable" based on their own opinions and proceed to register hash values for those files in one or more of the system's networked databases.[32] Wiltse's testimony in *Thomas* further indicates that CPS' reliance on these officer-made designations is extensive.[33] However, the records we have examined do not disclose any systematic safeguards for ensuring that these designations are accurate. This raises concerns that people's right to access and receive information—part of the right to free expression—could be at risk if officers mischaracterize files, or generate records when someone possesses lawful files (such as legal adult pornography).

Additionally, we understand that the element of the software suite called Shareaza LE gives officers the technical ability to view the hash values of, and download, *any* file an IP address is sharing on a peer-to-peer network—regardless of whether those files are believed to be illicit.[34] The Justice Department should explain whether it takes steps to ensure officers are not monitoring legitimate free expression in a manner that would be inconsistent with rights laws or policies.

## Personal Data and Discrimination Concerns

Through our research, we have become aware of potential law enforcement access to personal information when using CPS. This potential for access could undermine privacy and consumer protections found in federal law, reduce defendants' ability to learn about and challenge any abusive practices, and facilitate improper decision-making.

An undated user agreement for the CPS software submitted as evidence in a 2015 California criminal prosecution, *United States v. Hartman*, suggests that CPS users have—or have had—free access to "Unconfirmed Subscriber Data provided by TLO."[35] "Subscriber" is apparently a reference to people who subscribe to internet services and therefore are associated with an IP address, while "TLO" is a reference to the datamining operation now known as TLOxp.

---

[32] *United States v. Clements*, *supra* n. 7, Affidavit of William S. Wiltse, para. 9 ("The term 'Child Notable' is an *investigator assigned* category for certain file hashes within the Child Protection System…. During training investigators are provided software, which generates hash values for recently located child exploitation files and submits those hash values to CPS databases *with a category selected by the investigator*" (emphasis added)); *United States v. Thomas*, *supra* n. 23, Transcript, pp. 56-57 ("[L]aw enforcement has been aware and continues to become aware of new pieces of child pornography that are being made available on these [peer-to-peer] file sharing networks…. What law enforcement is trained to do is submit the hash values, so we actually give them tools that calculate the hash value for these files, but then law enforcement can then electronically submit those hash values to us, along with a category that the officer is trained to use as far as what is it that this file is categorized as based on your training, and then we then can leverage that hash value or the knowledge of that hash value in programs such as Peer Spectre. So what I mean by that is Peer Spectre is aware of hundreds of thousands of pieces of what *investigators describe as* child notable, which I guess for all intents and purposes is child pornography" (emphasis added))."

[33] *United States v. Thomas*, *supra* n. 23, Transcript, pp. 56-57 ("Peer Spectre is aware of *hundreds of thousands* of pieces of what investigators describe as child notable [files]" (emphasis added)).

[34] See, for example, *United States v. Clements*, *supra* n. 7, doc. 22-6 (filed March 16, 2016); *United States v. Naylor*, *supra* n. 24, no. 2:14-cr-00194 (S.D.W. Va.), doc. 19-1 (filed January 6, 2015), p. 17 of file. These documents are CPS screenshots indicating that officers using the software suite can see that an individual is sharing files that are "Not Categorized," "Adult Erotic," or of "No Known Relevance," in addition to known or suspected "Child Notable" files.

[35] *United States v. Hartman*, *supra* n. 16, "The Child Protection System – Acceptable Use Requirements" (doc. 102-2), undated, filed January 8, 2016, p. 2.

HUMAN
RIGHTS
WATCH

HRW.org

This "Unconfirmed Subscriber Data" might include marketing data about individuals—such as names, telephone numbers, addresses, and dates of birth—that corporate sources have linked to their IP addresses and email accounts. It is our understanding that officers using CPS have been told that no logs will be kept of any search they may perform of this corporate data.

Can you confirm what "Unconfirmed Subscriber Data" includes, from whence it is derived, and the means by which TLOxp could identify IP addresses with specific individuals? We would also like to understand why no records would be kept of law enforcement queries of this data, and whether that is, in fact, the practice.

TLOxp's website indicates that the information the datamining system possesses about an individual may include addresses and phone numbers;[36] records from automated license plate readers,[37] which can reveal where a car has traveled; information from drivers' licenses;[38] Social Security numbers;[39] employment records;[40] social media profiles, including photographs;[41] criminal records;[42] and connections to other people.[43] Please provide your understanding of what types of data CPS users, via TLOxp, may be able to view.

Under the Electronic Communications Privacy Act (ECPA), electronic communications service providers normally may only disclose information identifying the subscriber linked to an IP address in response to a subpoena or other legal process—thus leaving a paper trail defendants can obtain and scrutinize.[44] ECPA also limits the types of subscriber information the provider is obligated to disclose when responding to such a subpoena: primarily name, address, dates and durations of online sessions, and payment information.[45] While ECPA is outdated in many respects and subpoena powers are themselves susceptible to misuse,[46] these provisions nevertheless impose a significant privacy protection and create transparency about both the law enforcement demand and the data disclosed in response to it.

Our understanding is that TLOxp and CRC are not communications service providers and that ECPA therefore does not technically apply to their disclosure of data concerning people linked to IP addresses. However, we are concerned that the use of data from a data broker to identify subscribers without a subpoena or other legal process would subvert the protections Congress intended to establish in the law. Can you provide the details of what types of personal data law enforcement may be able to obtain when using CPS—and whether

---

[36] TransUnion, "TLOxp for Law Enforcement," https://www.tlo.com/law-enforcement (accessed November 5, 2018).
[37] TransUnion, "TLOxp Vehicle Sightings," https://www.tlo.com/vehicle-sightings (accessed November 5, 2018).
[38] TransUnion, "TransUnion's TLOxp for Law Enforcement," 2017,
https://www.tlo.com/resources/tlo/doc/industry/resources/industry-law-enforcement-as.pdf (accessed December 17, 2018),
p. 2.
[39] "TLO for Law Enforcement," *supra* n. 36.
[40] *Ibid.*
[41] TransUnion, "TLOxp Social Media Search," https://www.tlo.com/social-media (accessed November 5, 2018); "About TLOxp," *supra* n. 3.
[42] TransUnion, "TransUnion's TLOxp for Law Enforcement," *supra* n. 38, p. 1.
[43] TransUnion, "TLOxp Relationship Report," https://www.tlo.com/relationship (accessed November 5, 2018).
[44] 18 U.S.C. §§ 2702-03.
[45] 18 U.S.C. § 2703(c).
[46] See Human Rights Watch, *Dark Side*, *supra* n. 4, pp. 28-29.

**H U M A N**
**R I G H T S**
**W A T C H**

HRW.org

that data may go beyond what a communications service provider would normally disclose under ECPA?

As noted above, TLOxp's technical means of linking individuals to IP addresses also remain unclear. These methods could raise further constitutional or other legal questions when the data is used by law enforcement, rendering the disclosure of information about them desirable to ensure respect for rights. We would appreciate any information you may have as to these technical means, and whether and to what sort of technical or legal review they may have been subjected.

Our understanding of the typical progression of a CPS-enabled investigation is that the software's broad monitoring of peer-to-peer networks results in a database of IP addresses that are suspected of offering illicit files, and that officers can then use a different component of CPS in an attempt to create a complete log of all the files a specific IP address is sharing. At this stage, under ECPA, officers would have the power to issue a subpoena directly to the internet service provider and thereby obtain the name and address of the relevant internet subscriber. Our review of relevant cases suggests that such subpoenas are typically disclosed to defendants, who are then able to review these records. Can you explain why officers may choose to not use the ECPA, which provides a record to courts and defendants, to obtain a defendant's name and address, opting instead to use TLOxp for this purpose?

We further note that CRC's website claims the non-profit offers "[a]nalytics targeting the offenders at greatest risk of presently abusing children."[47] The Justice Department should disclose whether police are receiving the results of such "[a]nalytics," and if so, what data the non-profit uses—or enables officers to use—when making these calculations.

### Fundamental Rights Concerns: Parallel Construction

While "Unconfirmed Subscriber Data" from what is now TLOxp appears to be (or have been) available to CPS users, only one case we examined includes a record openly referring to this practice. It is possible that this absence of disclosures is due to officers' decisions not to view or use this data even though CRC has offered it. However, we are concerned that law enforcement may be gaining access to this personal data from or through CRC, and then deliberately concealing how officers obtained the information by re-obtaining it in other ways for use in court—a practice known as parallel construction. In our 2018 report *Dark Side: Secret Origins of Evidence in US Criminal Cases*, we documented evidence suggesting law enforcement has at times used parallel construction to conceal the original sources of leads in some criminal cases.[48]

Parallel construction can prevent courts from reaching important or novel questions about constitutional rights, and defendants from arguing that judges should exclude unconstitutionally obtained evidence under the "fruit of the poisonous tree" rule. The

---

[47] Child Rescue Coalition, "The Solution," https://childrescuecoalition.org/the-solution/ (accessed December 20, 2018).
[48] Human Rights Watch, *Dark Side*, *supra* n. 4, p. 1.

practice can also prevent defendants from learning that the government obtained exculpatory evidence during its investigation.[49]

As noted above, if police were attempting to obtain the identity of a subscriber associated with an IP address from an internet or telephone service provider, they would need to issue a subpoena.[50] However, the CPS user agreement disclosed in 2016 instructs, "Do not use this [data from TLO] for probable cause. It must be confirmed through other investigative means that are acceptable with your agency and prosecuting attorney."[51] This reference to using "other investigative means" to "confirm[]" personal data previously obtained by another method prompts concerns that officers may employ parallel construction to avoid revealing that their initial leads came from personal data obtained from TLOxp. Can you comment on whether this has been a practice, or whether there are measures to prevent such practices in place?

