## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### Case No. 8:20-cv-00676-MSS-CPT

STRIKE 3 HOLDINGS, LLC, a limited
liability company,

      Plaintiff/Counter-Defendant,

v.

JOHN DOE infringer assigned IP address
47.197.99.186, an individual,

      Defendant/Counter-Plaintiff.

_____/

### PLAINTIFF'S/COUNTER-DEFENDANT'S TRIAL BRIEF

Pursuant to this Court's Third Amended Case Management and Scheduling Order [DE 86], Plaintiff/Counter-Defendant, Strike 3 Holdings, LLC ("Strike 3" or "Plaintiff"), hereby files the following Trial Brief.

## I.  INTRODUCTION

John Doe ("Defendant") infringed Strike 3's copyrights when he downloaded and uploaded copies of its movies over the BitTorrent network. Strike 3 has both direct and circumstantial evidence of the infringement. First, its forensic software, VXN Scan, recorded evidence of Defendant's IP address (47.197.99.186) connecting with the BitTorrent network and exchanging

1

Plaintiff's works with others in that network. Moreover, that evidence shows that, of the thirty-six works at issue, Defendant possessed 100% of thirty-three of them, and at least 39%, 77%, and 86% of the remaining three. Plaintiff's expert witnesses will assist the trier of fact in understanding these technical issues, while Defendant's will fail.

Second, Plaintiff has strong, unrebutted circumstantial evidence linking Defendant to the infringement. VXN Scan also records what Strike 3 calls "Additional Evidence," which is a list of third-party works, including books, movies, and music, an IP address downloads over the BitTorrent network. Many of the files downloaded by IP address 47.197.99.186 correspond to Defendant's interests, hobbies, and career. This implicates Defendant in downloading the works in the Additional Evidence, and thus, in Strike 3's works as well. Although Defendant denies liability, he does not deny these connections.

Additionally, Defendant's conduct during this litigation evinces his liability. He appears to have used a virtual private network ("VPN") to continue downloading Strike 3's works during the litigation, which he has not denied. Defendant also reinstalled the operating system on one of his computers while allowing another computer to automatically overwrite data.

This destroyed data on those devices. He also withheld two other computer devices. These are not the actions of an innocent party. A jury will be able to infer a great deal of guilt from the many discovery violations committed by John Doe throughout the case.

This evidence shows that Defendant more likely than not infringed Strike 3's copyrights. His denials are unsupported, and his defenses are speculative at best. By contrast, Strike 3's evidence is largely unrefuted and backed by sound methodologies and expert testimony. Once Strike 3's case is presented, the jury will have no alternative but to find in Plaintiff's favor.

## II.     FACTUAL BACKGROUND

### A.     BitTorrent Piracy of Strike 3's Works Causes Untold Losses

It is useful for the Court to understand the factual context for what Strike 3 will present at trial. Strike 3 owns the intellectual property in award-winning adult motion pictures. [DE 114-1]. It makes those works available through its websites to subscribing customers, as well as on DVD and video-on-demand platforms. *See* [DE 11-1] at ¶¶13–22. What makes its movies so unique, acclaimed, and popular is their quality: its directors, filmography, and even marketing have all received accolades. *Id.* at ¶23.

This comes at a price, however. The production budget for each film is significantly higher than that of the typical studio. *See id.* at ¶¶16, 19. Like any entertainment company, its movies are its lifeblood. Any piracy of those movies represents a direct threat to the company's sustainability and growth.

That threat is amplified by infringement over the BitTorrent network. BitTorrent does not require usernames or for the individual to identify themselves in anyway; the only identification broadcast is an IP address. The BitTorrent protocol breaks files down into "pieces" where multiple users "seed" those pieces to other "peers" in the network. This allows for a relatively fast download of large files, such as movies.

Significantly, BitTorrent can only operate efficiently if many peers are seeding the requested files to other peers (hence the moniker "peer-to-peer network"). Thus, BitTorrent's default operation makes anyone with a "piece" of a file upload that piece to other members in the network. Anyone who downloads a "piece" of a file (even if that file is not yet complete) automatically uploads that "piece" to others. In copyrights' parlance, these actions constitute "reproductions" and "distributions" of copies of the work. *See* 17 U.S.C. § 106(1), (3).

4

The matter began the same as all BitTorrent matters: with an IP address. An IP address ("Internet Protocol" address), as the name implies, is a string of numbers used to identify and route an account to websites and networks. It does not identify the user, the user's location, or what devices the user used to access the Internet. That does not, however render all online infringers completely anonymous; with the aid of an "early" subpoena and some basic investigating, the user can be identified. That is what happened here.

Plaintiff observed that IP address 47.197.99.186 had used the BitTorrent protocol to download and distribute at least thirty-six of Strike 3's copyrighted motion pictures. *See* [DE 17-1]. More specifically, Strike 3's propriety software, VXN Scan, observed, recorded, and stored data showing IP address 47.197.99.186 infringing the copyrights.

**B.    VXN Scan Is a Robust and Reliable Program**

VXN Scan's two major functions are to (1) seek out and log infringing copies of Strike 3's movies and (2) record and store that data in a forensically sound manner.[1] To start, the "Torrent Collector" component searches well-

---

[1] The summary of VXN Scan's functionality is derived from David Williamson's Declaration in Support of Plaintiff's Motion for Leave to Serve a Third Party Subpoena Prior to a Rule 26(f) Conference [DE 11-1] since it is the most succinct encapsulation of the technology. VXN Scan is also

known BitTorrent websites for .torrents–files used to download materials over the BitTorrent network–of Strike 3's works. [DE 11-1] at ¶44. Then a separate component downloads the .torrent files that match Strike 3's works as well as "a *full copy* of th[at] targeted computer file[.]" *Id.* at ¶47 (emphasis added). After the file has been confirmed as one of Strike 3's movies, *see id.* at ¶¶48–49, the "Proprietary Client" then seeks out peers uploading that file to the BitTorrent network, connects to those peers, and then "download[s] a piece or multiple pieces of the infringing computer file from other computers connected to the Internet through IP addresses[.]" *Id.* at ¶¶ 53–54. "In this way, the Proprietary Client emulates the behavior of a standard BitTorrent client." *Id.* at ¶ 55.

With this groundwork, VXN Scan is then able to record and store data from these infringements. The "Capture Card," which records network transactions "in real-time," is "connected to the Proprietary Client's network," i.e., to the part of VXN Scan that downloads Strike 3's files from peers in the

---

described in other materials throughout the record, including both of Mr. Williamson's depositions, Mr. Williamson's Expert Report [DE111-1], Patrick Paige's deposition, as well as Mr. Paige's Expert Report [111-2] and Supplemental Expert Report [DE 114-9].

BitTorrent network. *See id.* at ¶¶ 63, 65. That data is recorded as a Packet Capture file ("PCAP"). *Id.* at ¶¶ 58–59.

The PCAP records important data about the transaction, including the IP address, "the date and time of the network transaction," port number, the Info Hash value of the file, and the BitTorrent client. *Id.* at ¶¶ 60–61. It also records the "BitField" value. [DE 114-2] at ¶31. A BitField relays what percent of a requested file that peer uploading that file has available to seed to other peers. *Id.* A BitField value of 100% means that a peer has a complete copy of a file. *Id.* Significantly, of the thirty-six works at issue, the PCAPs showed that IP address 47.197.99.186 had BitField values of 100% for thirty-three of the movies, while the remaining three had values of 39%, 77%, and and 86%. *Id.* at ¶33.

After a PCAP is recorded, it is streamed and stored to an Amazon server. [DE 11-1] at ¶66. Finally, the "PCAP Analyzer" inspects the PCAPs and "verifies that each retrieved data piece is a part of the .torrent related file," and organizes that data on a table.[2] *Id.* at ¶74.

---

[2] Nothing in BitTorrent's or VXN Scan's architectures requires an infringer to be at home or even in front of their computer for the BitTorrent protocol to exchange files or for VXN Scan to track and record that exchange.

VXN Scan also records evidence of BitTorrent downloads of third-party works. [DE 111-1] at ¶82 (describing Cross-Reference Tool). Strike 3 calls this its "Additional Evidence." This function records and logs information about other files an IP address is downloading from the BitTorrent network, including "dates, hash values, and file names corresponding to the torrent-files." *See id.* at ¶84. Strike 3 uses this information to help determine who the infringer is and what evidence to look for during discovery. *Infra.* This is the evidence Strike 3 has before it even contemplates litigation.

VXN Scan was tested multiple times during its development and before its launch. *See* Williamson Depo. (Dec. 20, 2021), at 76:21–77:13; 80:18–81:1; 93:2–7. Another forensic expert, Patrick Paige, also tested VXN Scan at a later date, and found that it tracked and recorded accurate data about the BitTorrent activity. [DE 114-9] at ¶¶33–60. Defendant elected not to inspect VXN Scan or even request the PCAPs during discovery. *See* [DE 59-2]. Strike 3, nevertheless, *sua sponte* produced all relevant 137 PCAPs. *See* [DE 138-10]. Still, Defendant continues to bury his head in the sand on the accuracy of VXN Scan and its data. [DE 115] at 2–5. But baseless speculation cannot, and does not, carry his burden.

### C.    Prelude to Spoliation and Abundant Additional Evidence Pointing to John Doe

A great deal of the procedural history in this case actually supports Strike 3's case for copyright infringement because it reveals actions on John Doe's part that evince guilt. This case originated in state court as a request for a pure bill of discovery. *Strike 3 Holdings, LLC v. Unknown Infringer's Identified on Exhibit "1"*, No. 2019-032122-CC-05, Dkt. No. 1 (Fla. Miami-Dade County Ct. Dec. 4, 2019) [hereinafter referred to as "B.D."]. The court allowed Plaintiff to serve a subpoena on Defendant's Internet service provider ("ISP"), Frontier Communications ("Frontier"), on January 16. *See* B.D. at Dkt. No. 5.