The potential use of subpoenas as a means of "parallel construction" in a different context is currently the subject of an investigation by the Justice Department's Office of the Inspector General.[52] We encourage the Inspector General, to whom we will send a copy of this letter,  to expand its investigation to determine whether such use of subpoenas is occurring in this context as well, and hope you will support such an effort.

In a California federal prosecution, *United States v. McKinion*, a Homeland Security Investigations special agent in Los Angeles used CPS to identify two different IP addresses as allegedly possessing unlawful child sexual abuse images in May 2012.[53] The agent's search warrant application stated that "throughout … April 2012," the agent had "conducted records checks" for McKinion, including searches of address records and employment history.[54] The agent issued either a single subpoena or two subpoenas on the same date to the relevant internet service provider regarding the two IP addresses in May 2012.[55]

In his affidavit, the agent did not explain what databases he used for his "records checks," why he had conducted such checks concerning McKinion in April 2012 if the suspected illicit activities were only detected beginning in May 2012, or whether or how he linked both IP addresses to McKinion prior to issuing the subpoena(s)—especially when one of the IP addresses was shared with seven other people.[56] Likewise, prosecutors did not explain precisely how the two different IP addresses had been linked to the defendant, instead stating simply that the special agent "determined that Suspect IP 1 belonged to defendant and that defendant used Suspect IP 2."[57]

---

[49] *Ibid.* at pp. 3, 57, 59.

[50] 18 U.S.C. § 2703(c)(2).

[51] *United States v. Hartman*, doc. 102-2, *supra* n. 16, p. 2.

[52] Office of the Inspector General, U.S. Department of Justice, "Ongoing Work," https://oig.justice.gov/ongoing/all.htm (accessed November 5, 2018).

[53] *United States v. McKinion*, *supra* n. 6, Affidavit in Support of Search Warrant (doc. 49-2), July 23, 2012, paras. 30-32. **Please be aware that these paragraphs contain graphic and disturbing descriptions of child sexual abuse images.**

[54] *Ibid.* at paras. 35-38.

[55] *Ibid.* at paras. 33-34.

[56] *Ibid.* at para. 34; see also *United States v. McKinion*, *supra* n. 6, Motion to Suppress Evidence Derived from Search Warrant (doc. 47), May 15, 2017, pp. 15-16.

[57] *United States v. McKinion*, *supra* n. 6, Opposition to Defendant's Motion to Suppress Evidence (doc. 49), May 22, 2017, p. 6. The structure of the discussion in this paragraph implies without stating that the special agent made this determination before issuing a subpoena to internet service provider Catalina Computers.

HUMAN
RIGHTS
WATCH

HRW.org

We are concerned that parallel construction may have been employed in this case to avoid the disclosure of investigative activities prior to April 2012 and/or the use of databases that may have linked the IP addresses to individuals' names, and invite the Justice Department to comment on this.

## Correcting Mistakes

Human Rights Watch is also concerned about whether CRC or law enforcement delete or correct data incorrectly linking innocent people to the possession of child sexual exploitation materials and, if so, how this is done.

Ensuring the deletion or correction of inaccurate data is essential to respecting rights and dignity. This is especially true when individuals may be wrongly suspected of illicit file-sharing because someone else used their internet services or devices for illegal activities without their knowledge. Police investigations of alleged downloads of child abuse images involving shared wi-fi networks and computers have previously led to questioning and searches impacting innocent people.[58] One such investigation in Jackson, Mississippi in 2011 that involved CPS led to a civil-rights lawsuit against local police.[59]

Wiltse, CRC's president, also acknowledged in a 2017 declaration in *McKinion* that if a malicious hacker gained access to the nonprofit's tools, he or she could "implicate an innocent person's IP address as participating in the collection, manufacture or distribution of child exploitation files."[60] Such a possibility, no matter how seemingly remote, further supports the need for safeguards at all stages in the collection, storage, and sharing of personal data related to such law enforcement activities.

## Questions for the Justice Department

In light of the foregoing discussion of concerns, we request that the Justice Department provide answers to the following questions:

## Testing

- Has the Justice Department conducted or commissioned thorough independent third-party testing of CPS? If so, what methodology was used and what were the results? If not, does the use of CPS comply with the Department's policy regarding the validation of software tools?

---

[58] See, for example, *Tuskan v. Jackson County*, *infra* n. 59; Sam Stanton, "He wanted to download child porn, so he hacked his neighbor's wifi," *Sacramento Bee*, August 1, 2017, https://www.sacbee.com/news/local/crime/article164803532.html (accessed December 7, 2018); Anthony Bellano, "Man Was Pirating Neighbor's Wi-Fi To Download Child Pornography: Prosecutor," *Patch*, September 12, 2016, https://patch.com/new-jersey/gloucestertownship/clementon-man-was-pirating-neighbors-wi-fi-download-child-pornography (accessed December 7, 2018); Brett Cihon, "Prosecutor: Man sets up neighbor's Wi-Fi, secretly uses it to download child porn," *Q13 FOX*, April 9, 2014, https://q13fox.com/2014/04/09/prosecutor-man-sets-up-neighbors-wi-fi-secretly-uses-it-to-download-child-porn/ (accessed December 7, 2018); Debra Cassens Weiss, "Prosecutor's Apology for Home Raid Highlights the Dangers of Unprotected WiFi," *ABA Journal*, March 18, 2011, http://www.abajournal.com/news/article/prosecutors_apology_for_home_raid_highlights_the_dangers_of_unprotected_wif/ (accessed December 7, 2018).
[59] *Tuskan v. Jackson County*, 2016 U.S. Dist. Lexis 182700 (S.D. Miss., 2016); for an investigative document showing the use of CPS, see case document 60-9 (case no. 1:13-cv-00356).
[60] *United States v. McKinion*, *supra* n. 6, Declaration of William S. Wiltse (doc. 62-1), October 27, 2017, paras. 15-16.

H U M A N
R I G H T S
W A T C H

HRW.org

- Does the Justice Department have policies or practices that relate to the involvement of private or nongovernmental entities in conducting or facilitating law enforcement operations, and if so, what are they?
- What are the Justice Department's policies regarding the level of technical expertise and access to software source code an officer should possess before prosecutors call him or her to testify about the software's functioning and results? Before an officer or agent may attest to the software's results in a search warrant application?
- Does the Justice Department require federal agents to receive training before using CPS? If so, what is the content of this training?

### Free Speech

- Has the Justice Department assessed what proportion of files designated as "Child Notable" in CPS or relevant databases constitute unlawful child sexual exploitation images under federal or state law?
- Has the Justice Department analyzed the First Amendment implications of law enforcement use of CPS?

### Personal Data and Discrimination Concerns

- Does the Justice Department permit agents to view subscriber data offered by CRC or TLOxp?
- Does the Justice Department believe logs should be kept of law enforcement access to such data? Are such logs kept?
- If agents are permitted to view the data, what types of information are included? What information links individuals' identities to IP addresses, and from what source does that information come?
- Has the Justice Department analyzed whether the protections of the FCRA apply, or should be applied as a matter of policy, to data from TLOxp or CRC? If so, what were the conclusions of this analysis and in what document(s) do they appear?

### Parallel Construction

- What are the Justice Department's positions concerning the disclosure of an agent's viewing or use of subscriber data from CRC or TLOxp to courts and defendants? Does the Justice Department require such disclosure if law enforcement subsequently obtains the information in question from other sources?
- Is the Justice Department aware of any use of parallel construction to conceal aspects of investigations involving CPS?
- Does the Justice Department have in place any rule, guidance or measure to prevent or disclose the use of parallel construction in obtaining evidence?

### Correcting Mistakes

- What are the Justice Department's policies and practices regarding the identification and treatment of investigative data incorrectly linking an individual, IP address, or device to the possession or sharing of illicit files? What are its policies and practices



HUMAN
RIGHTS
WATCH

HRW.org

regarding whether and how people who may have been wrongly linked to such activities should be notified?

- What are the Justice Department's policies and practices regarding how electronic evidence linking an individual to a suspected offense should be stored and secured? Has the Justice Department determined that CRC is in compliance with these policies, if any?

\* \* \*

We are aware that CPS is not the only software that may be capable of monitoring file-sharing networks for allegedly illegal images, and many of our concerns about this software suite may also apply to other systems. We believe answers to the foregoing questions will assist Congress, the courts, and the public in understanding the Justice Department's treatment of both CPS and other comparable systems, and the broader issues raised by the use of such systems.

We thank you for your attention to this matter and await your response on or before February 18, 2019.