Frontier notified Defendant about the subpoena on or around January 22. [DE 101-3]. Defendant, through counsel, filed a motion requesting Strike 3 litigate its case in federal court. *See* B.D. at Dkt. No. 9. As a result, and to avoid undue delay, Strike 3 decided to "drop" Defendant from the pure bill of discovery, and file a claim for copyright infringement in federal court.

Prior to dropping Defendant, Strike 3 sent Defendant's counsel notice of its  intent to file a complaint in federal court along with a "NOTICE OF DUTY TO PRESERVE EVIDENCE." [DE 89-2]. That notice explicitly instructed Defendant to "immediately identify and modify or suspend features

9

of its information systems and devices in routine operation operate to cause the loss of potentially relevant ESI." *Id.* Strike 3 emailed counsel the letter and notice on February 6 at 11:48 AM, [DE 110-4], and filed its Notice of Dropping Party at 11:51 AM that same day. *See* B.D. at Dkt. No. 10.

Strike 3 filed its Complaint for copyright infringement–still unaware of the subscriber's identity–on March 24. Strike 3 filed its motion for early discovery on May 28. Judge Tuite granted the motion. [DE 12].

Strike 3 served a second subpoena on Frontier requesting the Defendant's true name and address on June 19. [DE 110-5]. Not long after, Defendant received notice (again) about the pending subpoena from Frontier, and retained new counsel, Steven Vondran, soon thereafter. On July 3, Mr. Vondran emailed Strike 3:

> On this case, my client is well versed in computers and the type who would easily know how to use a VPN. He denies any wrongdoing and is willing to provide a declaration *and search of his hard drive*.[3]

---

[3] Defendant has also mischaracterized the substance of the exchange before the Court. For example, the proposition that, "Strike 3 failed to tell the Court, in their moving papers, that Strike 3's counsel expressly rejected the offer by John Doe's counsel to produce copies of the hard drives in July 2020." [DE 94] at 18, is false. Defendant's never offered to produce the hard drives, but rather, to "search" them. During fulsome discovery, Defendant fought Strike 3 at every turn to even produce basic data from those hard drives. Strike 3 was prudent in not accepting Defendant's "search" results as it would later discover that Defendant spoliated these hard drives.

[DE 94-3] (emphasis added). Counsel for Strike 3 responded, in part, "As to testimonial evidence and hard drive imaging, *this will be requested should we get into discovery.*" *Id.* (emphasis added).

Defendant ultimately did not challenge the second subpoena, and Strike 3 received his name and address on August 4, 2020. A third subpoena to Frontier (issued later in the litigation) would confirm that Defendant was assigned IP address 47.197.99.186 from August 8, 2019 00:48:35 GMT to December 16, 2019 21:48:02 GMT. [115-6]; *see also* [DE 138-6]. Frontier was unable to produce any information on either Defendant or IP address 47.197.99.186 prior to August 8, 2019, likely due to its policy to only retain records on its subscribers for a limited period of time.

Despite the absence of logs from earlier dates,[4] all the evidence indicates that Defendant was subscribed IP address 47.197.99.186 before August 8, 2019. Defendant has conceded that Frontier was his ISP for "the entire period." *See* [DE 110-1] at 61:24–62:7. And the exact same version of the exact same BitTorrent client was used to infringe Plaintiff's motion

---

[4] Direct evidence of what IP address Defendant used during the earlier period may have been contained on system log files or router, but those were not preserved. *See* [DE 110]; *see also* [DE 138-7] at ¶¶8–9.

pictures prior to and after August 8. [DE 138-7] at ¶10.  Additionally, Plaintiff can demonstrate Defendant's BitTorrent client was infringing the exact same files before and after the above date, making the probability of it being a random user virtually impossible.

Strike 3 does not reflexively prosecute subscribers. Rather, it uses the subscriber's information to further investigate which individual with access to the IP address infringed its copyrights. Here, Strike 3 uncovered substantial connections linking Defendant specifically to the infringement. It would uncover and confirm even more as litigation progressed. These include:

1. Defendant listed "VPN" under industry knowledge on his LinkedIn profile. Plaintiff's Additional Evidence shows Defendant's IP address downloading the following files:

   a. *Avira Phantom VPN Pro 569 27075 Final Incl Crack*;
   b. *CyberGhost VPN 9803188  Crack*;
   c. *Express Vpn 8 63 Key only 2018*;
   d. *Hotspot Shield VPN*;
   e. *Hotspot Shield VPN Elite 113624 Multilingual  Patch*;
   f. *Hotspot Shield VPN Elite 92415  Patch Keygen*;
   g. *VPN 365  Free Unlimited VPN Proxy  WiFi VPN v1 2 6 Mod AdFree*;
   h. *Easy VPN v3.0.OSX Mac OS*;
   i. *Hide My IP 12.4.241 Multilingual Premium VPN + Key*;
   j. *HMA! Pro VPN 3.2b for Windows (Vista  7  8.1  10)*;
   k. *Hotspot Shield VPN Elite 10.29.13 Multilingual + Patch*;
   l. *IPVanish VPN 11.8.8 Full Version &10days Free With Cracked*; and

m. *IPVanish VPN 11.8.8 Full Version &amp;10days Free With Cracked*.

2. Defendant listed "VMware" and "VMware ESX" under "Tools & Technologies" on his LinkedIn profile. Plaintiff's Additional Evidence lists:

    a. *VMware Workstation 1210 Build 2305331 Final Incl*;
    b. *VMware Workstation v1400 FULL  Serials [TechTools]*;
    c. *VMware Workstation Pro 12.1.1 Build 3770994 + Keys*; and
    d. *Mac OS X 112 Mavericks for ESXI*.

3. Defendant's LinkedIn identified him as a "Network Infrastructure Engineer." Plaintiff's Additional Evidence lists:

    a. *VisualRoutev81d Professional  CrackFiSKPiNNE*;
    b. *serverscheckmonitoringsoftware8 0 5 exe*; and
    c. *MATLAB R2018 a [PC] [x64] with Serial  Crack*.

4. Defendant is a Star Wars fan. Plaintiff's Additional Evidence lists:

    a. *[PsP - CsO] Lego Star Wars [Motionxcitystx] .cso*;
    b. *Star Wars The Rise of Skywalker 2019BRRipXviDAC3EVO[EtMovies]torrent*;
    c. *Rogue One A Star Wars Story 2016 BRRipXviDAC3EVO*; and
    d. *Star Wars  Rogue One Adaptation 02 of 06 2017 3 covers digital MinutemenMidascbr*.

5. Defendant is a World of Warcraft fan. And Plaintiff's Additional Evidence lists:

    a. *World of Warcraft Client - Version 1.12.1 enUS – Windows*.

6. Defendant is a Seth McFarlane fan. Plaintiff's Additional Evidence lists:

    a. *Download Family Guy S16E18 2018 HDTV x264  LEGi0N torrent*; and

b. *Family Guy S16E18 2018 HDTV x264 – CM.*
c. *TheOrvilleS01E061080pWEBx264TBS [rarbg]*

7. Defendant is a fan of the videogame Diablo. Plaintiff's Additional Evidence lists:

a. *Diablo 3 With Lord of Destruction (v1.21c) (Direct Play)*

8. Defendant has stated in his deposition that he is certified in "ethical hacking." Plaintiff's Additional Evidence lists:

a. *Learn Ethical Hacking using Kali Linux  Full Course.*

*See* [DE 114-4] at ¶6.

Strike 3 filed its First Amended Complaint ("FAC") on August 31, 2020. [DE 17]. The FAC maintained the same claim for copyright infringement in the thirty-six works but amended the pleadings to make clear that Defendant was the infringer. Defendant answered the Complaint on November 12 and counterclaim for "declaratory judgment of non-infringement." [DE 23]. The only injury-in-fact Defendant alleged in his counterclaim was that he "has incurred costs, fees, and expenses in connection with its Defense." *Id.* at ¶6. Defendant also raised nine separate affirmative defenses. *Infra.* Strike 3 answered the counterclaim, asserting affirmative defenses of its own, and the matter proceeded into discovery. [DE 24].

**D.   Defendant's Obstruction of Discovery Credibly Supports Strike 3's Case for Infringement**

14

### 1.    Defendant Confessed to Spoliation

Defendant, a supposed expert in forensic computer searches, deleted evidence from the hard drives he produced and withheld others. He has admitted to this and it will be introduced at trial. Additionally, two of Defendant's attorneys submitted retainer agreements with Defendant demonstrating a plan for Defendant to profit off of the litigation. Indeed, the agreement between the attorneys and Defendant was that they would submit to the Court bills for attorneys' fees with a rate *higher* than what they actually charged Defendant, and then, if the Court awarded fees, would split the difference with Defendant. [DE 53-1]; [DE 53-2]. That is, Defendant stood to not just recover his attorneys' fees but to *profit* from them. [DE 138-11]. This, too, is evidence supporting guilt.

### 2.    Defendant Used an Undisclosed VPN

Defendant is a user of a Virtual Private Network ("VPN"). A VPN masks a user's IP address. Defendant did not provide this information in response to direct discovery requests.   Instead, Plaintiff learned through Defendant's Twitter account information that Defendant had used several different IP addresses to login. [DE 114-4] at ¶8. At least one of these

addresses, 146.70.38.84, traced to an undisclosed VPN service, Private Internet Access ("PIA"). *Id.* at ¶10–13.