Sincerely,

[signature]

Sarah St.Vincent
Researcher/Advocate on National Security, Surveillance, and Domestic Law Enforcement
Human Rights Watch

**Encl.**

Appendix: List of federal cases examined by Human Rights Watch

**Appendix:
List of Federal Cases Examined by Human Rights Watch**

*Federal prosecutions*

United States v. Baalerud (W.D.N.C., 3:14-cr-00188)

United States v. Brooks (M.D. Fla., 3:13-cr-00058)

14

United States v. Clements (N.D. Ohio, 1:15-cr-00275)

United States v. Crowe (D.N.M., 1:11-cr-01690)

United States v. Dang (D. Kan., 6:16-cr-10027)

United States v. Dennis (N.D. Ga., 3:13-cr-00010)

United States v. Dodson (W.D. Tex., 4:13-cr-00014)

United States v. Dunning (E.D. Ky., 7:15-cr-00004)

United States v. Hart (W.D. Wash., 3:14-cr-05507)

United States v. Hartman (C.D. Cal., 8:15-cr-00063)

United States v. Juhic (S.D. Iowa, 4:16-cr-00162)

United States v. Leikert (D. Vt., 5:12-cr-00097)

United States v. McKinion (C.D. Cal., 2:14-cr-00124)

United States v. Naylor (S.D.W. Va., 2:14-cr-00194)

United States v. Neale (D. Vt., 5:12-cr-00044)

United States v. Ocasio (W.D. Tex., 3:11-cr-02728)

United States v. Pirosko (N.D. Ohio, 5:12-cr-00327)

United States v. Price (S.D. Fl., 0:12-cr-60016)

United States v. Shia (N.D. Cal., 3:15-cr-00257)

United States v. Thomas (D. Vt., 5:12-cr-00037)

*Federal civil actions*

Brushaber v. Jackson County, Mississippi et al. (S.D. Miss., 1:13-cv-00453)

Pardue v. Jackson County, Mississippi et al. (S.D. Miss., 1:14-cv-00290)

Peairs v. Jackson County, Mississippi et al. (S.D. Miss., 1:13-cv-00402)

Tuskan v. Jackson County, Mississippi et al. (S.D. Miss., 1:13-cv-00356)

Exhibit C

*Prosecutors Dropping Child Porn Charges After Software Tools Are Questioned*, PRoPUBLICA



Photo illustration: David Sleight/ProPublica; child silhouette: Raúl Vázquez/EyeEm via Getty Images; laptop: Tawatchai Prakobkit/EyeEm via Getty Images; background texture: The7Dew via Getty Images

## Prosecutors Dropping Child Porn Charges After Software Tools Are Questioned

More than a dozen cases were dismissed after defense attorneys asked to examine, or raised doubts about, computer programs that track illegal images to internet addresses.

by Jack Gillum, April 3, 2019, 5 a.m. EDT

*ProPublica is a nonprofit newsroom based in New York. [Sign up for ProPublica's Big Story](#) newsletter to receive stories like this one in your inbox as soon as they are published.*

Using specialized software, investigators traced explicit child pornography to Todd Hartman's internet address. A dozen police officers raided his Los Angeles-area apartment, seized his computer and arrested him for files including a video of a man ejaculating on a 7-year-old girl. But after his lawyer contended that the software tool inappropriately accessed Hartman's private files, and asked to examine how it worked, prosecutors dismissed the case.

Near Phoenix, police with a similar detection program tracked underage porn photos, including a 4-year-old with her legs spread, to Tom Tolworthy's home computer. He was indicted in state court on 10 counts of committing a "dangerous crime against children," each of which carried a decade in prison if convicted. Yet when investigators checked Tolworthy's hard drive, the images weren't there. Even though investigators said different offensive files surfaced on another computer that he owned, the case was tossed.

At a time when at least half a million laptops, tablets, phones and other devices are viewing or sharing child pornography on the internet every month, software that tracks images to specific internet connections has become a vital tool for prosecutors. Increasingly, though, it's backfiring.

Drawing upon thousands of pages of court filings as well as interviews with lawyers and experts, ProPublica found more than a dozen cases since 2011 that were dismissed either because of challenges to the software's findings, or the refusal by the government or the maker to share the computer programs with defense attorneys, or both. Tami Loehrs, a forensics expert who often testifies in child pornography cases, said she is aware of more than 60 cases in which the defense strategy has focused on the software.

Defense attorneys have long complained that the government's secrecy claims may hamstring suspects seeking to prove that the software wrongly identified them. But the growing success of their counterattack is also raising concerns that, by questioning the software used by investigators, some who trade in child pornography can avoid punishment.

Case 8:20-cv-00676-MSS-CPT   Document 187-11   Filed 08/26/22   Page 78 of 95 PageID 3997

"When protecting the defendant's right to a fair trial requires the government to disclose its confidential techniques, prosecutors face a choice: Give up the prosecution or give up the secret. Each option has a cost," said Orin Kerr, an expert in computer crime law and former Justice Department lawyer. "If prosecutors give up the prosecution, it may very well mean that a guilty person goes free. If prosecutors give up the secret, it may hurt their ability to catch other criminals. Prosecutors have to choose which of those outcomes is less bad in each particular case."

In several cases, like Tolworthy's, court documents say that the software traced offensive images to an Internet Protocol address. But, for reasons that remain unclear, those images weren't found on the defendant's computer. In others, like Hartman's, defense lawyers said the software discovered porn in areas of the computer it wasn't supposed to enter, and they suggested the police conducted an overly broad search.

These problems are compounded by the insistence of both the government and the software manufacturers on protecting the secrecy of their computer code, so as not to imperil other prosecutions or make trade secrets public. Unwilling to take the risk that the sensitive programs could leak publicly, they have rejected revealing the software even under strict court secrecy.

Nevertheless, the software is facing renewed scrutiny: In another case where child pornography identified by the software wasn't found on the suspect's computer, a federal judge in February allowed a defense expert to examine it. And recently, the nonprofit Human Rights Watch asked the Justice Department to review, in part, whether one suite of software tools, the Child Protection System, had been independently tested.

"The sharing of child-sex-abuse images is a serious crime, and law enforcement should be investigating it. But the government needs to understand how the tools work, if they could violate the law and if they are accurate," said Sarah St.Vincent, a Human Rights Watch researcher who examined the practice.

"These defendants are not very popular, but a dangerous precedent is a dangerous precedent that affects everyone. And if the government drops cases or some charges to avoid scrutiny of the software, that could prevent victims from getting justice consistently," she said. "The government is effectively asserting sweeping surveillance powers but is then hiding from the courts what the software did and how it worked."

The dismissals represent a small fraction of the hundreds of federal and state child pornography prosecutions since 2011. More often, defendants plead guilty in exchange for a reduced sentence. (Of 17 closed cases brought since 2017 by the U.S. attorney's office in Los Angeles, all but two resulted in plea deals, ProPublica found.) Even after their charges were dropped, Tolworthy and Hartman are both facing new trials. Still, the dismissals are noteworthy because challenges to the software are spreading among the defense bar and gaining credence with judges.

Software developers and law enforcement officials say the detection software is an essential part of combating the proliferation of child pornography and exploitation on the internet.

"This is a horrendous crime, and as a society we're obligated to protect victims this young," said Brian Levine, a computer science professor at the University of Massachusetts at Amherst who helped develop one such tool, called Torrential Downpour. "There are a number of victims who are too young to speak, or can't speak out of fear. This tool is available to law enforcement to rescue those children who are abused."

In cases where previously flagged porn isn't turning up on a suspect's computer, investigators have suggested the files have merely been erased before arrest, or that they're stored in encrypted areas of a hard drive that the police can't access. Defense attorneys counter that some software logs don't show the files were ever downloaded in the first place, or that they may have been downloaded by mistake and immediately purged.

Defense lawyers are given a bevy of reasons why porn-detection software can't be handed over for review, even under a protective order that limits disclosure to attorneys and their experts. Law enforcement authorities often say that they're prohibited from disclosing software by their contracts with the manufacturer, which considers it proprietary technology.

Prosecutors are also reluctant to disclose a coveted law enforcement tool just to convict one defendant. A Justice Department spokeswoman referred ProPublica to a government journal article, which argued peer-to-peer detection tools "are increasingly targeted by defendants through overbroad discovery requests."

"While the Department of Justice supports full compliance with all discovery obligations imposed by law," wrote lawyers for the Justice Department and the FBI, "those obligations generally do not require disclosure of sensitive information regarding law enforcement techniques which, if exposed, would threaten the viability of future investigations."

One former Justice Department prosecutor said the government has shielded software in criminal cases for fear that disclosure could expose investigators' capabilities or classified technology to criminals.

"They don't want to reveal that in a case because it can be the last time they use it," said the lawyer, who requested anonymity because of the sensitive nature of the topic. "It sounds like they may, in some circumstances, be using programs that are never intended to see the light of day in the criminal justice system."

---

The government's reluctance to share technology with defense attorneys isn't limited to child pornography cases. Prosecutors have let defendants monitored with cellphone trackers known as Stingrays go free rather than fully reveal the technology. The secrecy surrounding cell tracking was once so pervasive in Baltimore that Maryland's highest court rebuked the practice as "detrimental." As was first reported by Reuters in 2013, the U.S. Drug Enforcement Administration relied in investigations on information gathered through domestic wiretaps, a phone-records database and National Security Agency intercepts, while training agents to hide those sources from the public record.

"Courts and police are increasingly using software to make decisions in the criminal justice system about bail, sentencing, and probability-matching for DNA and other forensic tests," said Jennifer Granick, a surveillance and cybersecurity lawyer with the American Civil Liberties Union's Speech, Privacy and Technology Project who has studied the issue.

"If the defense isn't able to examine these techniques, then we have to just take the government's word for it — on these complicated, sensitive and non-black-and-white decisions. And that's just too dangerous."

The software programs used by investigators scan for child porn on peer-to-peer networks, a decentralized connection of computers on the internet where users share files directly with one another. Those networks behave similarly to software like Napster, the popular file-sharing program used to download music in the early days of the commercial internet.

Although Napster may have faded, the trading of child pornography on peer-to-peer networks hasn't. To keep up, police rely on modified versions of popular peer-to-peer programs to flag IP addresses of suspected child pornography, enabling investigators to subpoena the internet provider and unearth the internet subscriber. They then obtain a search warrant for computers at the physical location they say is involved in sharing porn.