Plaintiff searched that IP address in its Additional Evidence database and discovered evidence of additional BitTorrent infringement from August 12, 2021 to December 8, 2021, during the pendency of this litigation. *Id.* at ¶10. In fact, Plaintiff's Additional Evidence shows that IP address 146.70.38.84 infringed even more of Strike 3's works. *Id.* at 11. It also shows that IP address 146.70.38.84 also downloaded files for Minecraft, Borderlands, and Spotify, which are present on on Defendant's PlayStation. [DE 114-7].

On December 9, 2021, the day Plaintiff notified Defendant of its intent to serve a subpoena on PIA, the infringement stopped and has not resumed. [DE 114-4] at ¶13. Confronted with this evidence, Defendant testified that he *did* maintain an account with PIA and that he terminated it the same day he received notice of the subpoena on PIA, and the same day the infringement stopped. [DE 114-6] at 92:5–92:19. He also conceding to using VPNs, [DE 114-6] at 92:8–92:19, not just at work, [DE 110-1] at 188:9–16, but at home, *id.* at 188:21–188:23, and on his "disclosed computer devices." *Id.* at 189:11–189:13. Defendant's protestations that have so far been filed, and which are

16

expected to be made at trial, are not credible from either a substantive or technical standpoint. No jury is going to believe him, especially in the face of so many actions designed to hide his devices, his downloads, and to otherwise stymie discovery in this case.

### 3.   Defendant Withheld the Existence of Various Hard Drives and Data from Those Devices

For example, rolling production and supplementation of computer devices–some after discovery and others not at all–further detracted from the merits of any John Doe defense. Defendant initially only disclosed an ASROCK DeskMini 110W desktop computer ("Desktop") and a Lenovo X320 laptop computer ("Laptop"), along with an iPad, iPhone, PlayStation 4, and Xbox 360. *See* [DE 38] at n.2. Months later, during his deposition, Defendant also revealed that he had **ten previously undisclosed external drives**. He supplemented his discovery responses to include those devices. Strike 3 was therefore unable to ask him questions about these devices in any informed way at John Doe's fact deposition.

But it was only after Strike 3 was finally able to review Defendant's system log files–which had to essentially be compelled by Judge Tuite after an all day hearing–that it leaned of two hard drives that had not been disclosed. *See* [DE 89]; [DE 110] (recounting investigation). First, Plaintiff's expert

uncovered another device that had accessed a file partially titled, "American-Pornstar.18.12.19.Gina.Gerson.XXX.SD.MP4-KLEENEX." [DE 89-11] at ¶¶22–24. Not only did this file mirror a file downloaded from BitTorrent,[5] but it indicated that Defendant had *another* undisclosed device. *See id.* at ¶23. After Strike 3 brought this to the Court's attention, Defendant conceded the existence of the missing device, and claimed he disposed of it to a relative. *See* [DE 94-8] at ¶¶6–7. There is no evidence to support this claim.  In fact, Defendant failed to disclose the identity of any relatives or this device in his Interrogatory responses *despite* being compelled by the Court to provide more complete answers. *See* [DE 47]; [DE 156-3] (Ex. 391, John Doe's "Amended Contacts" (Amended JAD076)). This will all come out at trial.

Defendant also later revealed an undisclosed device within his possession: an ADATA hard drive. Indeed, after both Defendant's expert, Michael Yasumoto, and Defendant himself, testified that there were only *two* hard drives, Defendant admitted in his June 15, 2022 deposition that another device existed and that he had not supplemented his discovery. [DE 102-1].

---

[5] "KLEENEX," for example, is a popular entity on BitTorrent websites that uploads infringing pornographic works. One can even search "KLEENEX" as a tag on those websites to find files it has uploaded.

When he finally supplemented his discovery just days before the dispositive motion deadline, the data provided was in non-native format and unreadable. [DE 138-7] at ¶¶6–7. Presented to a jury, this information will tend to show John Doe's guilt.

### 4.    Defendant Spoliated At Least Two of His Hard Drives

Defendant deleted evidence from the two hard drives he initially admitted to owning – his Laptop and Desktop computers.  In an unproduced email with Defendant's expert, Joel Brillhart**,** Mr. Edmondson cautioned that "If we find video files and/or torrent files [when examining Defendant's hard drives], then that would be good to know. [Defendant's hard drives] *may not be so clean*." *See* Brillhart Depo. at 89:11–14 (emphasis added). That same day, July 19, 2022, Mr. Brillhart produced for the first time an email showing *thousands* of undisclosed search results for the word "torrent" on one of Defendant's hard drives.[6] *See* [DE 112-2]. Defendant has since conceded that he destroyed data on his hard drive.

Defendant admitted that on June 1, 2020, *just four days after Strike 3 emailed Mr. Simon to confer about the federal litigation*, that he reinstalled

---

[6] The results listed in that email were apparently Google searches were from July 8, 2020. *See* [DE 112-2].

the operating system on his Laptop. [DE 125-3] at ¶1. This indisputably "deletes and/or overwrites critical data previously stored on the hard drive." [DE 89-11], at ¶11. He also conceded that he failed to prevent his Desktop from automatically updating (and deleting evidence) even though this occurred *after* he filed his counterclaim. [DE 94-8] at ¶¶13–14. Defendant has consequently destroyed direct evidence on his Laptop and Desktop computers. *See* [DE 110]. Juries do not usually condone this kind of behavior because they know they would not be able to escape the consequences as John Doe now attempts to do.

Defendant continued to destroy evidence throughout discovery. He routinely used his Laptop and Desktop computers after they were preserved, altering and overwriting data. *See* [DE 110-2] at 30:5–30:12, 47:21–48:1. This may not have been as big a problem had Defendant searched his preserved hard drives, but he did not. Instead, each time he was charged with searching his hard drives with "string searches" he created new copies of his unpreserved hard drives, searched those copies, and then deleted them. *See* [DE 110-1] at 60:1–62:10. This wheel of destruction and regeneration of unpreserved data further destroyed data and degraded the validity of the search results.

Take, for example, the basic string search for the word "torrent." As Mr. Paige explained after his review of the system log files, there existed multiple results for the search of "torrent" that were never produced, *see* [DE 89-11] at ¶¶26–28, which Defendant does not deny. *See* [DE 94-8] at ¶9. Defendant also notes that his "search returned many files, all of which were irrelevant," *id.*, but is vague if any were withheld. As Mr. Brillhart's email would indicate, [DE 112-2], at least the preserved hard drives contained thousands of results for "torrent" that would have been responsive, relevant, and proportional. It remains unclear, however, if Defendant destroyed this data prior to his searches or if he simply withheld them from Strike 3. But their existence is undisputed.

As a result of Defendant's destruction of evidence, Strike 3 is forced to rely on a universe of circumstantial evidence that is not complete. But copyright infringement is often proved with less, and this circumstantial evidence is largely undisputed. John Doe has no other theory, plausible or otherwise, to present the jury to explain the facts. None of Defendant's experts have shown the VXN Scan is unreliable or malfunctioned in this case. There is nothing to dispute Strike 3's PCAP evidence. There is nothing to dispute the BitField values or their significance. There is nothing to dispute Plaintiff's

Additional Evidence. There is nothing to dispute the fact that spoliated two of his hard drives. Quite the opposite: Defendant conceded his failure to preserve and he will have to do so at trial. Defendant infringed thirty-six of Strike 3's copyrights. Neither his counterclaim, affirmative defenses, nor discovery abuses can alter that conclusion.

## III.   LEGAL OVERVIEW

The parties bear different burdens on their competing claims. Strike 3 must persuade and prove that Defendant infringed its copyrights. And while the parties stipulate that Defendant must prove standing for his counterclaim, *see* [DE 149] at 15, they disagree whether he must also prove "non-infringement" to prevail on his counterclaim for declaratory relief. In any event, "[t]o establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991) (citation omitted).

## IV.   KEY ISSUES FOR TRIAL

### A.    Plaintiff has the Burden of Proof by Preponderance of the Evidence

Plaintiff need only prove its claims by a preponderance of the evidence. *See Tingley Sys., Inc. v. HealthLink*, Inc., 509 F. Supp. 2d 1209, 1217 (M.D. Fla. 2007). "The 'preponderance of the evidence' standard is customary in civil actions, and in copyright infringement litigation." *Greenberg v. Nat'l Geographic Soc'y*, No. 97-3924, 2005 WL 8156229, at *4 (S.D. Fla. Oct. 3, 2005). "Proving something by a 'preponderance of the evidence' means 'an amount of evidence that is enough to persuade [the jury] that the Plaintiff's claim is more likely true than not true.'" *Weathers v. Lanier*, 280 F. App'x 831, 833 (11th Cir. 2008). Affirmative defenses are also decided based on a preponderance of the evidence standard*, see Tingley*, 509 F. Supp. 2d at 1218, as is Defendant's counterclaim for declaratory relief of non-infringement. *Cf. Sandoz Inc. v. Amgen Inc.*, 773 F.3d 1274, 1281 (Fed. Cir. 2014).

## B.   Plaintiff is the Owner of Original Motion Pictures

### 1.   Plaintiff Timely Registered its Copyrights

Plaintiff will introduce into evidence Certificates of Registration issued by the United States Copyright Office for each of the works-in-suit, which constitute "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c); *see Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886–87 (2019). Those

certificates show that Strike 3 is the proper claimant. *See Strober v. Harris*, No. 20-2663 (MSS)(JSS), 2021 WL 7629457, at *2 (M.D. Fla. Nov. 23, 2021).