One common suite of software tools, the Child Protection System, is maintained by the Florida-based Child Rescue Coalition. Although the coalition says it's a nonprofit, it has ties to for-profit data brokers and the data company TLO. (TransUnion, the major credit-reporting agency, has acquired TLO.) CRC has hosted some of its computer servers at

TransUnion since 2016, according to a review of internet records collected by the firm Farsight Security.

A redacted user manual filed in a federal case, portions of which were un-redacted by Human Rights Watch and confirmed by ProPublica, indicates that the Child Protection System draws on unverified data gathered by these firms. It says TLO "has allowed law enforcement access to data collected on internet users from a variety of sources," with enhanced information that includes "marketing data that has been linked to IP addresses and email accounts from corporate sources."

"No logs are kept of any law enforcement query of corporate data," the manual continued. It cautioned that subscriber data was unconfirmed, and that it should "be confirmed through other investigative means that are acceptable with your agency and prosecuting attorney."

Software that relies on unconfirmed information from big data brokers, civil liberties advocates say, may not only point police to the wrong internet address owner, but it also enables them to gather a mountain of personal details about a suspect without a court order, sidestepping constitutional protections.

The software's makers have resisted disclosure of its coding. In May 2013, TLO asked a federal court in El Paso, Texas, to quash a subpoena to reveal the software known as the Child Protection System in a child-porn case. The materials sought, they said, "are protected under the law enforcement privilege and trade secrets laws." After the judge ordered the software produced, prosecutors instead agreed to a plea deal that favored the defendant; he was sentenced to three years he had already served for "transportation of obscene material."

CRC says on its website that its software is used in every state and more than 90 countries, and has tracked more than 54 million offenders. CRC President William Wiltse, a former Oregon police officer, has testified for the prosecution in cases in which investigators relied on the Child Protection System.

CRC did not respond to phone and email inquiries from ProPublica this month about its software. It told Human Rights Watch this year, "As a policy, we do not publicly share details of how we identify sex offenders online, as we do not want predators to learn better ways to hide their illegal activity." A spokesman for TransUnion, which now owns TLO, said the company "supports Child Rescue Coalition in its work with law enforcement to protect children from sexual exploitation online."

Another widely used detection tool, Torrential Downpour, was developed by the University of Massachusetts a decade ago with U.S. government funding, court records show. Levine told ProPublica in an interview that the program is accurate enough to find probable cause for a search warrant, but that it can only be effective if police and the courts do their jobs.

"The software is one part of an entire process," Levine said, "followed by investigators and courts to produce reliable evidence and to follow a fair judicial process."

---

Investigators using Torrential Downpour said they turned up damning evidence to ensnare Tolworthy, a software engineer from Mesa, Arizona. They accused him of possessing illicit files that included "Pedo Baby 03 - 2 yo Photos 56.jpg." His IP address was "involved in making those types of files available," Pinal County Sheriff's Deputy Randall Snyder testified in May 2015, according to testimony obtained by ProPublica. "I selected five of them off of the laptop for investigative and charging purposes." Tolworthy pleaded not guilty.

Asked if the files were "on his computer, or were they just observed being downloaded," Snyder replied that references to the images were part of a torrent file — a kind of digital index that asks to download specific images or movies. But, he said, "We have not conducted a thorough enough

investigation of the computers through our forensics yet to find those particular files."

In other words, the state couldn't say if half the files Tolworthy, 44, was arrested for possessing — and that were identified by the software — were indeed on his computer. After prosecutors assured grand jurors that the investigation was continuing, they indicted him anyway.

Yet by late 2016, Tolworthy's defense expert began raising doubts about whether the files existed. "I was unable to locate the torrent, the info hash or the files of child pornography identified during the undercover investigation," Loehrs said in an affidavit after conducting her own search of Tolworthy's hard drive.

"In addition, the torrent, the info hash and the files of child pornography were not found by the State's forensic examiner, either," she wrote.

That "info hash," as it's called, is a fingerprint that identifies computer files, which investigators match against a database of known child porn. That's how police detect illegal files that might have been renamed with mundane-sounding headings (such as "sunset.jpg") to avoid detection. The hash is also important to the defense, Loehrs said, because a computer might mistakenly broadcast the hash of a downloaded file when, in fact, it's the hash of a movie or video a user merely requested — sometimes by accident.

Arizona Superior Court Judge Mark Brain found the defense arguments persuasive. He said it appeared that Tolworthy had "a substantial need for the software" and ruled in February 2017 that Tolworthy's lawyers could ask for it.

The defense pressed for the software program, but the University of Massachusetts balked. Its lawyer said in a court document that handing over the software would "destroy its value to the university and its faculty researcher," citing a $440,000 annual FBI grant. "Releasing it to public view would frustrate public policy and impede law enforcement's ability to deter peer-to-peer sharing of child pornography," the lawyer added.

If the images identified by Torrential Downpour are missing from a suspect's hard drive, as in Tolworthy's case, that's not the software's fault, Levine told ProPublica. Suspects could delete contraband after downloading it, or they might encrypt their computers to prevent illicit materials from being found.

Prosecutors first indicated they'd drop only the charges associated with the search and leave those arising from images found on another computer during a search of Tolworthy's house. In April 2018, though, they dismissed all charges, saying it was "in the interests of justice." They have since re-filed charges against Tolworthy relating in part to the material on the old computer; that case is pending in state court.

Tolworthy, through his lawyer, declined to comment. Maricopa County Attorney's Office spokeswoman Amanda Steele said there was no policy to dismiss charges rather than disclose secretive software tools. "Prosecutors regularly review cases to ensure appropriate charges are filed and just results are achieved," she said.

The Tolworthy saga is strikingly similar to another Arizona case, which is in federal court. In late 2016 and early 2017, Torrential Downpour identified child pornography at the IP address of Anthony Gonzales, who lived with his family in Surprise, Arizona, northwest of Phoenix. As in the Tolworthy case, the files previously tagged by investigators online weren't found on Gonzales' computer, but police say other contraband turned up on a tablet after his house was searched. Gonzales pleaded not guilty.

In February, the judge ordered the software turned over to the defense. Loehrs, the expert for Gonzales as well as Tolworthy, "opined that all software programs have flaws, and Torrential Downpour is no exception," U.S. District Judge David Campbell wrote.

"Defendant Gonzales has done more than simply request access to the software and argue that it is material to his defense," the judge wrote. "He

has presented evidence that calls into question the government's version of events."

Both sides in the pending case are in discussions about how to test the software, according to a person familiar with the matter.

"It matters to find out whether the government is abiding by the law and the Constitution," said Barbara Hull, a Phoenix lawyer representing Gonzales. "People need to know what the government is doing on the internet, and whether their privacy and their rights are being violated."

---

Even when the child porn identified by the software does show up on the suspect's computer, some of the cases have unraveled, largely due to the government's penchant for secrecy.

After the Child Protection System led police to illicit files on Hartman's hard drive, such as the video "Cumming over loli_s pussy 2010 7yo and Dad Brilliant.wmv," the former church youth counselor faced up to 50 years in prison if convicted. Hartman pleaded not guilty and his public defender, Andrea Jacobs, asked to inspect the software.

Prosecutors said its disclosure would allow child pornographers to evade detection. They also noted that the Child Protection System is available to law enforcement under a strict agreement that maintains its secrecy: "No persons shall publicly demonstrate this system or the software provided without the expressed permission of the software owner."

To counter the evidence of child pornography turned up by Child Protection System, Hartman's lawyer contended that an examination of the software was critical to his defense. The detection program, Jacobs said, likely searched files in private areas on his computer that weren't ever meant to be found on peer-to-peer networks. Hartman, his expert said, had not shared the hundreds of images in four of the six files allegedly identified by Child Protection System and downloaded by a Newport Beach, California, police officer during the investigation. And the last time that the two remaining files were shared had been three months before the investigation started, so the software should not have caught them, she said.

Only the software itself could show whether it went too far, and the prosecution and the manufacturer refused to reveal the program. As a result, "Despite ample opportunity to do so, the government has not refuted this testimony," U.S. District Judge Josephine Staton wrote in November 2015. She sided with Hartman's lawyer and ordered disclosure of the software.

Prosecutors stalled. "The government has made substantial progress, but is requesting additional time because items pivotal to the requested testing are in the possession of a non-governmental entity" that also owns the intellectual property, Assistant U.S. Attorney Anne Gannon said on Jan. 8, 2016.

She promised an answer by Jan. 19, 2016. The next day, she dismissed the case in a one-sentence filing.

Jacobs, who is no longer representing Hartman, told ProPublica she couldn't discuss the case. Hartman's mother did not respond to an interview request, and family staying at his house in Yorba Linda, California, did not answer a knock at the door and a written message left by a ProPublica reporter in mid-March.

As with Tolworthy, the dismissal didn't end Hartman's legal troubles. He was later charged in California state court under child-porn and child-sex laws. That case is pending.

Both Tolworthy and Hartman are in jail awaiting trial.

*Claire Perlman contributed to this report.*

*Do you have access to information about secretive uses of technology that should be public? Email jack.gillum@propublica.org. Here's how to send tips and documents to*

*ProPublica securely.*

**Jack Gillum**

Jack Gillum was a reporter at ProPublica based in Washington, D.C., covering technology and privacy.

✉ jack.gillum@propublica.org    🐦 @jackgillum    📱 202-886-9504

🔒 Signal: 202-854-9062

# Exhibit D

*Child Pornography Prosecution Statistics*

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

Revised November 21, 2017:
Updated "possession of child pornography" category in tables 1-8 and
related text to "possession, receipt, or distribution of child pornography."