"As a condition of such enforcement . . . the Act generally requires that copyright holders of United States works register those works before bringing an infringement action." *Dish Network L.L.C. v. Fraifer*, No. 16-2549-T-60CPT, 2020 WL 1515938, at *9 (M.D. Fla. Jan. 31, 2020) (citing 17 U.S.C. § 411). "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410. Plaintiff's Certificates of Registration contain dates demonstrating each of Plaintiff's motion pictures were timely registered. *See* [DE 17-1]. Defendant lacks any evidence to rebut this in his Exhibit List.

The Certificates of Registration list Plaintiff, Strike 3 Holdings, LLC as the owner of the copyrights. Strike 3 obtained this ownership via transfer from its production company VXN Group, LLC who obtained the registrations as a work-made-for-hire. "A 'work made for hire' is—(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially

ordered or commissioned for use as a contribution to a collective work, [or] as a part of a motion picture or other audiovisual work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." *Burruss v. Zolciak-Biermann*, No. 13-789 (WSD), 2013 WL 5606667, at *3 (N.D. Ga. Oct. 11, 2013) (citing 17 U.S.C. § 101). "The employer or other person for whom the work was prepared is considered the author and owns the copyright of a work made for hire, unless the parties agree otherwise in writing." *Id*.

Strike 3 has and will provide testimony at trial from its corporate representative evidencing that each of the motion pictures were properly registered as a work made for hire, including that each of the directors, editors, script writers, and other creative contributors to Plaintiff's films were either employees of VXN Group, LLC or agreed in writing as independent contractors that the motion pictures would be works-made-for-hire. Strike 3's corporate representative will also provide testimony evidencing proper transfer of ownership via assignment agreements. Again, Defendant has not produced any evidence to contest the copyrights' work-made-for-hire status or their transfer of ownership.

### 2.    Plaintiff's Motion Pictures are Original

Each motion picture contains unique performers, scripts, locations, dialog, plots, sounds, sequence of images, camera angles, wardrobe, and other creative elements constituting originality.  "The Supreme Court has cautioned that it is not difficult to satisfy the originality requirement for purposes of copyright protection." *Pohl v. MH Sub I LLC*, 770 F. App'x 482, 486–87 (11th Cir. 2019) (citing *Feist*, 499 U.S. at 345).  "The requisite level of creativity is extremely low; even a slight amount will suffice.' And '[t]he vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Feist*, 499 U.S. at 345 (internal quotation marks omitted).  "When considering originality, therefore, the court must determine whether the author's creativity is enough to overcome a charge of triviality."  *Schiffer Publ'g, Ltd. v. Chron. Books*, *LLC*, 350 F. Supp. 2d 613, 617 (E.D. Pa. 2004).

Plaintiff's motion pictures are original. Each one contains countless creative decisions by Plaintiff's production teams. Plaintiff's corporate representative will testify in detail to the creative process behind Plaintiff's motion pictures which employs dozens of people and will satisfy the "creative spark" necessary to meet the originality standard. Defendant lacks any evidence to rebut this either.

But Defendant has proffered an expert who contends that the originality in the works is trivial. This misapprehends the nature of copyright law. Indeed, just because Plaintiff's motion pictures contain some overlapping ideas, that does not detract from their originality.  "Originality does not signify novelty; a work may be original even though it closely resembles other works." *Feist*, 499 U.S. at 358.

Here, "courts long have recognized that photographing a person or filming an event involves creative labor." *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 668 (7th Cir. 1986). "The many decisions that must be made during the broadcast of a baseball game concerning camera angles, types of shots, the use of instant replays and split screens, and shot selection similarly supply the creativity required for the copyrightability of the telecasts." *Id*. "Among other things, [Plaintiff] selected the kind of camera (movies, not snapshots), the kind of film (color), the kind of lens (telephoto), the area in which the pictures were to be taken, the time they were to be taken, and (after testing several sites) the spot on which the camera would be operated." *Time Inc. v. Bernard Geis Assocs*., 293 F. Supp. 130, 143 (S.D.N.Y. 1968).

Similarly, the many decisions made to create Strike 3's adult work supply the creativity required for copyrightability. Everything from the camera, lens, equipment, location, script, and various choreographed actions of the performers contributes to the creative process. It is baffling that John Doe has not conceded the originality of the works. Instead, he appears intent on wasting the jury's time by making them watch the 36 works in question to see for themselves.

### 3.    The Merger Doctrine and Scenes a Faire Do Not Apply

The merger doctrine is inapplicable to Plaintiff's works.  "Under the merger doctrine, copyright protection is denied to expression that is inseparable from, or 'merged' with the ideas, processes or discoveries underlying the expression." *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1290 (M.D. Fla. 2001).  "The merger doctrine denies copyright protection when creativity merges with reality; that is, when there is only one way to express a particular idea." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 68 (1st Cir. 2009).

Defendant attempts to sneak the merger doctrine in with Plaintiff's motion pictures because some (but not all) of the underlying content in the motion pictures contains depictions sexual relations between adults. The

merger doctrine finds that "expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1273 (M.D. Fla. 2008). Plaintiff is not attempting to assert a copyright in sex any more than broadcasters filming sports are attempting to copyright playing soccer or baseball. Instead, each of Plaintiff's motion pictures contain creative expressions of depictions of sex. It is the creative expression, not the act itself, that is protected by the Copyright Act.

Moreover, this is not a case where Defendant recreated a movie similar to Plaintiff's motion pictures. Here, Defendant is being accused of direct copying of the motion picture wholesale without paying for it. *See, e.g.*, *C.B. Fleet Co. v. Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1082 (S.D. Fla. 2007) (refusing to apply the merger doctrine when the copying is almost identical).

Likewise, the *scenes a faire* doctrine does not apply to Plaintiff's motion pictures. "Under the scenes a faire doctrine, copyright protection is denied to those expressions that are standard, stock, or common to a particular topic or that necessarily follow from a common theme or setting. It also denies copyright protection to those elements that have been dictated by external

factors, such as hardware standard and mechanical specifications and computer industry programming practices." *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1290 (M.D. Fla. 2001). Again, the copyrightability of Plaintiff's motion pictures stems from the creativity involved in capturing expressions of sex and creating a fantasy for the viewer.  Just as a telecast of a football game is copyrightable because of the direction of the cameras and angles captured, Plaintiff's motion pictures are copyrightable because of the creative expression involved in capturing the sexual performance by its performers, not to mention the script, dialog, and unique scene and background of each motion picture.

Consideration of the merger doctrine and *scenes a faire* is unnecessary because the original copyrightability of Plaintiff's motion pictures is obvious and will only needlessly increase the time of trial and confuse the jury.

### 4.    Plaintiff's Motion Pictures are Not Part of a Compilation

When determining whether a copyrighted work is part of a compilation for purposes of 17 U.S.C. § 504(c)(1), the primary "focus[ ] [is] on whether the plaintiff—the copyright holder—issued its works separately, or together as a unit." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 101 (2d Cir. 2016) (quoting *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135,

141 (2d Cir. 2010)), *cert. denied sub. nom.*, 137 S. Ct. 2269 (2017). That is because the Copyright Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

Plaintiff seeks an award of statutory damages for each work because Plaintiff not only registered each work separately, but also *issued* each work separately. *See* [DE 1-1]; [DE 17-1] (listing date of publication for each work). Plaintiff's works were *not* issued collectively, that is, arranged in such a way to create an original work of authorship like songs on an album.

Each movie contains its own plot and is first issued separately. Plaintiff's customers may well choose to watch all, some, or may even skip around within each movie. Indeed, when considering whether each movie "is, in itself, viable," *MCA TV, Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir. 1996), or whether each movie is more like a patchwork whose "value lies in . . . its combined assembly into the quilt as a whole," *Sullivan v. Flora, Inc.*, 936 F.3d 562, 572 (7th Cir. 2019), it is noteworthy that Defendant sought out and downloaded (and then distributed) each work individually. *See Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 915 (E.D. Mo. 2015);

*Playboy Enterprises Inc. v. Sanfilippo,* No. 97-0670-IEG (LSP), 1998 WL 207856, at *5 (S.D. Cal. Mar. 25, 1998).

> **5.    Considerations of Originality, Merger Doctrine, Scenes a Faire, and Compilation Status are Unnecessary and Will Significantly Delay Trial**

As set forth above, the originality of Plaintiff's motion pictures is obvious.  Indeed, Plaintiff knows of no scenario in existence where a motion picture was ever found to be "unoriginal," or impacted by the merger doctrine and *scenes a faire*. Forcing the jury to consider these issues for each of the 36 motion pictures at issue will add days to the trial.  Indeed, it will force the jury to review each motion picture, each averaging between thirty and sixty minutes, in significant detail. This would amount to over 3 full 8 hour days of trial (an unlikely event) just to display the movies—saying nothing of how much time it may take the jurors to review them during deliberations. The legal concepts behind these doctrines will likely lead to confusion, and the sexual nature of the films will potentially distract, cause resentment, and prejudice Plaintiff. *See* Fed. R. Evid. 403. This is exactly why Defendant is contesting these issues when no valid basis exists and where the originality is otherwise obvious and should be a part of the stipulated facts.

> **C.    Defendant Infringed Plaintiff's Works through BitTorrent**

### 1.   Elements of Infringement

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 358 (citation omitted). "The second element can be proven either with direct proof of copying or, if direct proof is unavailable, by demonstrating that the defendants had access to the copyrighted work and that the works are substantially similar." *Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1321 (11th Cir. 2016). Strike 3 will prove both elements at trial by overwhelming evidence.