## SPECIAL REPORT

OCTOBER 2017                                                                 NCJ 250746

# Federal Prosecution of Commercial Sexual Exploitation of Children Cases, 2004-2013

William Adams and Abigail Flynn, *Urban Institute*

Between 2004 and 2013, the number of suspects in criminal matters referred to U.S. attorneys for commercial sexual exploitation of children (CSEC) offenses increased by 54%, from 2,972 to 4,579 suspects (figure 1). The number of defendants prosecuted in cases filed in U.S. district court with a CSEC charge increased by 98% during this period, from 1,405 to 2,776 cases. In 2013, CSEC offenses made up 3.3% of all suspects prosecuted in U.S. district court, up from 1.5% in 2004.

Data in this report come from three federal justice agencies: the Executive Office for U.S. Attorneys' (EOUSA) National LIONS (Legal Information Office Network System) database, which details the investigation and prosecution of suspects in criminal matters received and concluded; the Administrative Office of the U.S. Courts' (AOUSC) Criminal Master File, which describes criminal cases filed and terminated in U.S. district court; the Administrative Office of the U.S. Courts' Probation and Pretrial Services Automated Case Tracking System (PACTS) database, which collects data on defendants interviewed and supervised by pretrial services; and the U.S. Sentencing Commission's Monitoring database, which captures data on defendants sentenced under the federal sentencing guidelines, including type of sentence imposed and length of prison term.

Federal statutes and sentencing guidelines pertaining to CSEC offenses were used to define the universe of cases examined. For EOUSA data, the federal statute designated



### FIGURE 1
**Suspects in commercial sexual exploitation of children matters referred, and defendants in cases filed and convicted, 2004 and 2013**

Note: CSEC = commercial sexual exploitation of children.
Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004 and 2013; Administrative Office of the U.S. Courts, criminal master file, 2004 and 2013; and U.S. Sentencing Commission monitoring data files, 2004 and 2013.

by U.S. Attorneys as the "lead charge" was used to define CSEC cases. For AOUSC criminal data, federal statutes for all five filing charges were examined. If any of the five charges was a CSEC statute, the case was defined as a CSEC case. (See *Methodology* for specific CSEC statutes and federal sentencing guidelines.)

## HIGHLIGHTS

- From 2004 to 2013, a total of 37,105 suspects were investigated and referred to U.S. attorneys for commercial sexual exploitation of children (CSEC) offenses.

- The FBI was the lead investigative agency in 45% of CSEC matters investigated and referred to U.S. attorneys from 2004 to 2013.

- Nearly all defendants convicted of CSEC offenses from 2004 to 2013 were sentenced to federal prison (98%).

- The mean prison sentence imposed on CSEC defendants in 2013 was 11.6 years.

- Six in 10 suspects in CSEC matters investigated and referred to U.S. Attorneys from 2004 to 2013 were prosecuted in U.S. district court.

- Most defendants charged for CSEC offenses from 2004 to 2013 were male (97%), white (82%), U.S. citizens (97%), and had no prior felony convictions (79%).

- CSEC suspects had a median age of 39 years.

- Nearly all (95%) defendants in CSEC cases adjudicated in federal court from 2004 to 2013 were convicted, mostly through guilty pleas (91%).



**Offenses related to the production of child pornography and child sex trafficking grew the most (19.5%) from 2004 to 2013**

From 2004 to 2013, a total of 37,105 suspects referred to U.S. attorneys had a CSEC lead charge. Suspects referred for the possession, receipt, or distribution of child pornography (72%) accounted for the majority of all CSEC suspects referred, followed by child sex trafficking (18%) and child pornography production (10%) suspects (table 1).

The growth in suspects referred for child sex trafficking and the production of child pornography exceeded the growth in suspects referred for the possession, receipt, or distribution of child pornography. The number of suspects referred for the production of child pornography increased 195% from 2004 to 2013 (from 218 to 643 suspects), and the number of suspects referred for child sex trafficking grew 111% (from 488 to 1,031) (figure 2). The number of suspects referred for the possession, receipt, or distribution of child pornography increased by 28% from 2004 to 2013, with the majority of

the growth occurring from 2004 to 2007. The number of suspects referred for the possession, receipt, or distribution of child pornography grew less than 1% between 2007 and 2013 (from 2,901 to 2,905 suspects) (not shown).

**FIGURE 2**

**Suspects in commercial sexual exploitation of children matters referred, by offense type, 2004 and 2013**



Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

**TABLE 1**

**Suspects referred to U.S. attorneys with commercial sexual exploitation of children offense as lead charge, 2004–2013**

| Lead charge | 2004–2013 | | 2004 | | 2013 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| All commercial sexual exploitation of children offenses | 37,105 | 100% | 2,972 | 100% | 4,579 | 100% |
| Child pornography production | 3,604 | 9.7 | 218 | 7.3 | 643 | 14.0 |
| Child pornography possession/receipt/ distribution | 26,785 | 72.1 | 2,266 | 76.2 | 2,905 | 63.4 |
| Child sex trafficking | 6,716 | 18.1 | 488 | 16.4 | 1,031 | 22.5 |

Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

---

### Commercial sexual exploitation of children offenses

The U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention defines the commercial sexual exploitation of children (CSEC) offenses as "crimes of a sexual nature committed against juvenile victims for financial or other economic reasons."[1] Federal CSEC offenses include child sex trafficking and the production, trafficking, distribution, and possession of child pornography. They do not include child sex abuse offenses because there are no commercial aspects involved in such offenses.

In this report, federal CSEC offenses are classified into three subtypes. (See *Methodology* for the federal statutes used to define these subtypes.)

- ***Child pornography production:*** includes sexually exploiting a minor to produce sexually explicit visual or printed materials; selling or buying of children for use in

the production of child pornography; parent or custodian permitting minor to engage in sexually explicit conduct; and production of sexually explicit depictions of minors for importing into the United States.

- ***Child pornography possession, receipt, or distribution:*** trafficking in materials involving the sexual exploitation of a minor through the possession, receipt, transport (including by shipping or mailing), distribution, advertising, or access of these materials.

- ***Child sex trafficking:*** includes sex trafficking of children; transportation of a minor with intent for minor to engage in criminal sexual activity; coercion and enticement (transportation for prostitution or other criminal sexual activity); travel with intent to engage in illicit sexual contact with a minor; and engaging in illicit sexual conduct with a minor in a foreign country.

[1]http://www.ojjdp.gov/programs/csec_program.html.

### The FBI (45%) was the most common lead investigative agency for CSEC matters referred for prosecution

From 2004 to 2013, Department of Justice (DOJ) agencies were the lead investigative agency in 46% of all matters with a CSEC lead charge referred to U.S. attorneys for prosecution (table 2). The FBI served as the lead investigative agency in 45% of all CSEC matters referred. Department of Homeland Security (DHS) agencies investigated 31% of all CSEC referrals, with Immigration and Customs Enforcement investigating 22% of all CSEC referrals. State and local authorities referred another 7% of CSEC matters to U.S. attorneys, and federal and state task forces were responsible for 6%. About 10% of CSEC referrals came from various other investigative agencies, including the U.S. Postal Service, branches of the military, and other federal government agencies.

DOJ agencies were responsible for investigating a greater share of child sex trafficking matters (59%) than matters relating to the production (50%) and possession, receipt, or distribution (43%) of child pornography. In comparison, DHS agencies investigated 35% of matters related to the possession, receipt, or distribution of child pornography, 25% of matters related to the production of child pornography, and 19% of matters related to child sex trafficking.

### Most suspects (60%) in CSEC matters concluded were prosecuted in U.S. district court

Of the 36,080 suspects in matters with a CSEC lead charge that were concluded by U.S. attorneys from 2004 to 2013, 21,569 (60%) were prosecuted in U.S. district court, 13,125 (36%) were declined for prosecution, and 1,386 (4%) were disposed by U.S. magistrates (table 3). The percentage of CSEC suspects prosecuted was higher than the share of suspects prosecuted for several major offense categories, including suspects for violent (58%), property (53%), and public order (42%) offenses. However, the percentage of CSEC suspects prosecuted was lower than the percentage of suspects prosecuted in drug (76%) and weapon (70%) offenses (not shown).