### 2.   Peer-to-Peer Infringement Using the BitTorrent Protocol is Copyright Infringement

"[T]he use of P2P [peer-to-peer] systems to download and distribute copyrighted music has been held to constitute copyright infringement." *World Digital Rts., Inc. v. John Does 1-80*, No. 12-225-FTM, 2012 WL 1623871, at *2 (M.D. Fla. May 9, 2012) (citing *Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565 (S.D.N.Y. 2004)). Indeed, numerous Courts have recognized that using peer-to-peer file sharing software (including BitTorrent)

to obtain copyrighted works is infringement.[7]

_____

[7] *See*, *e.g.*, *Malibu Media, LLC v. Bui*, 13- 00162 (RJJ), ECF No. 40, at *2–3 (W.D. Mich. July 21, 2014) (granting Plaintiff's Motion for Summary Judgment, holding that "using BitTorrent technology, he ultimately winds up with . . . unauthorized copies of Plaintiff's works – copies that did not exist until Defendant himself engaged the technology to create new and unauthorized copies with a swarm of other users."); *Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 788 (E.D. Pa. 2013) ("Malibu has satisfied its burden of proof with substantial evidence and deserves a large award[.]"); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002) and *aff'd sub nom. A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002) ("We agree that plaintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3). Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights. Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights."); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* 545 U.S. 913, 125 S.Ct. 2764 (2005) (holding Grokster liable for contributory infringement because it materially aided and induced its users to commit direct infringement via its peer-to-peer file sharing service); *Sony v. Tennenbaum,* 660 F.3d 487 (1st Cir. 2011) (holding in a twenty-six page opinion that Tennenbaum was liable for infringement committed through a peer-to-peer network, that peer-to-peer infringement is not "fair use" nor would any other defense shield Tennenbaum's tortious conduct, and that the statutory damages clause set forth in the Copyright Act is constitutional); *Arista Records, LLC. v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) (denying an individual John Doe Defendant's motion to quash a subpoena issued to an internet service provider in response to an allegation that the John Doe Defendant infringed Arista's copyrights through a peer-to-peer file sharing network); *In re Charter Communications, Inc. Subpoena Enforcement Matter*, 393 F.3d 771, 774 (8th Cir. 2005) (opining that copyright owners have a right to identify peer-to-peer file sharers through a Rule 45 subpoena because those file sharers *are* infringing the owners' copyrights); *RIAA v. Verizon Internet Services, Inc.,* 351 F.3d 1229, 1238

### 3.    Defendant Used BitTorrent to Infringe Plaintiff's Exclusive Rights

The Copyright Act provides certain exclusive rights to a copyright holder. *See* 17 U.S.C. §106.  Relevant here, "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." *Id*.

Using the BitTorrent protocol to obtain copies Plaintiff's motion pictures without Plaintiff's consent violates Plaintiff's exclusive rights to reproduce and distribute. "Copyright infringement exists where file-sharing software and protocols (such as BitTorrent) are used to download works and reproduce, distribute, display, or publicly perform works without the copyright-holder's permission." *Strike 3 Holdings, LLC. v. Doe*, No. 21-1140 (RDA)(TCB), 2022 WL 3337797, at *4 (E.D. Va. Aug. 4, 2022).  "[A]s long as the BitTorrent software is running, the file can be uploaded to other BitTorrent users automatically. In other words, the BitTorrent user has to

---

(D.C. Cir. 2003) (repetitively acknowledging that file sharing is infringement); *UMG Recording, Inc. v. Alburger*, 2009 WL 3152153, *3 (E.D. PA. 2009) (same).

manually choose to download a file while its distribution to other users is performed automatically and simultaneously through the BitTorrent software." *Malibu Media, LLC v. Roldan*, No. 13-3007-T-30TBM, 2015 WL 556406, at *2 (M.D. Fla. Feb. 10, 2015).

> Copyright holders have the exclusive right to make copies of or reproduce their works. [17 U.S.C.] § 106(1). As outlined in detail above, the BitTorrent network used by Defendant involves the sharing of file "pieces" to recreate and distribute Plaintiff's motion pictures. This replication violates Copyright Plaintiffs' exclusive rights to reproduce their Works. *See* [17 U.S.C.] § 106(1). Copyright holders also possess an exclusive right to distribute their works. *See* [17 U.S.C.] § 106(3). A defendant violates a holder's distribution rights when that defendant disseminates the work or makes the work generally available to the public.

*Strike 3*, 2022 WL 3337797 at *5.

### D.   Plaintiff Has Compelling Direct and Circumstantial Evidence Proving Defendant Copied Its Works

Strike 3 has both direct and circumstantial evidence showing Defendant infringed its copyrights, each category reinforcing the other. "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S. Ct. 2148, 2154, 156 L. Ed. 2d 84 (2003) (quoting

*Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).

Specifically, this evidence will be used to show "copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 111 (citation omitted). This "can be proven either with direct proof of copying or, if direct proof is unavailable, by demonstrating that the defendants had access to the copyrighted work and that the works are substantially similar." *Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1321 (11th Cir. 2016). While direct evidence, such as an admission, is obviously probative, it is also rare. *See Williams v. Gaye*, 895 F.3d 1106, 1123 (9th Cir. 2018). Accordingly, "copying is usually circumstantially proved[.]" *Id.*

The copying prong "comprises two subparts, 'factual and legal copying[.]'" *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020). Factual copying asks "'whether the defendant actually used the plaintiff's material,' [and] may be inferred from indirect evidence demonstrating that the defendant had access to the copyrighted work and that there are probative similarities between the allegedly infringing work and the copyrighted work." *Id.* (citations omitted). "'Legal'—or 'actionable'— copying occurs when 'those elements of the [copyrighted work] that have

been copied are protected expression and of such importance to the copied work that the appropriation is actionable.'" *Id.* (citations omitted).

Even if Plaintiff is unable to show that Defendant accessed the works, it may still prove copying circumstantially by showing that the works are "strikingly similar." "Striking similarity exists where the proof of similarity in appearance is 'so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded.'" *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1253 (11th Cir. 2007) (citations omitted). In any event, Plaintiff must show the a "substantial similarity" in the copies, which is "assessed with respect to both the quantitative and the qualitative significance of the amount copied to the copyrighted work as a whole." *Compulife Software*, 959 F.3d at 1301 (citation omitted).

The PCAPs and videos themselves show "copying." First, the PCAPs show network evidence of Defendant's IP address exchanging pieces of the infringing files with VXN Scan. *Supra.* This is tangible, undisputed proof that Defendant's IP address had, at a minimum, "access" to the works. *Cf. Malibu Media, LLC v. Weaver*, No. 14-1580-T-33TBM, 2016 WL 1394331, at *5 (M.D. Fla. Apr. 8, 2016).

Second, the PCAPs also evidence "factual copying." Again, the network evidence shows the actual, real-time exchange of pieces of Strike 3's movies from Defendant's IP address to VXN Scan. That is, Defendant's IP address was not just passively *observed* infringing the works, but VXN Scan recorded and stored the concrete piece that Defendant uploaded. Strike 3 knows Defendant was the individual behind the IP address because it connected him to that IP address and the activity emanating from that IP address. *Supra* at § II.C. Defendant actually "copied" the copyrighted movies.

Finally, Defendant "legally copied" the movies by downloading and distributing substantial (not *de minimis*) portions of those works. The PCAPs recorded not just the piece of the work,[8] but its associated Info Hash, [DE 17-1] (listing Info Hashes), and BitField value. [DE 114-2] at ¶¶31–33. For example, a PCAP evinces that Defendant possessed a movie file from a particular Info Hash with a BitField value of 100%, and, on the lower register, a different movie file from a different Info Hash with a BitField value of 39%. This evidence combines to show that Defendant not only downloaded

---

[8] The piece is also direct evidence itself, but it should not be mistaken (as Defendant has argued) that Strike 3's sole evidence of legally copying. Rather these pieces, when properly contextualized with the rest of the evidence, circumstantially prove that Defendant copied even more of the file than was just contained in the PCAPs.

complete copies of the files for thirty-three of the thirty-six works (and substantial portions of the remaining three works), but was uploading pieces of all the works to other peers.

Although there is no direct evidence of these files on Defendant's spoliated hard drives, the circumstantial evidence is powerful. It is also admissible at trial. To confirm that the Info Hashes listed in Exhibit A to the FAC are actual copies of Strike 3's works, Ms. Stalzer reviewed movie files downloaded from those Info Hashes side-by-side with copies of the works from its websites. *See* [DE 11-3] at ¶¶8–10. She averred that they are, if not identical, at least substantially similar or strikingly similar. *Id.* at ¶11. Strike 3 also produced to Defendant both copies of the video files as downloaded from the Info Hash as well as its "control copies"–copies of the works its deposits with the Copyright Office. *See* [DE 138-10]. He has never refuted their similarity or attempted to do so. He appears to be pinning his hopes on technical objections to evidence that should be eliminated or pre-ruled upon at the pre-trial conference.

### E. Defendant Does Not Provide Credible Testimony or Evidence of His Non-Infringement

Generally, "credibility determinations are left to the jury." *United States v. Archible*, No. 21-14172, 2022 WL 16833770, at *2 (11th Cir. Nov.