Among matters concluded, suspects in matters related to the production of child pornography had the highest percentage of prosecution (65%) from 2004 to 2013, compared to suspects

---

**TABLE 2**
**Suspects in commercial sexual exploitation of children (lead charge) matters referred, by investigative agency, 2004–2013**

| | All commercial sexual exploitation of children suspects | | Child pornography production | | Child pornography possession/receipt/distribution | | Child sex trafficking | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| **Department of Homeland Security (DHS)** | 11,634 | 31.4% | 910 | 25.2% | 9,425 | 35.2% | 1,299 | 19.3% |
| Immigration and Customs Enforcement | 8,168 | 22.0 | 639 | 17.7 | 6,631 | 24.8 | 898 | 13.4 |
| Secret Service | 1,136 | 3.1 | 91 | 2.5 | 920 | 3.4 | 125 | 1.9 |
| U.S. Customs & Border Protection | 912 | 2.5 | 42 | 1.2 | 793 | 3.0 | 77 | 1.1 |
| Citizenship and Immigration Services | 813 | 2.2 | 70 | 1.9 | 633 | 2.4 | 110 | 1.6 |
| Other DHS | 605 | 1.6 | 68 | 1.9 | 448 | 1.7 | 89 | 1.3 |
| **Department of Justice (DOJ)** | 17,179 | 46.3% | 1,818 | 50.4% | 11,418 | 42.6% | 3,943 | 58.7% |
| FBI | 16,685 | 45.0 | 1,739 | 48.3 | 11,120 | 41.5 | 3,826 | 57.0 |
| Other DOJ | 494 | 1.3 | 79 | 2.2 | 298 | 1.1 | 117 | 1.7 |
| **Federal/state task forces** | 2,112 | 5.7% | 234 | 6.5% | 1,394 | 5.2% | 484 | 7.2% |
| **State/county/municipal authorities** | 2,488 | 6.7% | 308 | 8.5% | 1,717 | 6.4% | 463 | 6.9% |
| **Other investigative agencies*** | 3,692 | 10.0% | 334 | 9.3% | 2,831 | 10.6% | 527 | 7.8% |

*Includes the U.S. Postal Service, branches of the military, and other agencies.
Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

---

**TABLE 3**
**Suspects in commercial sexual exploitation of children matters concluded, by disposition of matter, 2004–2013**

| | All commercial sexual exploitation of children suspects | | Child pornography production | | Child pornography possession/receipt/distribution | | Child sex trafficking | |
|---|---|---|---|---|---|---|---|---|
| Disposition of matter | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total | 36,080 | 100% | 3,388 | 100% | 26,568 | 100% | 6,124 | 100% |
| Prosecuted | 21,569 | 59.8 | 2,201 | 65.0 | 15,747 | 59.3 | 3,621 | 59.1 |
| Declined for prosecution | 13,125 | 36.4 | 1,044 | 30.8 | 9,875 | 37.2 | 2,206 | 36.0 |
| Disposed by U.S. magistrate | 1,386 | 3.8 | 143 | 4.2 | 946 | 3.6 | 297 | 4.8 |

Note: Includes matters with a commercial sexual exploitation of children offense as lead charge. Excludes observations with a disposition of "criminal charge included in other case" (471) and "transfer from district" (307).
Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

in matters related to child sex trafficking and the possession, receipt, or distribution of child pornography (59% each).

The overall prosecution rate for CSEC suspects increased from 53% in 2004 to 64% in 2013 (figure 3). During the same period, the percentage of suspects prosecuted for the production of child pornography increased from 51% to 71%, and the percentage of suspects prosecuted for the possession, receipt, or distribution of child pornography increased from 52% to 64%. However, these increases did not occur at a constant rate. Percentages of suspects prosecuted for child pornography production and possession, receipt, or distribution peaked in 2007 and then decreased before returning to 2007 levels by 2013. The percentage of suspects prosecuted for child sex trafficking decreased between 2004 and 2013, from 59% to 57%.

### 24% of CSEC matters were declined by U.S. attorneys due to weak or inadmissible evidence

The most common reasons suspects with a CSEC lead charge were declined for prosecution by U.S. attorneys from 2003 to 2013 was because of weak or inadmissible evidence (24% of all declinations), referral to other authorities for prosecution (21%), and lack of criminal intent (20%). The most common reason that matters related to both the production of child pornography (32%) and child sex trafficking (26%) were declined was the referral to other authorities for prosecution. The most common reason that matters related to the possession, receipt, or distribution of child pornography were declined was weak or inadmissible evidence (25%) (table 4).

### The mean processing time for CSEC matters concluded by U.S. attorneys was more than 9 months

The mean processing time was 290 days (or 9 months) from the receipt of a matter investigated to disposition of the matter for all suspects in matters with a CSEC lead charge from 2004 to 2013 (not shown). Matters related to the

possession, receipt, or distribution of child pornography had the longest average processing time (306 days), followed by matters related to child sex trafficking (253 days) and the production of child pornography (231 days). Matters with a CSEC lead charge that were declined for prosecution (474 days) had a much longer mean processing time than matters prosecuted (177 days) or disposed of by U.S. magistrate (247 days). The mean processing time for matters with a CSEC lead charge was higher than the mean for all other matters (192 days) and higher than all other major offense types except for property offenses (440 days) (not shown).

The mean processing time for matters with a CSEC lead charge decreased by 1% overall from 2004 to 2013, but there were differences among CSEC offense types (not shown). Mean processing time decreased for both matters related to the production (down 25%) and possession, receipt, or distribution (down 4%) of child pornography, but increased for matters related to child sex trafficking (up 42%).

### FIGURE 3
**Prosecution rate of suspects in commercial sexual exploitation of children matters concluded, 2004–2013**



Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

### TABLE 4
**Suspects in commercial sexual exploitation of children matters declined, by reason for declination, 2004–2013**

| Reason for declination | All commercial sexual exploitation of children suspects | Child pornography production | Child pornography possession/receipt/ distribution | Child sex trafficking |
|---|---|---|---|---|
| Lack of criminal intent | 19.5% | 14.6% | 20.1% | 18.8% |
| No federal offense evident/minimal federal interest | 7.9 | 7.6 | 8.0 | 7.7 |
| Referred to other authorities for prosecution | 21.3 | 31.7 | 19.1 | 25.9 |
| Weak or inadmissible evidence | 24.1 | 18.9 | 25.2 | 21.5 |
| Agency request | 9.2 | 7.7 | 9.1 | 10.4 |
| Other[*] | 18.1 | 19.6 | 18.5 | 15.7 |
| Number of declinations | 13,125 | 1,044 | 9,875 | 2,206 |

[*]Other reasons include juvenile suspect, deceased suspect, jurisdiction or venue problems, lack of investigative or prosecutive resources, office or petite policy, and unspecified reasons.

Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

## Most suspects charged with CSEC crimes were white, male, unmarried, U.S. citizens, and had no prior criminal record

Most suspects arrested for CSEC crimes were male (97%), white (82%), U.S. citizens (97%), had no prior felony convictions (79%), and were not married (70%) (table 5). More than half (56%) had no more than a high school education. CSEC suspects had a median age of 39 years.

Suspects in matters related to the possession, receipt, or distribution of child pornography were overwhelmingly male (99%), white (87%), and U.S. citizens (98%). They were also older (median age of 41 years) than other CSEC suspects, and were more likely to have no prior felony convictions (82%). Among suspects in matters related to child sex trafficking, 60% were white, 25% were black, 12% were Hispanic, 11% were female, and 6% were noncitizens. Suspects in matters of child sex trafficking were younger (median age of 34 years) than other CSEC suspects, and more likely to have a criminal history (30% had a prior felony conviction). In comparison, 18% of suspects in matters related to the possession, receipt, or distribution of child pornography had a prior felony conviction.

### TABLE 5
**Characteristics of commercial sexual exploitation of children suspects at initial hearing, 2006–2013**

| Characteristic | All commercial sexual exploitation of children suspects | Child pornography production | Child pornography possession/receipt/distribution | Child sex trafficking |
|---|---|---|---|---|
| **Sex** | | | | |
| Male | 97.1% | 93.5% | 99.4% | 89.2% |
| Female | 2.9 | 6.5 | 0.6 | 10.8 |
| **Race/Hispanic origin[a]** | | | | |
| White | 82.0% | 81.1% | 87.0% | 59.5% |
| Black | 7.1 | 7.4 | 3.1 | 25.1 |
| Hispanic | 8.9 | 9.5 | 8.1 | 12.0 |
| American Indian/Alaskan Native | 0.5 | 0.7 | 0.4 | 0.7 |
| Asian/Native Hawaiian/Other Pacific Islander | 1.6 | 1.3 | 1.3 | 2.8 |
| **Age** | | | | |
| 20 or younger | 2.9% | 2.4% | 2.5% | 5.3% |
| 21–30 | 25.5 | 22.5 | 23.7 | 36.1 |
| 31–40 | 24.7 | 30.5 | 23.8 | 25.3 |
| 41–50 | 23.4 | 26.3 | 24.1 | 18.5 |
| 51–60 | 15.5 | 13.2 | 16.8 | 10.3 |
| 61 or older | 8.0 | 5.0 | 9.2 | 4.5 |
| Median age | 39 yrs. | 39 yrs. | 41 yrs. | 34 yrs. |
| **Citizenship** | | | | |
| U.S. citizen | 97.4% | 97.6% | 98.1% | 94.1% |
| Non-U.S. citizen | 2.6 | 2.4 | 1.9 | 5.9 |
| **Marital status[b]** | | | | |
| Married or cohabitating | 29.9% | 29.2% | 30.1% | 29.1% |
| Divorced or separated | 23.6 | 29.3 | 23.5 | 20.1 |
| Single | 46.6 | 41.6 | 46.4 | 50.8 |
| **Education level[c]** | | | | |
| Less than high school | 11.8% | 13.7% | 9.8% | 20.0% |
| High school graduate | 43.8 | 45.5 | 44.1 | 41.4 |
| Some college | 24.7 | 25.3 | 25.4 | 20.7 |
| College graduate | 19.8 | 15.5 | 20.8 | 17.9 |
| **Criminal record** | | | | |
| No prior felony conviction | 78.8% | 71.7% | 81.8% | 70.1% |
| Prior felony conviction | 21.2 | 28.4 | 18.2 | 29.9 |
| **Number of defendants** | 17,744 | 1,849 | 13,035 | 2,860 |

Note: Percentages are based on nonmissing data. U.S. Code Title and Section information for offense charged was not available in the Administrative Office of the U.S. Courts' Probation and Pretrial Services Automated Case Tracking System data files for fiscal years 2004–2005. Therefore, this table only reports statistics for fiscal years 2006–2013.

[a]White; black; American Indian or Alaska Native; and Asian, Native Hawaiian, or Other Pacific Islander race categories exclude persons of Hispanic or Latino origin.