40

9, 2022) (citing *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009)). Courts, however, need not credit a witness's statement where the "testimony is unbelievable on its face or incredible as a matter of law, meaning it contains facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." *Id.* (citation omitted). Additionally, "[a] witness's credibility may be impeached by a prior inconsistent statement so long as 'the statements are indeed inconsistent.'" *United States v. Frye*, 243 F. App'x 575, 576 (11th Cir. 2007) (quoting *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975)). "Otherwise irrelevant evidence sometimes may be admissible when used to impeach a witness's testimony." *United States v. Hands*, 184 F.3d 1322, 1327–28 (11th Cir.), *corrected*, 194 F.3d 1186 (11th Cir. 1999). "A district court is free not to credit [witness] testimony, but it can[not] ignore it." *See Newman*, 959 F.3d at 1310.

Defendant's testimony that he did not infringe Strike 3's works is not credible. His proof here has always been that his "search" of his computer devices revealed no evidence of the infringing files or BitTorrent client. How generous from a Defendant, who wiped his computer prior to the search! He also testified that he preserved his computer devices and did not even

"partially wipe" them. *See* [DE 110-1] at 175:15–178:14;180:24–181:8; 183:4–183:6. He has since admitted that this was untrue. *See* [DE 125-3] at ¶1; [DE 94-8] at ¶¶13–14. This calls into significant question the helpfulness of John Doe's own trial brief, which claims:

> Strike 3 has only one piece of speculative evidence from 2018 from John Doe's hard drive. Strike 3 never found any evidence of a Bittorrent client or any torrent files on his media. More importantly, Strike 3 did not find any of their 36 movies.

[DE 158] at p. 5.

This claim *alone*, given the failure to maintain the devices so that a proper search could even be conducted, exposes the total implausibility of Defendant's case. It is not one which the jury will countenance.

### F.   The Opinions of Many of Defendant's Expert Witnesses Are Unreliable and Predicated on Faulty Methodologies

At trial, Strike 3 will present its overwhelming direct and circumstantial evidence. John Doe's defense strategy is predicated upon confusing the issues for the factfinder. One of the weapons John Doe intends to bring to bear are expert witnesses who either do not understand the issues or do not address any key facts.

David Dickson, Joel Brillhart, and Defendant himself are subjects of pending *Daubert* motions, [DE 109]; [DE 111]; [DE 112], and Juan Martinez

is the subject of a pending Motion in Limine. [DE 154] at 11–18. The flaws in their methodologies and foundation of their opinions are patent.

Mr. Dickson is proffered as an expert in the entertainment industry but has zero experience in adult entertainment and has not reviewed any documents detailing the specific parameters of each production in this case prior to rendering such opinions. He is not a copyright lawyer. In fact, nothing in his report discusses the "originality" of Strike 3's works in the legal sense.

Mr. Brillhart admits he is not an expert in Linux, the operating system on Defendant's Laptop, one of the devices he examined. He also screened and failed to disclose search results that *he* deemed not relevant to the case, even though they were responsive to keywords in this case, but has failed to explain his criteria for "relevance." This is particularly concerning because he did not review the complaints in this matter and has shown that he withheld thousands of search results for "torrent." *See* [DE 112-2]. It will not make for a convincing direct examination by John Doe.

Mr. Martinez's report is even more bizarre. He notes that most of his analysis was based on assumption he made about the router and its settings during the period of infringement. Yet even if these assumptions were sound, they are meaningless since he reviewed the manufacturer's specification and

43

inspected the wrong router. Indeed, Defendant admitted to disposing of the router from the relevant time-period, which may have contained information about its security configuration. *also See* [DE 138-7] at ¶¶8–9.  Thus, he is unable to render an accurate opinion what security settings Defendant's router had during the period of infringement, Defendant's WiFi's range, and whether it was even accessible to his neighbors.

Brandon Garcia-Paeth's conclusion that the "pieces" contained on Plaintiff's PCAPs only contains small portions of the actual file misstates the evidence. [DE 127-3] at ¶¶30–32. First, this confirms the accuracy of the PCAP as well as its competence to prove both access and factual copying. Although Mr. Garcia-Paeth appears to test its ability to prove legal copying, he either ignored or failed to examine the BitField values in each PCAP. [DE 127-3] at ¶31.

Dr. Kal Toth opinion that "VXN [Scan] reports false positives at a very high rate[,]" *see* [DE 127-3] at ¶18–19, also misstates the evidence. Dr. Toth erroneously defines "false positive" as those cases where Plaintiff has amended its complaint against a third-party, and not the subscriber to a particular IP address. *See id.* But this does not indicate that VXN Scan's results were false. VXN Scan does not identify the individual; it identifies and

records evidence from the network level–i.e. the IP address. *See id.* at ¶22. Dr. Toth's false equivocation between VXN Scan's accuracy and whether the subscriber is the infringer conflates and confuses two irrelevant events. Importantly, Dr. Toth could not show that VXN Scan misfunctioned in this, or any other, case.

Finally, Michael Yasumoto, admitted to only reviewing two of at least four of Defendant's hard drives. He did, however, perform a string search for some of the Additional Evidence on Defendant's withheld ADATA drive, but only after discovery concluded. *See* [DE 125-2]. At an evidentiary hearing, Mr. Yasumoto testified that "[s]earch string[s] probably wouldn't be sufficient" to examine a hard drive for infringement because it would be impracticable "to determine when . . . deletion occurred or when reinstallation occurred." *See* Hr. Tr. 72:1–14. And, during his deposition, Mr. Yasumoto conceded he would have performed his examination of the hard drives differently than he did in his report, as the search was too limited.

## G.   Plaintiff's Experts Are Qualified and Their Opinions Are Reliable and Undisputed

Strike 3's expert witnesses, by contrast, have tendered reports and opinions that not only surpass *Daubert*, but competently support Plaintiff's claim for infringement. They will be excellent witnesses at trial.

Mr. Williamson is an Information Systems and Management Consultant who is am employed as independent contractor by Plaintiff. [DE 127-2] at ¶11. He oversaw the design, development, and overall creation of VXN Scan which Strike 3 used to identify the IP at issue in this case. *Id.* at ¶40. Mr. Williamson knows how the VXN Scan functions, records, stores, and preserves PCAPs and has testified to such in two separate depositions in this matter. Defendant has not rebutted any of Mr. Williamson's statements or opinions about how VXN Scan functions, its reliability, the soundness of its evidence, or the significance of that evidence.

Plaintiff's second expert witness, Mr. Paige is a computer forensics expert with over twenty years of computer forensic experience which includes investigations into computer related crimes, crimes committed using peer-to-peer file sharing software, and executing search warrants on homes identified as being assigned particular IP addresses engages in criminal activity. *See* [DE 127-5]. Mr. Paige designed and executed a test to determine the accuracy of VXN Scan. The test confirmed that it successfully and accurately identifies IP addresses used to engage in BitTorrent activity. *Id.* at ¶¶32–60. Although this test is replicable, none of Defendant's experts have conducted a similar examination of the VXN Scan system. None have provided any alternative

explanation for Mr. Paige's results. And none have disputed Mr. Paige's conclusions that Defendant spoliated two of his hard drives.

### H.   Defendant Has Not Carried His Burden of Persuasion on Any of His Affirmative Defenses

#### 1.   Summary

Both parties have raised various affirmative defenses in response to the other's claim. As of the time of this brief, none of the affirmative defenses have been withdrawn or disposed of on summary judgment. In response to Strike 3's claim for copyright infringement, Defendant has alleged defenses of waiver, implied license, unclean hands, estoppel, mitigation of damages, innocent infringement, and copyright misuse. [DE 23]. There is no evidence to support any of these defenses.

#### 2.   Plaintiff has Not Waived its Copyrights

"[W]aiver or abandonment of copyright occurs only if there is an intent by the copyright proprietor to surrender rights in his work." *Weaver*, 2016 WL 1394331 at *8 (quoting *Malibu Media, LLC v. Zumbo*, No. 13-729 (JES)(DNF), 2014 WL 2742830, at *2 (M.D. Fla. June 17, 2014) (citation and internal quotation marks omitted)). There is simply no evidence of this. Suing to enforce its copyrights would suggest the opposite.

The theory Defendant proffers is even more farfetched. He alleges that, "[o]n information and belief, Plaintiff, either directly, or through its agent, directed or allowed its videos to be 'seeded' to the Internet via torrent sites. Defendant either impliedly or expressly had permission to download its copyrighted Works." *See* [DE 23], at 6–7. This has never happened here or in any of Strike 3's cases.[9] Defendant has been afforded months of discovery, including deposing Strike 3's experts and corporate representative, and has presented zero evidence to support this allegation. The reason for the lack of evidence is simple: there is none. There are no exhibits or witnesses disclosed by John Doe who would help him on this.

### 3. Defendant Was Never Authorized in Any Manner to Download or Distribute Strike 3's Works

"An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work." *Weaver*, No. 2016 WL 1394331 at *8 (quoting *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010)). There is no evidence that Defendant of any of this, let alone any

---

[9] Mr. Williamson has also explained that VXN Scan is designed so that it is "*incapable* of distributing the infringing computer files." *E.g.*, [DE 11-1] at ¶55 (emphasis original).

meeting-of-the-minds between the parties. Defendant admits that the parties were strangers to one another until *after* Strike issued its subpoena. *See* [DE 89-1] at 94:4–94:17. The parties have never stood in any form of contractual privity–express, implied, or otherwise. There are no witnesses or exhibits listed who would assist John Doe on this.

### 4.   Plaintiff Has Not Come to This Litigation With Unclean Hands

"To prevail on the defense of unclean hands, Defendant[ ] must demonstrate that: (1) Plaintiff's alleged wrongdoing is directly related to the claim against which it is asserted; and (2) Defendant[ ] [was] personally injured by Plaintiff's conduct." *Weaver*, 2016 WL 1394331 at *9 (citation omitted). This defense also relies on, and thus fails as a result of, Defendant's spurious theory that Strike 3 uploaded its works to the BitTorrent network. Again, Defendant "has presented no evidence in support of this affirmative defense and, therefore, has failed to carry his burden." *Id.* John Doe has listed no witnesses or exhibits that would help him make this claim.