[b]Marital status data were missing for 7.9% of commercial sexual exploitation of children (CSEC) suspects at initial hearing.

[c]Education level data were missing for 9.3% of CSEC suspects at initial hearing.

Source: Bureau of Justice Statistics, based on data from the Administrative Office of the U.S. Courts, Probation and Pretrial Services Automated Case Tracking System, fiscal years 2006–2013.

### More than half (54%) of all CSEC defendants received pretrial release prior to case disposition

Fifty-four percent of all CSEC defendants received pretrial release, compared to 71% of property defendants, 64% of public order defendants, 37% of drug defendants, 31% of violent and weapon defendants, and 13% of immigration defendants (not shown). The percentage of CSEC defendants that received pretrial release was higher than the overall percentage (35%) for all federal defendants released prior to trial. The pretrial release rate varied by CSEC offense types. Sixty-three percent of defendants in cases related to the possession, receipt, or distribution of child pornography received pretrial release, compared to 19% of defendants in cases related to the production of child pornography and 32% of defendants in cases related to child sex trafficking (table 6).

### Number of CSEC defendants prosecuted nearly doubled between 2004 and 2013

The number of defendants in cases filed with any offenses for the production or possession, receipt, or distribution of child pornography or child sex trafficking increased by 98% from 2004 to 2013.[2] The number of defendants in cases filed with an offense for the production of child pornography had the largest proportional growth over this period, tripling from 170 to 528 (up 211%) (figure 4). Prosecutions related to the possession, receipt, or distribution of child pornography increased by 91%, from 1,118 defendants in 2004 to 2,140 defendants in 2013. Prosecutions related to child sex

[2]Data on the number of defendants prosecuted for a CSEC offense were based on the number of cases that had a CSEC statute as any of five filing offenses at case filing, according to the AOUSC criminal data.

trafficking grew by 87% between 2004 and 2013, from 314 to 586 defendants. Of the 21,887 defendants in cases filed in U.S. district court with a CSEC charge from 2004 to 2013, 80% of defendants were charged with possession, receipt, or distribution of child pornography, 20% were for child sex trafficking, and 14% were for the production of child pornography (table 7).

Nearly all (97%) of the 20,720 CSEC criminal cases filed in U.S. district court from 2004 to 2013 had one defendant. Cases were more likely to have multiple defendants when the charge was for child sex trafficking (9%) than when the charge was for the production (6%) or possession, receipt, or distribution (1%) of child pornography (not shown).

### FIGURE 4

**Defendants in commercial sexual exploitation of children cases filed, by offense, 2004–2013**



Source: Bureau of Justice Statistics, based on data from the Executive Office for U.S. Attorneys, National Legal Information Office Network System database, fiscal years 2004–2013.

### TABLE 6

**Defendants in commercial sexual exploitation of children cases released pretrial, by type of offense, 2006–2013**

| Pretrial release status | All commercial sexual exploitation of children defendants | Child pornography production | Child pornography possession/receipt/distribution | Child sex trafficking |
|---|---|---|---|---|
| Released pretrial | 54.0% | 19.2% | 63.3% | 31.6% |
| Not released pretrial | 46.0 | 80.8 | 36.7 | 68.4 |
| Number of defendants | 15,993 | 1,530 | 11,918 | 2,545 |

Note: U.S. Code Title and Section information for offense charged was not available in the Administrative Office of the U.S. Courts' Probation and Pretrial Services Automated Case Tracking System data files for fiscal years 2004–2005. Therefore, this table only reports statistics for fiscal years 2006–2013.
Source: Bureau of Justice Statistics, based on data from the Administrative Office of the U.S. Courts, Probation and Pretrial Services Automated Case Tracking System, fiscal years 2006–2013.

### TABLE 7

**Defendants in commercial sexual exploitation of children cases filed, by offense, 2004–2013**

| Type of offense | Total | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| All commercial sexual exploitation of children offenses | 21,887 | 1,405 | 1,614 | 1,765 | 2,190 | 2,303 | 2,406 | 2,321 | 2,648 | 2,459 | 2,776 |
| Child pornography production | 3,058 | 170 | 156 | 191 | 248 | 265 | 293 | 339 | 446 | 422 | 528 |
| Child pornography possession/receipt/distribution | 17,528 | 1,118 | 1,246 | 1,344 | 1,750 | 1,906 | 2,039 | 1,920 | 2,150 | 1,915 | 2,140 |
| Child sex trafficking | 4,276 | 314 | 379 | 432 | 464 | 404 | 362 | 354 | 480 | 501 | 586 |

Note: Includes cases with a commercial sexual exploitation of children statute as any one of five offenses at case filing.
Source: Bureau of Justice Statistics, based on data from the Administrative Office of the U.S. Courts, criminal master file, fiscal years 2004–2013.

### 91% of adjudication outcomes in CSEC cases were convictions resulting from guilty pleas

From 2004 to 2013, a total of 19,801 adjudications in federal cases had a CSEC charge with 95% of these adjudications resulting in a conviction (table 8).[3] The conviction rate stayed relatively stable each year (fluctuating 1% to 2%). This was higher than the overall conviction rate (91%) for all federal cases adjudicated during the same period.

Ninety-one percent of convictions in cases with CSEC charges resulted from guilty pleas. Trials lead to a conviction in 4% of all CSEC adjudication outcomes. Trials that did not lead to a conviction made up less than 1% of all verdicts, and 5% of cases were dismissed. Defendants charged for sex trafficking had a higher percentage of case adjudications resulting in conviction by trial (9%) than defendants charged for the production (7%) or possession, receipt, or distribution (3%) of child pornography.

---

[3]Data are based on the number of cases that had a CSEC statute as any of five offenses at case termination, according to the AOUSC criminal data. Charges at case termination may not be the same as charges at case filing.

### 98% of defendants convicted of CSEC offenses were sentenced to prison

Nearly all (98%) CSEC defendants convicted in U.S. district court received a prison sentence (table 9).[4] Ninety-seven percent received prison-only sentences, and less than 2% received sentences of prison terms combined with community confinement. Less than 1% received probation or probation with confinement conditions. Ninety-nine percent of defendants convicted of producing child pornography received a prison-only sentence, compared to 97% of defendants convicted of child sex trafficking and 94% of defendants convicted of the possession, receipt, or distribution of child pornography.

The percentage of convicted CSEC defendants who were sentenced to prison (98%) was higher than the percentage of all convicted and sentenced federal defendants (86%) who received a prison sentence. More specifically, the percentage of convicted CSEC defendants who were sentenced to prison was also higher than the percentage of defendants sentenced to prison who were convicted in all major offense categories, including property (63%), public order (64%), violent (91%), weapon (92%), drug (93%), and immigration (96%) offenses (not shown).

---

[4]CSEC offense determinations were based on the primary sentencing guideline applied. (See *Methodology* for the specific federal sentencing guidelines that applied to CSEC offenses.)

## TABLE 8
**Adjudication outcomes of defendants in commercial sexual exploitation of children cases, 2004–2013**

| Adjudication outcome | All commercial sexual exploitation of children defendants | | Child pornography— | | | | Child sex trafficking | |
| | | | Production | | Possession/receipt/distribution | | | |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|---|---|
| Total* | 19,801 | 100% | 2,607 | 100% | 16,096 | 100% | 3,801 | 100% |
| Convicted | 18,851 | 95.2% | 2,486 | 95.4% | 15,432 | 95.9% | 3,550 | 93.4% |
| Plea | 17,989 | 90.8 | 2,306 | 88.5 | 14,881 | 92.5 | 3,194 | 84.0 |
| Trial | 862 | 4.4 | 180 | 6.9 | 551 | 3.4 | 356 | 9.4 |
| Not convicted | 950 | 4.8% | 121 | 4.6% | 664 | 4.1% | 251 | 6.6% |
| Dismissed | 883 | 4.5 | 113 | 4.3 | 625 | 3.9 | 226 | 5.9 |
| Trial | 67 | 0.3 | 8 | 0.3 | 39 | 0.2 | 25 | 0.7 |

Note: Includes cases with a commercial sexual exploitation of children statute as any one of five offenses at case termination.
*Does not include observations with an outcome value of "dismissed statistically" (n=141).
Source: Bureau of Justice Statistics, based on data from the Administrative Office of the U.S. Courts, criminal master file, fiscal years 2004–2013.

## TABLE 9
**Type of sentence imposed for convicted defendants in commercial sexual exploitation of children cases, 2004–2013**

| Type of sentence | All commercial sexual exploitation of children defendants | | Child pornography— | | | | | | Child sex trafficking | |
| | | | Production | | Possession | | Receipt/transport/distribution | | | |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 17,390 | 100% | 1,887 | 100% | 6,850 | 100% | 6,686 | 100% | 1,967 | 100% |
| Prison only | 16,828 | 96.8% | 1,871 | 99.2% | 6,445 | 94.1% | 6,597 | 98.7% | 1,915 | 97.4% |
| Prison/community split | 284 | 1.6 | 14 | 0.7 | 194 | 2.8 | 41 | 0.6 | 35 | 1.8 |
| Probation and confinement | 139 | 0.8 | 1 | 0.1 | 107 | 1.6 | 26 | 0.4 | 5 | 0.3 |
| Probation only | 133 | 0.8 | 1 | 0.1 | 99 | 1.5 | 22 | 0.3 | 11 | 0.6 |
| Fine only | 6 | 0.0 | 0 | 0.0 | 5 | 0.1 | 0 | 0.0 | 1 | 0.1 |

Source: Bureau of Justice Statistics, based on data from the U.S. Sentencing Commission monitoring data files, fiscal years 2004–2013.