### 5.   Plaintiff Is Not Estopped from Protecting Its Copyrights

"The gravamen of estoppel . . . is misleading and consequent loss[.]" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684, 134 S. Ct. 1962,

1977, 188 L. Ed. 2d 979 (2014). It requires, among other elements, that "the defendant must be ignorant of the true facts" and that "he must rely on the plaintiff's conduct to his injury." *Thompson v. Looney's Tavern Prods., Inc.*, 204 F. App'x 844, 850 (11th Cir. 2006) (citation omitted).

This defense can also not be maintained. First, the defense relies on Defendant's allegation that Strike 3 "seeded" its works to Defendant. *See* [DE 23] at 7. There is no evidence of this because it never happened. Second, even if Plaintiff had seeded its works to Defendant, that would still require Defendant to show that Strike 3 authorized Defendant to download *and* upload its works to others in the BitTorrent network. *Cf. Malibu Media, LLC v. Doe*, 381 F. Supp. 3d 343, 358 (M.D. Pa. 2018) ("John Doe has not shown that Malibu was aware of and acquiesced in his conduct, or in the infringing conduct of other BitTorrent users."). Defendant would also have to show that he reasonably relied on Strike 3's apparent authorization. *Cf. id.* There is no evidence to support any of this. There are no witnesses or exhibits that have been disclosed that would assist John Doe on this defense.

### 6.   Plaintiff Has Not Failed to Mitigate its Damages

A failure to mitigate damages defenses arises, as Defendant notes, when a party has a "duty to mitigate its damages and . . . fail[s] to do so." [DE 23]

at 7. But Defendant has alleged no such "duty" or breach of that duty. This defense "is generally inappropriate when a party seeks only statutory, as opposed to actual, damages." *Weaver*, 2016 WL 1394331 at *7 (citation omitted); *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 275 (5th Cir. 2020) ("Where plaintiff seeks only statutory damages, such a defense is meritless and should be struck since there is no requirement that statutory damages be pegged to actual damages.") (quoting 6 Patry on Copyright § 22:192.25).

Statutory damages are committed to the Court's discretion, *see* 17 U.S.C. § 504(c), which can adjust the award to what it finds appropriate under the circumstances of the case. While Plaintiff can petition the Court for these damages, it cannot control them. Consequently, no obligation has inured on Strike 3, leaving no "duty" for it to breach. The defense is inapt. Whatever the case, John Doe has failed to disclose any witnesses or exhibits that would assist him on this defense.

### 7.   Defendant Is Not An Innocent Infringer

"[I]nnocent infringement of a copyright is not an affirmative defense to an infringement action." *Pk Studios, Inc. v. R.L.R. Invs., LLC*, No. 15- 389- FTM-99CM, 2016 WL 4529323, at *4 (M.D. Fla. Aug. 30, 2016) (collecting

cases). "The innocent infringer defense gives the district court discretion to reduce the minimum statutory damages from $750 to $200 per infringed work if it finds that the infringer 'was not aware and had no reason to believe that his or her acts constituted an infringement of copyright.'" *Maverick Recording Co. v. Harper*, 598 F.3d 193, 198 (5th Cir. 2010) (citing 17 U.S.C. § 504(c)(2)). Yet Defendant has denied all infringement. *See* [DE 23], at ¶¶55–61. He cannot now claim that *if* he infringed, that infringement was "innocent."

Moreover, as is the case with statutory damages generally, whether the maximum amount recoverable per work is reduced is committed to the Court's "discretion." *See* 17 U.S.C. § 504(c)(2). The parties may argue over appropriateness and degree of these damages, but that does not erase Defendant's liability.

### 8.   Plaintiff Has Not Misused Its Copyrights in This or Any Litigation

"The doctrine of copyright misuse 'bar[s] recovery for a copyright owner who attempts to extend its limited copyright rights to property not covered by the copyright.'" [DE 149] at 16 (citation omitted). Defendant's sole basis to this defense is predicated on a deliberate misreading of the record. He alleges that Strike 3 brought "a copyright case in state court," [DE 137] at

32, and that Plantiff "use[d] . . . the Florida State Court as preliminary process to attempt to acquire federally protected subscriber information[.]" [DE 23] at 7.

First, as is clear from the papers themselves, Strike 3 did not bring a suit for copyright infringement in state court; it requested a pure bill of discovery. *See* [DE 114-3]. A pure bill of discovery is "a mechanism to obtain the disclosure of facts . . . in aid of the prosecution of an action pending or about to be commenced in some other court." [DE 139] at 2. It is an equitable and procedural remedy. It does not adjudicate substantive law like copyright. The state court did not analyze–and was not asked to rule on–copyright infringement. Rather, the limited motion was to seek authorization to serve a subpoena on Defendant's ISP, which the state court permitted.

Second, it is of no moment what source of law protects Defendant's subscriber information. State courts issue orders touching on federal protected rights all the time, including those by the Constitution and those by the relevant Cable Communications Policy Act of 1984, 47 U.S.C. § 551 *et seq.* *Cf. SC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("There is no privilege or restriction on releasing customer records to a nongovernmental

entity pursuant to a court order."). It is, thus, no abuse to petition the state for an Internet subscriber's identity.

Third, a pure bill of discovery does not extend the reach of the copyrights' monopoly because the Copyright Act simply affords a series of "exclusive rights" to "the owner[s] of copyright" in expressive "works of authorship." *See* 17 U.S.C. §§ 102(a), 301(b)(3) ("Nothing in [the Copyright Act] annuls or limits any rights or remedies under the common law or statutes of any State with respect to . . . subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103[.]"). By contrast, the pure bill of discovery sought just two points of information: Defendant's name and address. "[T]hese bits of information are uncopyrightable facts[.]" *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991). Defendant's attempt to recharacterize basic discovery as a radical expansion of copyright law is baseless.

Finally, Defendant has not "submitted evidence from which a trier of fact might find that [Plaintiff]'s lawsuit is anything other than a 'good faith attempt to enforce a copyright,' conduct which 'does not violate the antitrust laws.'" *Cf. Malibu Media*, 381 F. Supp. 3d at 359 (citation omitted) (granting

summary judgment against copyright misuse). It is simply wrong as a matter of law to maintain that a pure bill of discovery touches on the same subject matter as copyright or improperly expands any of the exclusive rights vested in a copyright.

## I.   Strike 3's Affirmative Defenses Stand

### 1.   Overview

In response to Defendant's counterclaim for declaratory relief, Strike 3 has raised defenses for lack of standing/no subject matter jurisdiction, failure to state a claim, unclean hands, failure to mitigate damages, and abuse of process. [DE 24].

### 2.   Defendant Lacks Standing to Support His Counterclaim and Has Thus Failed to State a Claim and Deprived the Court of Subject Matter Jurisdiction Over It

The parties stipulate that "[a] claim for declaratory relief must be supported by standing, including an Article III injury-in-fact. [DE 149] at 15 (citing *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017) (collecting cases); *California v. Texas*, 141 S. Ct. 2104, 2115, 210 L. Ed. 2d 230 (2021) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–127, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007)). Standing is also baked into the Declaratory Judgment Act, which requires the claimant

present a "a case of actual controversy[.]" *See* 28 U.S.C. § 2201(a). The Act is further limited to declarations regarding "the rights and other legal relations of any interested party[.]" *See id.* Thus, standing and subject matter jurisdiction is inextricably tied up with the validity of a claim for declaratory relief.

Defendant has failed to state an injury-in-fact, let alone support it. His basis to declaratory relief is that he "has incurred costs, fees, and expenses in connection with its Defense." [DE 23] at ¶6. Yet he has steadfastly refused to answer questions about his fee payments. *See* [DE 53-3]. Even if he had, precedent is clear that an interest in attorneys' fees is not an Article III injury-in-fact. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107–08, 118 S. Ct. 1003, 1019, 140 L. Ed. 2d 210 (1998). Nor has Defendant alleged any form of right or legal relationship to which the Declaratory Judgment Act appertains. *See* [DE 114] at n.5. "No concrete harm," and no cognizable claim, then "no standing" and no jurisdiction. *See TransUnion LLC v. Ramirez*, 210 L. Ed. 2d 568, 141 S. Ct. 2190, 2214 (2021); *see also Strike 3 Holdings, LLC v. Doe*, No. 21-83 (GJH), 2022 WL 1289667, at *3 (D. Md. Apr. 29, 2022).

### 3.   Defendant Has Unclean Hands and Failed to Mitigate His Damages

The parties have further stipulated that "[a]n unclean hands defense requires that "(1) [Defendant]'s alleged wrongdoing is directly related to the claim against which it is asserted; and (2) [Plaintiff was] personally injured by [Defendant]'s conduct." [DE 149] at 16 (quoting *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1283 (M.D. Fla. 2008)). Here, even if Defendant were not the infringer (which he is), his iniquitous conduct bars recovery.

Defendant dragged out litigation in the hopes that Strike 3 would settle or dismiss its claim, allowing him to move for fees and, in turn, profit. His discovery abuses have tacked on thousands of dollars in expenses of requesting, reviewing, re-reviewing Defendant's materials which were produced in a bad faith attempt to frustrate Plaintiff and prevent it from learning about the despoliation of evidence. Thus, Defendant has also failed to mitigate damages by ignoring his duties of candor and to act in good faith in discovery.