## The mean prison sentence for CSEC defendants increased from 70 to 139 months

Prison sentences imposed on defendants convicted of CSEC offenses were among the longest in the federal justice system. The mean prison sentence imposed on convicted CSEC defendants increased by 99% from 2004 to 2013, from 70 to 139 months (table 10).

The mean prison sentence increased for all CSEC offense types between 2004 and 2013. The mean prison sentence for defendants who were convicted of the production of child pornography increased 106%, from 156 to 321 months. The mean prison term imposed for defendants who were convicted of the possession of child pornography also increased, from 34 to 66 months (up 94%). The mean prison sentence for defendants who were convicted of child sex trafficking increased from 82 to 133 months (up 62%).

**TABLE 10**
**Mean and median prison sentence length imposed for defendants convicted in commercial sexual exploitation of children cases, 2004 and 2013**

| | All commercial sexual exploitation of children defendants | | Child pornography— | | | | | | Child sex trafficking | |
| | | | Production | | Possession | | Receipt/transport/distribution | | | |
| Prison term averages | 2004 | 2013 | 2004 | 2013 | 2004 | 2013 | 2004 | 2013 | 2004 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean prison term | 70.0 mos. | 139.2 mos. | 156.0 mos. | 320.7 mos. | 33.7 mos. | 66.1 mos. | 74.3 mos. | 131.4 mos. | 82.1 mos. | 133.4 mos. |
| Median prison term | 46 | 100 | 121 | 124 | 27 | 60 | 57 | 108 | 60 | 120 |
| Number of cases | 747 | 2,233 | 98 | 340 | 283 | 727 | 332 | 870 | 34 | 296 |

Source: Bureau of Justice Statistics, based on data from the U.S. Sentencing Commission monitoring data files, fiscal years 2004–2013.

## Federal legislation passed to combat commercial sexual exploitation of children and to increase penalties

- *Protection of Children from Sexual Predators Act of 1998*—increased penalties for offenses including the transportation of minors for illegal sexual activity and created a zero tolerance policy for the possession of child pornography

- *Trafficking Victims Protection Act of 2000*—established human trafficking (including sex trafficking of children) as federal offenses, and which was subsequently reauthorized in 2003, 2005, 2008, and 2013.

- *Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today (PROTECT) Act of 2003*—increased penalties for persons who travel abroad to engage in sex with a minor, and increased penalties for first-time child pornography production offenses.

- *Adam Walsh Child Protection and Safety Act (2006)*—established new mandatory minimum penalties for child sex trafficking offenses (15-year minimum prison term if the victim was younger than age 14, and 10-year minimum prison term if the victim was 14 to 17 years old) [18 USC §1591 (b) (1) & (2)].

- *PROTECT Our Children Act (2008)*—expanded scope of prosecutable child pornography offenses, including prohibiting broadcast of live images of child abuse and modification of images of identifiable minors to produce child pornography.

- *Effective Child Pornography Prosecution Act (2008)*—clarified and broadened language in existing child pornography statutes to aid in the prosecution of child pornography offenses, including modifying statutes involving the transportation of child pornography to encompass the use of "any means or facility of interstate or foreign commerce."

- *William Wilberforce Trafficking Victims Protection Reauthorization Act (2008)*—required screening of all unaccompanied non-U.S. citizen and U.S. national children entering the United States for human trafficking. Removed the knowledge-of-age requirement for cases of the sex trafficking of children.

## Federal task forces and initiatives addressing the commercial sexual exploitation of children

- *Internet Crimes Against Children Task Force Program (1998-present)*—a national network of task forces formed to combat internet crimes against children and sexual exploitation of children facilitated by the use of technology, and administered by the Department of Justice (DOJ), Office of Juvenile Justice and Delinquency Prevention. These task forces facilitate cooperation among federal, state, and local law enforcement and prosecutors and provide training on investigating and prosecuting cases involving internet crimes against children.

- *Innocence Lost Initiative (2003-present)*—created by the FBI in conjunction with the DOJ's Child Exploitation and Obscenity Section and the National Center for Missing and Exploited Children to combat domestic sex trafficking of children. These task forces and working groups bring together federal, state, and local law enforcement to work with U.S. Attorney's offices to identify children involved in domestic sex trafficking and to prosecute the persons who exploit them.

- *Operation Predator (2003-present)*—Immigration and Customs Enforcement initiative for the investigation of offenses involving child pornography, sex trafficking of children, and travel overseas for the purpose of sex with children. This initiative uses the National Child Victim Identification System, a database of child pornography, to prove images possessed by suspects depict real children.

- *Project Safe Childhood (2006-present)*—DOJ initiative created to address the increase in technology-facilitated sexual exploitation of children. It was launched in 2006 to address the increase in technology-facilitated crimes involving the sexual exploitation of children. Since it began, the DOJ's Criminal Division, the FBI, the Department of Homeland Security's Homeland Security Investigations, and the U.S. Postal Inspection Service have coordinated national and international operations targeting the production, distribution, and possession of child images.

# Methodology

The Federal Justice Statistics Program database compiles comprehensive information on individuals processed through the federal justice system from source data provided by the Executive Office for U.S. Attorneys (EOUSA), the Administrative Office of the U.S. Courts, (AOUSC), the U.S. Sentencing Commission (USSC), the U.S. Marshals Service, and the Federal Bureau of Prisons.

In this report, commercial sexual exploitation of children (CSEC) cases were defined according to the following federal statutes pertaining to CSEC offenses:

- *Child pornography production*—18 USC § 2251 and 18 USC §2251A

- *Child pornography possession, receipt, or distribution*—18 USC § 2252, 18 USC § 2252A, 18 USC § 2260, and 18 USC § 1466A

- *Child sex trafficking*—18 USC § 1591, 18 USC § 2422, and 18 USC § 2423

For the statistics on sentencing presented in this report, CSEC defendant cases were defined through an examination of the highest U.S. Sentencing Guideline, if that primary guideline was one of the following:

- *Child pornography production*—§2G2.1 or §2G2.3

- *Child pornography possession, receipt, or distribution*—§2G2.2 (or §2G2.4 where Guideline amendment year<=2004) and §2G2.6

- *Child sex trafficking*—§2G1.3 or (§2G1.1 and ADJ-CHI>0, where Guideline amendment year<=2003)

For child pornography materials offenses, a further distinction was made between "possession" and "receipt, transport, and distribution" by examining the values of the U.S. Sentencing Commission (USSC) base offense level variable in these cases. The base offense levels range from 1 to 43 and are used as a measure of offense severity by the USSC. For "possession" the base offense level was less than or equal to 18 and for "receipt, transport, and distribution" the base offense levels with values of 20, 21, and 22 were retained in the analysis

For suspects in criminal matters referred to U.S. attorneys, the lead charge was the federal statute pertaining to the most serious offense investigated, as determined by the assistant U.S. attorney responsible for the matter.[5] Data from the

EOUSA Legal Information Office Network System were used to describe CSEC suspects in criminal matters referred to U.S. Attorneys by federal investigative agencies. If the lead charge designated was a CSEC charge, then the suspect matter was classified as a CSEC suspect matter and included in the data.[6]

Pretrial data from the AOUSC's Office of Probation and Pretrial Services Automated Case Tracking System were used to describe the characteristics of CSEC defendants at their initial hearing and CSEC defendants who were released prior to trial. The most serious offense charged according to the federal judiciary's hierarchy of offense severity was used to identify CSEC defendants at the pretrial stage. If the most serious offense corresponded to a CSEC charge, the defendant case record was defined as a CSEC case and counted in the data.

AOUSC criminal data were used to describe CSEC defendants in criminal cases filed and adjudicated. The AOUSC criminal master file contains the top five filing and terminating charges. These five charges were examined to determine whether any of these charges was a CSEC charge. If any of the five charges was identified as a CSEC charge, the defendant case record was defined as a CSEC case and counted in the data.

USSC data were used to describe CSEC defendants sentenced pursuant to the federal sentencing guidelines in U.S. district court. The primary guideline applied at sentencing was used to identify sentenced CSEC defendants.

For child sex trafficking offenses, it was not possible to subset statutes pertaining to only child victims for two reasons:

- the structure of the federal sex trafficking statute (18 USC § 1591) covers sex trafficking offenses against both child and adult victims in the same section and does not allow for distinguishing between these two types of victims

- limitations in the manner in which the underlying data from the source agencies record statute information that does not permit subsetting for child victims only [applies for the sex transportation statutes (18 USC § 2422, and 18 USC § 2423)].

For these reasons, data for child sex trafficking will represent an over count of persons age 17 or younger who were victims of this offense.

---

[5]A matter was a potential case under investigation on which at least 1 hour of investigation time was spent.

[6]For this report, CSEC charges include 18 USC § 2251; 18 USC §2251A; 18 USC § 2252; 18 USC § 2252A; 18 USC § 2260; 18 USC § 1466A; 18 USC § 1591; 18 USC § 2422; and 18 USC § 2423.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable and valid statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeri M. Mulrow is acting director.

This report was supported by Grant No. 2013-R2-CX-K056 awarded by BJS to the Urban Institute. At the Urban Institute, William Adams and Abigail Flynn wrote the report and Kamala Malik-Kane verified the report. Mark Motivans of BJS collaborated on technical details and overall quality in accordance with BJS's Statistical Integrity and Data Quality guidelines.

Monika Potemra and Jill Thomas edited the report. Steve Grudziecki produced the report.

October 2017, NCJ 250746



NCJ250746

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.usdoj.gov**