### 4. Defendant Abused Process By Filing A Counterclaim to Gain a Meritless Tactical Advantage

Finally, the parties have stipulated that "[a]n abuse of process requires: "(1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process; and (3) that, as a result of such

action on the part of the defendant, the plaintiff suffered damage." [DE 149] at 15 (quoting *Duncanson v. SJ Wathen Bloomington LLC,* No. 14-704-ORL-40KRS, 2016 WL 7228743, at *2 (M.D. Fla. June 24, 2016)). Here, the abuse is Defendant's filing of a counterclaim for declaratory relief.

Obviously, a defendant may deny their liability in an Answer, raise avoidances and defenses, and plead counterclaims if appropriate. *See* Fed. R. Civ. P. 11(b). Defendant's counterclaim, however, was not filed to litigate a meritorious claim, but rather, to trap Strike 3 in a case where Defendant had, by the time that counterclaim was filed, despoiled his Laptop and Desktop devices.

The procedure here is complex. Filing an Answer alone is enough to prevent Strike 3 from unilaterally dismissing its claim. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). The counterclaim adds nothing there under the Federal Rules. Thus, after an answer is filed, Plaintiff is left with the following options: if it wants to dismiss, (1) seek a stipulated dismissal with Defendant (i.e. settle), *id.* 41(a)(1)(A)(ii), (2) move for a court order dismissing the claim and/or counterclaim, *id.* 41(a)(2), or, if it does not want to dismiss, (3) litigate.

The first option did would not work. A stipulated dismissal requires Defendant's approval, and separate mediation and settlement conferences

have not resolved the matter. *See* [DE 35]; [DE 153]. Thus far, there has been no mutual agreement to terminate the litigation.

Moreover, the second option–a dismissal via order of the Court–is foreclosed as a result of the counterclaim itself. First, that provision is unavailable when "a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss" since "the action may be dismissed over the defendant's objection *only if* the counterclaim can remain pending for independent adjudication." Fed. R. Civ. P. 41(a)(2) (emphasis added). Defendant's counterclaim, which is inextricably tied up with Plaintiff's claim, would lose its only arguable claim to standing, and thus could not be independently adjudicated.

Second, and more critically, even if Strike 3 were to dismiss *its* claim, that would not dispose of Defendant's counterclaim, which is a mirror-image of Strike 3's claim. *See Malibu Media, LLC v. Redacted*, 705 F. App'x 402, 406 (6th Cir. 2017). Thus, Strike 3 is still stuck either proving its claim (now in a defensive posture to Defendant's counterclaim), or subject to Defendant's caprices for a settlement. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). The counterclaim is designed to box Plaintiff into to a situation where, no matter how much

discovery misconduct had taken place, it would be forced litigate or forced to settle.

This is a "perverted use" of the pleadings. And Defendant's ulterior motive–to coerce an unreasonable settlement–is not only evidenced by his discovery abuses, but by his unethical fee agreements with Mr. French and Mr. Edmondson. Those agreements created a moral hazard that prolonged a litigation in which Defendant destroyed critical evidence before he even filed his counterclaim. Even if Defendant were held to be the prevailing party, equity would demand that he not profit from his malfeasances.

## J.    Defendant's Willful Infringement Warrants Significant Statutory Damages

The Copyright Act affords rightsholder both legal and equitable remedies. 17 U.S.C. § 501 *et seq.* With respect to legal damages, the Act permits the rightsholder to recover either statutory or actual damages. *Id.* § 504(a)(1)–(2). Strike 3 has consistently, and since the beginning of this litigation, elected to recover statutory damages. *See* [DE 1] at ¶47, [DE 17] at ¶46, [DE 149] at 14 ¶4 (stipulating to recovering statutory damages). Generally, statutory damages run from $750 to $30,000 *per* work infringed. 17 U.S.C. §504(c)(1).

However, if Defendant's infringement was "committed willfully," the range of statutory damages increases from $750 to $150,000 *per* work infringed. *Id.* §504(c)(2). "Willful" is a misnomer. The Eleventh Circuit has held that it not only "means that the defendant 'knows his actions constitute an infringement [and that] the actions need not have been malicious,'" but that "willfulness" also "encompasses reckless disregard of the possibility that one's actions are infringing a copyright." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1271–72 (11th Cir. 2015) (citations omitted).

On top of denying infringement outright, Defendant has also claimed that he is an "innocent infringer." Those would mean that the Court, in its discretion, could remit statutory damages to as low as $200 per work. See 17 U.S.C. § 504(c)(2). But "the infringer *sustains the burden of proving . . . that such infringer was not aware of and had no reason to believe that his or her acts constituted an infringement of copyright." *Id.* (emphasis added). Defendant, however, avers that no infringement has taken place. He cannot avail himself to these lower damages now that the evidence is stacked against him.

**K.    Strike 3 is Further Entitled to Equitable Relief**

The Copyright Act also permits equitable relief, including enjoining further infringement of the copyrights, 17 U.S.C. § 502(a), and ordering the "destruction or other reasonable disposition of all copies . . . found to have been made or used in violation of the copyright owner's exclusive rights[.]" *Id.* § 503(b).

Courts routinely find that permanent injunctions barring infringers from further downloading and uploading Plaintiff's works are appropriate. *See*, *e.g.*, *Strike 3 Holdings, LLC v. Doe*, No. 18-5305 (DRH)(SIL), 2020 WL 6875260, at *5 (E.D.N.Y. Nov. 12, 2020*), report and recommendation adopted*, No. 18-5305 (DRH)(SIL), 2021 WL 21532 (E.D.N.Y. Jan. 4, 2021). Courts also routinely grant Plaintiff's request "that the court require defendant to delete and permanently remove the digital media files and copies relating to plaintiff's copyrighted works from each computer and device under defendant's possession, custody, or control." *See*, *e.g.*, *Strike 3 Holdings, LLC v. Rollins*, No. 20-0954 (AJT)(JFA), 2021 WL 5872073, at *5 (E.D. Va. Nov. 19, 2021), *report and recommendation adopted*, No. 20-954 (AJT)(JFA), 2021 WL 5865735 (E.D. Va. Dec. 9, 2021).

This case is somewhat unique as Defendant has already "destroyed" data on some of his hard drives. *Supra.* Regardless, at no point has Defendant

suggested that, if he were found liable, he should be able to continue downloading and uploading Strike 3's movies over BitTorrent, or that he should be able to keep copies of the infringed works. A permanent injunction would prevent further uploads of Strike 3's works to other peers in the network. Additionally, an order for Defendant to destroy unauthorized copies would not only prevent him from enjoying the fruits of infringing conduct, but would aid in preventing him from uploading them to others.

## V.    CONCLUSION

Before trial, the Court has an opportunity to substantially narrow the range of disputed issues by granting Strike 3's motion for summary judgment [DE 114] in whole or in part. It lays out much of the evidence described in this brief, and which would be brought to bear at trial. Even if the relief granted was as minor as eliminating John Doe's affirmative defenses, this will aid the fact-finder by eliminating totally unnecessary work by the parties and fact-finder later on.

Additionally, the Court has a major opportunity to facilitate the path of trial by overruling John Doe's exhibits to evidence for trial. John Doe has offered several objections, most notably to the infringed works and their copies, that will groundlessly inhibit their introduction and possibly force

them to be published. In the trial's Third Amended Case Management Order [DE 86], the Court reflected party expectations that a trial will last 3 days. That is an outdated view according to Strike 3. There is no conceivable situation, short of granting Strike 3's motion for summary judgment [DE 114] that will so shorten the likely trial. It would be five days under a best case scenario. Compelling Strike 3 to publish all of the videos, infringing versions and not, will extend the trial by a week.

This is especially absurd because Strike 3 provided Defendant with the official deposit copies of its motion pictures submitted to the United States Copyright Office with its registration (with the applicable title on the file) and the infringing copy, identified by an unalterable hash. Each of these movies, as demonstrated by Ms. Stalzer's declaration, are either identical or substantially similar. John Doe's counsel knows this all too well, but refuses to concede it for some reason. They are not recreations with some overlapping expressive content: they are carbon copies of the original work. Any adult can look at Plaintiff's motion picture and the corresponding infringing copy and determine they are identical. Defendant has had months and a multitude of experts to review these files and has not demonstrated that one copy of the movie does not match the other.

Because there are 36 movies at issue, averaging 45 minutes each, this would cause the Court and parties approximately an additional 27 hours of trial time.[10] There is absolutely no need to add these extra days to trial when Defendant can stipulate and has no evidence of any actual factual dispute between the infringing copy and Plaintiff's motion picture. This appears to be one facet of a potential violation of 28 U.S.C. §1927.

Finally, unfortunately, the parties have continued to argue about the verdict form after its submission. While the undersigned is optimistic that the parties will be able to resolve this matter, he would be more optimistic if the Court held a status hearing to discuss the issues.

In the end, regardless of the foregoing, Strike 3 is ready for trial and it looks forward to vindicating itself in front of a jury.

Dated: December 20, 2022              Respectfully submitted,

                                      /s/ Christian W. Waugh
                                      Christian W. Waugh [FBN 71093]
                                      WAUGH GRANT PLLC
                                      201 E. Pine Street, Suite 315
                                      Orlando, FL 32801
                                      Email: cwaugh@waughgrant.com
                                      Telephone: 321-800-6008

---

[10] Plaintiff estimates that the average length of time of each movie is 45 minutes. Multiplying that by 36, and then again by 2 (to factor in the infringing copy

Fax:   844-206-0245

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2022, a true and correct copy of the following documents was served on Defendant's counsel by email via CM/ECF.

/s/ Christian W. Waugh